## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

MARCAS, L.L.C.               )
                                      )

     **Plaintiff,**           )
                                        )

       **v.**                 )        **Civil Action No. WGC-07-196**
                                        )

**BOARD OF COUNTY COMMISSIONERS** )
**OF ST. MARY'S COUNTY**         )
                                        )

     **Defendant.**         )
_____)

## MEMORANDUM OPINION

Plaintiff Marcas, L.L.C. ("Marcas") brought this action against Defendant Board of County Commissioners of St. Mary's County ("the County") alleging violations of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, *et seq.*, ("SWDA") as amended by the Resource Conservation and Recovery Act ("RCRA"[1]), and various tort causes of action under Maryland law stemming from the releases of hazardous substances and other pollutants from a landfill operated by the County onto Marcas' property. The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* Document No. 46.[2] This case was subsequently referred to the undersigned. *See* Document No. 98. Pending and ready for

---

[1] As Marcas acknowledges in its Memorandum in Support of its Motion for Partial Summary Judgment, RCRA is part of, and is also known as SWDA. Throughout its Second Amended Complaint Marcas refers to "SWDA." "Because relevant case law more frequently refers to RCRA, Marcas will refer to that statute throughout this brief in its discussion of its claim for relief. . . ." Pl.'s Mem. Supp. Mot. Partial Summ. J. at 2 n.1. The Court will likewise refer to the statute as RCRA, not SWDA.

[2] On October 2, 2009 Magistrate Judge Day certified two questions of law to the Court of Appeals of Maryland and stayed all further proceedings. *See* Document No. 97. On October 25, 2010 this Court received the Mandate of the Court of Appeals of Maryland answering the questions of law. *See* Document No. 99.

resolution are the County's Motion for Partial Summary Judgment (Document No. 68) and Marcas' Motion for Partial Summary Judgment (Document No. 76). No hearing is deemed necessary and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2011).

## <u>BACKGROUND</u>

Marcas is a limited liability corporation, formed under the laws of Maryland and doing business in Maryland. Second Am. Compl. ¶ 6. Marcas owns property consisting of about 227 acres of land, located in California, Maryland, designated as Parcel 455 on St. Mary's County Tax Map 34. *Id.* ¶ 8. Cazimir Szlendak acquired the Property in 1978. *Id.* ¶ 9. On April 10, 1998 Marcas acquired the Property from Cazimir Szlendak, who directly or indirectly has an interest in Marcas.

The Marcas property is adjacent to St. Andrew's Landfill ("St. Andrew's Landfill" or "the Landfill"), which lies to the south and southwest of the Marcas property. The County "began purchasing land for St. Andrews Landfill in 1971 and completed land acquisition in 1984, for a total site area of approximately 270 acres. The Landfill includes four sanitary waste disposal cells (Cells 1- 4) and one rubble disposal cell (Cell 5)." *Id.* ¶ 22; Answer ¶ 22. The County owns and operates[3] the Landfill. The County discontinued waste disposal in Cells 1, 2 and 4 in November 1997 and discontinued waste disposal in Cell 3 in February 1999. In June 2001 the disposal of rubble was discontinued. Second Am. Compl. ¶ 25; Answer ¶ 25.

---

[3] "To the extent paragraph 24 of the Second Amended Complaint is using the terms 'owner' or 'operator' as terms of law under CERCLA, St. Mary's states that the allegations of paragraph 24 are allegations of law to which no response is required. To the extent that the terms 'owner' and 'operator' are being used within their everyday meaning, St. Mary's admits that it is the owner of the Landfill and that County employees work at the Landfill." Answer ¶ 24.

The County has tested the groundwater around the Landfill for many years. Beginning in 1994, on some occasions, "tetrachlorathene[4]" and vinyl chloride[5], a known human carcinogen, were detected exceeding maximum allowable contaminant levels in a monitoring well (W-4) located approximately 200 feet from the Marcas property. Second Am. Compl. ¶ 27; Answer ¶ 27. Furthermore, in some groundwater monitoring wells of the Landfill at various points in time, volatile organic compounds ("VOCs")[6] exceeding safe drinking water levels were detected. Second Am. Compl. ¶ 26; Answer ¶ 26.

In June of 1996 representatives of Marcas and representatives of St. Mary's County Department of Public Works & Transportation ("DPW&T") met and discussed St. Andrew's Landfill and the County's remediation plan. Second Am. Compl. ¶ 11; Answer ¶ 11.

---

[4] Generally spelled tetrachloroethane or tetrachloroethene.

"Tetrachloroethene is a synthetic, nonflammable liquid. It evaporates easily into the air and has a sharp, sweet odor. Tetrachloroethene is also known as tetrachloroethylene and perchloroethylene or PCE." "Chemicals in Private Drinking Water Wells Fact Sheet," Florida Department of Health, Division of Environmental Health, http://www.doh.state.fl.us/Environment/programs/chemical_fact_sheets/Tetrachlorethylene_FS.pdf (last updated April 2005).

Tetrachloroethane is designated a hazardous substance by the U.S. Environmental Protection Agency ("EPA"). *See* 40 C.F.R. Table 302.4 (List of Hazardous Substances and Reportable Quantities) (2011).

[5] "Most vinyl chloride is used to make polyvinyl chloride (PVC) plastic and vinyl products. Acute (short-term) exposure to high levels of vinyl chloride in air has resulted in central nervous system effects (CNS), such as dizziness, drowsiness, and headaches in humans. Chronic (long-term) exposure to vinyl chloride through inhalation and oral exposure in humans has resulted in liver damage. Cancer is a major concern from exposure to vinyl chloride via inhalation, as vinyl chloride exposure has been shown to increase the risk of a rare form of liver cancer in humans. EPA has classified vinyl chloride as a Group A, human carcinogen."
"Vinyl Chloride," Technology Transfer Network Air Toxics Web Site, US EPA, http://www.epa.gov/ttnatw01/hlthef/vinylchl.html (last updated January 2000).

[6] "Volatile organic compounds (VOCs) are emitted as gases from certain solids or liquids. VOCs include a variety of chemicals, some of which may have short- and long-term adverse health effects. Concentrations of many VOCs are consistently higher indoors (up to ten times higher) than outdoors. VOCs are emitted by a wide array of products numbering in the thousands. Examples include: paints and lacquers, paint strippers, cleaning supplies, pesticides, building materials and furnishings, office equipment such as copiers and printers, correction fluids and carbonless copy paper, graphics and craft materials including glues and adhesives, permanent markers, and photographic solutions."
"Volatile Organic Compounds," Indoor Air Quality, US EPA, http://www.epa.gov/iaq/voc.html (last visited Sept. 24, 2011).

Subsequent to this meeting, in November 1996, a related entity of Marcas, Porto Bello Development, Inc., applied to the County to have the Property rezoned as a Planned Unit Development ("PUD"), to be known as First Colony Planned Unit Development or First Colony PUD. Second Am. Compl. ¶ 12. Subject to certain terms and conditions, on October 27, 1997, the St. Mary's County Planning Commission approved the application. *Id.* ¶ 12. The County approved the rezoning and creation of the First Colony PUD, by Ordinance Z98-03, on June 9, 1998. *Id.* ¶ 13; Answer ¶ 13.

In 1999 the Maryland Department of the Environment ("MDE") inspected the Landfill and found evidence of several leachate[7] seeps flowing from the Landfill to adjacent waters. Second Am. Compl. ¶ 33; Answer ¶ 33. "As a result of its inspections of the Landfill, MDE issued a site complaint to St. Mary's County, ordering the [County] to contain and collect leachate seeps to prevent further discharges." Second Am. Compl. ¶ 35. *See* Answer ¶ 35.

At some point before June 18, 2001 the County contracted with GCI Environmental Services ("GCI"). Nine landfill gas monitoring probes were installed around the perimeter of the Landfill by GCI. In a July 26, 2001 Memorandum to File, Richard Tarr ("Mr. Tarr"), Solid Waste Manager, St. Mary's County DPW&T, summarized recent events regarding landfill gas monitoring, stating in pertinent part,

> On July 23, 2001, GCI Environmental Services began the installation of nine (9) landfill gas monitoring probes around the perimeter of the St. Andrews Landfill property. The locations of the probes can be found [in] the "Environmental Monitoring Plan," which was approved by the Maryland Department of the Environment (MDE) on July 3, 2000. On June 18, 2001, GCI Environmental Services requested the relocation of three probes and was subsequently approved by the MDE on July 20, 2001. On July 26, 2001, Mr. Steve Brown of GCI Environmental Services notified me that the installation of the nine probes were complete

---

[7] "[A] solution resulting from leaching, as of soluble constituents from soil, landfill, etc., by downward percolating groundwater[.]" Webster's New Universal Unabridged Dictionary 1092 (1996).

and reported the following preliminary sampling results as the percentage of gas below the Lower Explosive Limit (LEL): GW-1, 100%; GW-2[,] 100%; GW-3, 8%; GW-4, 100%; GW-5, 0%; GW-6, 0%; GW-7, 0%; GW-8, 0% & GW-9, 100%. These sampling results were acquired directly after the probes were installed.

I contacted MDE and left a message with Mr. Edward Dexter of the Solid Waste Program requesting he contact my office immediately. In addition, I have contacted the St. Mary's County Health Department, Environmental Division requesting they sample the three buildings as outlined in the Plan mentioned above.

Def.'s Reply, Ex. 4 at 2 (Mem. from Tarr to File of 7/26/01).

On August 1, 2001 Mr. Tarr wrote a two page letter to Mr. Dexter stating in the final three paragraphs,

On July 26, 2001, Mr. Steve Brown of GCI Environmental Services notified this office that installation of the wells was complete and had the following results to report as percent Lower Explosive Limit (%LEL): GW-1, 100%; GW-2, 100%; GW-3, 8%; GW-4, 100%; GW-5 0%; GW-6, 0%; GW-7, 0%; GW-8, 0% & GW-9, 100%. The results were acquired directly after the wells were installed. I contacted your office on July 26, 2001 and left a message requesting you contact this office immediately. In accordance with 40 CFR 258.23(c)(2), a memorandum was placed in the operating record on July 26, 2001, which included the above mentioned results and steps taken to protect human health.

On July 27, 2001, we spoke regarding the findings and all regulatory requirements that must be fulfilled. In addition, Mr. Brown returned to re-sample the wells and the three buildings as identified in the above-mentioned plan. The following results were reported as %LEL: GW-1, 100%; GW-2 80%; GW-3, 16%; GW-4, 16%; GW-5, 0%; GW-6, 0%; GW-7, 0%; GW-8, 100%; GW-9, 0%; and three buildings, 0%. As you can see, the results remained the same for GW-1, 5, 6 & 7, increased for GW-3 & 8 and decreased for GW-2, 4 & 9. Upon review of the data, I discussed with Mr. Brown any circumstances causing such drastic differences, such as proper calibration of the instrument, past and present weather conditions and sampling techniques.

This Department is requesting a meeting with your agency, Mr. Brown, and Mr. Louis Shaw (Maryland Environmental Service) to discuss the findings and the recently revised landfill gas system which was approved by your agency on July 20, 2001 and how each subject relates to any action St. Mary's County may implement to fulfill all federal and state regulatory requirements. This discussion should fulfill the requirements in implementing a remediation plan within 60 days of detection as outlined in 40 CFR 258.23 (c)(3). In the interim, if you should have any questions, please do not hesitate to contact myself. We appreciate your on-going support of our operations.

*Id.*, Ex. 5 at 2-3 (Letter from Tarr to Dexter of 8/1/01 at 1-2).

On September 7, 2001 Mr. Tarr sent an e-mail to multiple recipients summarizing the St. Mary's County Landfill Gas Monitoring Status Meeting of September 6, 2001.

The following summarizes the meeting held at the Maryland Department of the Environment (MDE) on 9/6/01 with Ed Carlson and Brian Coblentz from the MDE, Les Shaw and William Chica from the Maryland Environmental Service (MES) and Richard Tarr from St. Mary's County. The recent installation (July 2001) of nine (9) landfill gas monitoring wells around the perimeter of the St. Andrews Landfill and subsequent sampling of same prompted a discussion with the above mentioned in order to further evaluate the current findings and outline a plan for the near future. The following items were agreed upon by all parties based on the discussion:

1. Continue to monitor the nine landfill gas monitoring wells for %LEL as required by Federal and State Regulations on a monthly basis to determine if the recently placed landfill cover and passive landfill gas extraction system has any effect on subsurface migration of landfill gas originating from Cells 1, 2 & 4. This monitoring will continue for 6 months and a follow-up meeting will be conducted with MDE to discuss such findings.

2. Collect one air sample from gas wells 8 & 9 to determine chemical makeup which resulted in elevated %LEL readings. This sampling will be conducted during the upcoming groundwater sampling event or during the subsequent quarterly gas well sampling event to be conducted by GCI Environmental, Inc.

*               *               *

> Lastly, MDE will include recommendations above in their correspondence to St. Mary's upon review of the September – October 01 Sampling and Analysis Report. St. Mary's County is requesting a meeting with the above parties to discuss the six months of data collection to further evaluate future monitoring/remedial action initiatives.

*Id.*, Ex. 6 (E-mail from Tarr to Chica of 9/7/01).

By the middle of 2002 there was some concern about gas migrating from the Landfill to properties nearby. George A. Erichsen, Director, St. Mary's County DPW&T, proposed a solution to this potential problem in a May 23, 2002 letter to Edward M. Dexter of MDE.

> As a follow up to our prior correspondences, this Department is requesting formal approval for the usage of mini-blowers at each of the landfill gas vent flares located on Cells 1 through 5 (St. Andrews Landfill – Area B). This particular active gas recovery system alternative is not intended to replace the previously approved active gas recovery system, but rather a supplemental alternative, at a significantly reduced cost for this particular rural application.

> *                    *                    *

> The mini-blower specifications appear to be compatible with the existing gas vent flares from a construction, operational and performance standpoint. In addition, the mini-blowers will facilitate the extraction of landfill gas from the landfill at a more uniform rate, thus minimizing the potential for offsite landfill gas migration. . . .

> We trust you are in agreement with the above and look forward to your positive response. We appreciate your on-going and comprehensive support of our solid waste issues. In the interim, if you should have any questions, please do not hesitate to contact either myself, or Mr. Tarr.

*Id.*, Ex. 7 at 2 (Letter from Erichsen to Dexter of 5/23/02).

Two weeks later Mr. Dexter approved Mr. Erichsen's request.

> This is in reference to your request for formal approval for the usage of mini-blowers at each of the landfill gas vent flares located on Cells 1 through 5 at the St. Andrews Landfill located in

California, St. Mary's County.  We note that the Air and Radiation Management Administration (ARMA) has determined that this will not require a change to their permit.  Therefore, this request is approved with the following comments:

- Your evaluation that the mini-blower specifications appear to be compatible with the existing gas vent flares from a construction, operational, and performance standpoint is noted.  However, on page 1 of 4 on CF-5 Vent Flare specifications, it is indicated that the flares combust flammable gases at low ambient pressure without need for blowers or external power.  Please ensure that the blowers do not exceed the maximum flow rate of the flares.  If the flares cannot be maintained in an acceptably functional state, larger flares or another acceptable engineering solution will be required.

- We acknowledge that the blowers will facilitate the extraction of landfill gas at a higher and more uniform rate.  This will help to reduce the offsite migration of landfill gas, and is an approved remedial measure.

   Please notify us when the blowers are to be installed.

*Id.*, Ex. 8 (Letter from Dexter to Erichsen of 6/6/02).

On December 31, 2002 Janet A. Parks of St. Mary's County, Department of Facilities Management, sent the following letter to Caz Szlendak, Marcas L.L.C., stating in pertinent part,

   The subsurface testing and monitoring plan for the St. Andrew's Landfill has been submitted and approved by the State of Maryland.  A copy of the plan in enclosed for your use.

   I have also enclosed a copy of the right of entry document I previously sent you for review.  Please sign and have notarized the right of entry agreement and return to this office.

*Id.*, Ex. 65 at 2 (Letter from Parks to Szlendak of 12/31/02).

On May 30, 2003 Patrick Kelly, a geologist with the Maryland Environmental Service ("MES"), submitted to Mr. Tarr a Landfill Gas Management Plan for St. Andrew's Landfill.  The purpose of MES's plan "is to augment the existing environmental monitoring plan for the St. Andrew's landfill developed in February 2002, and address landfill gas management

alternatives." *Id.*, Ex. 9 at 4. As part of its proposed management plan, MES intended to have a geologic study performed to determine the extent of landfill gas migrating off the site. If the study shows off-site migration is occurring, MES listed the additional steps which would need to be taken to quantify and mitigate the gas migration.

> If off-site migration of landfill gas proves to be a continuing problem after the corrective action efforts of cell capping and additional active gas removal flares, the addition of an active collection system may be considered between the landfill cells and the property line to prevent off-site migration of landfill gases from the cells. This would require the delineation of the gas plume for placement of extraction gas wells to intercept the migration of gas from the landfill. Vacuum levels will have to be determined to achieve an optimum gas removal rate.

*Id.*, Ex. 9 at 5.

On July 21, 2003, Mr. Szlendak, on behalf of Marcas, signed and had notarized the Right-of-Entry Agreement. *See id.*, Ex. 25 at 2-3; Pl.'s Mem., Ex. 65 at 3-4. On September 11, 2003 Mr. Tarr addressed a letter to Mr. Dexter and enclosed a copy of MES's Landfill Gas Management Plan for St. Andrew's Landfill. Mr. Tarr also made a reference to the Right-of-Entry Agreements, stating in pertinent part,

> This Department recently acquired the majority of necessary Right-of-Entry Agreements to perform off-site landfill gas sampling on neighboring properties adjacent to the St. Andrews Landfill. A number of adjacent landowners have been non-responsive to the request, and we feel it is prudent to move forward with the field work in a timely fashion. Field work is tentatively scheduled for October 2003 and we invite your staff to be present. Based on results of the field work, a meeting will be requested with your Department to discuss the findings and determine the appropriate plan of action; and the Management Plan will be revised accordingly, as may be required.

*Id.*, Ex. 9 at 2 (Letter from Tarr to Dexter of 9/11/03).

Several months later, on January 15, 2004, Mr. Tarr sent another letter to Mr. Dexter. The letter concerned, among other things, the Landfill Gas Investigation at St. Andrew's Landfill.

> As you are aware, field work for the St. Andrews landfill gas investigation beyond the property boundary began on November 13, 2003 and the majority of the work around the eastern portion of the property was completed at that time. The results from the work were reported to Mr. Ed Carlson on November 14, 2003 and he was satisfied with same. Field work to complete the investigation began January 14, 2004 and was complete this date. Please find attached a copy of the preliminary investigative results, a final report will be provided by GCI Environmental Services in the near future.
>
> As depicted, landfill gas has migrated beyond the property boundary along the eastern boundary of the St. Andrews Landfill, Cells 1, 2 and 4. In addition, landfill gas was detected (Sample ID#27) along the northern portion of the County property near Gas Well #8 at the property boundary. As a result, this Department sampled the crawl spaces of the nearest two (2) residences and no landfill gas was present. This Department has instructed GCI Environmental Services to return to the site next week to expand the investigation, namely around the residence adjacent to the positive reading. Also, Gas Wells 8 & 9 were sampled to determine if the combustible gas present is methane and/or volatile organic compound(s). Once the results are available, a copy will be forwarded to your Department.
>
> Consistent with our meeting held on November 4, 2003, the Maryland Environmental Service (MES) will revise the existing landfill gas management plan based on this investigation and include the recommended remedial action within 30 days. This revised plan is intended to replace the plan previously submitted to your Department on September 11, 2003. Once the gas control/remediation approach has been selected by the County, a public information meeting will be scheduled to inform the community of the landfill gas situation and the selected control measures.

*Id.*, Ex. 24 at 2 (Letter from Tarr to Dexter of 1/15/24).

Less than 10 days later, on January 23, 2004, George Erichsen, Director, St. Mary's

DPW&T, addressed a letter to Mr. Szlendak, Marcas L.L.C., stating,

> This Department annually conducts environmental sampling and analysis at the St. Andrews Sanitary Landfill as per Federal and State requirements. On January 22, 2004, the Department concluded its annual sampling event, which included an investigation to determine the possibility of landfill gas migrating from the landfill and the extent of same.
>
> Based on preliminary findings on the County property and samples taken on [Tax Map 34 Parcel 455 the Marcas' Property], landfill gas has migrated approximately 200' beyond the County property boundary. The samples with positive results are not uniform around the landfill and suggest isolated areas will require some sort of remedial action in order to prevent any further landfill gas migration from occurring in the future.
>
> We continue to work with the Maryland Department of the Environment; and if a remedial action is implemented, you will be notified accordingly. Lastly, we may need to perform additional sampling beyond our property boundary in accordance with the provisions of the Right-of-Entry Agreement forwarded to you previously by the County's Real Property Manager, Joyce R. Malone. If a remedial action is required, the provisions in the Right-of-Entry Agreement may need to be revisited accordingly.
>
> We will continue with the annual environmental sampling and analysis as required to ensure the health and safety of the community and we apologize for any inconvenience the testing may have caused. We thank you for your continued cooperation.

*Id.*, Ex. 26 at 2 (Letter from Erichsen to Szlendak of 1/23/04); Ex. 46 at 2 (Letter from Erichsen to Szlendak of 1/23/04).

Mr. Szlendak claims he did not receive the January 23, 2004 letter from Mr. Erichsen.

Second Am. Compl. ¶ 64.

On April 30, 2004 GCI submitted a written report to Mr. Tarr about the Soil Gas Survey

conducted November 13-14, 2003, January 14-15, 2004 and January 22, 2004 with regard to St.

Andrew's Landfill. GCI summarized the data stating in pertinent part,

The highest landfill gas concentrations were measured at SG-4, SG-13, SG-14, SG-16 and SG-27. These relatively high concentrations ranged from 8% by volume methane at SG-4 to 68% by volume methane at SG-16. All of these monitoring points are located northeast of the waste disposal except for SG-27, which is located along the northwest boundary of the County property.

The property boundary northeast of the waste disposal area that divides the County property and Parcel No. 455 [Marcas] traversed a heavily wooded area and was not marked in the field so it is not clear if the soil gas monitoring locations, SG-4, SG-13, SG-14 and SG-16 are located on County property or on Parcel No. 455. These locations were assumed to be just over the County property line on Parcel No. 455 based on field measurements.

*                        *                        *

The soil gas monitoring locations, SG-8, -9, -10 and -11, are located east of the waste disposal area on private property on Parcel 455. These locations are approximately 200-ft beyond the gas monitoring wells, GW-3 and GW-4. Quarterly gas readings measured at GW-3 and GW-4 in March 2004 ranged from 44% by volume methane to 54% by volume methane.

In summary, based on the soil gas data obtained during this survey the landfill gas concentrations measured along the property line northeast and east of the waste disposal area are above regulatory criteria and have migrated onto private property to a limited extent. The elevated landfill gas concentrations measured at GW-3 and GW-4 during the quarterly gas monitoring events does not appear to be migrating onto Parcel 455.

Pl.'s Mem. Supp. Mot. Partial Summ. J. ("Pl.'s Mem."), Ex. 20 at 3 (Letter from GCI to Tarr of 4/30/04 at 2).

On August 11, 2004 Marcas, as the seller, and Lincoln Property Company Southwest, Inc. ("Lincoln"), as the buyer, executed a Lot Purchase Contract whereby Marcas agreed to sell and Lincoln agreed to buy certain residential building lots (POD 2 and POD 3) in the First Colony Planned Unit Development. Lincoln intended to construct new homes for the U.S. Navy. *Id.*, Ex. 21; Def.'s Reply, Ex. 50.

According to Marcas, the January 23, 2004 letter from Mr. Erichsen and addressed to Mr. Szlendak was discovered in the files maintained by St. Mary's County DPW&T on September 8, 2004. Second Am. Compl. ¶ 64. In the following memorandum Mr. Tarr, Solid Waste Manager, acknowledged having contact with a Marcas representative in September 2004.

> This Memorandum serves as an update to the file regarding the St. Andrews Landfill Environmental Sampling and the possibility of residential units being constructed adjacent to same at the First Colony property(s). Attached are copies of transmittals to the referenced agency requesting information on the landfill and the status of the environmental sampling conducted to date. Mr. Chuck Miller of PF Summers, Inc. requested the information mentioned above as part of an environmental assessment for the First Colony Subdivision. Upon review of the information provided on September 9, 2004, Mr. Miller visited this Department . . . In addition, Mr. Miller requested a brief overview of the data, prior investigations, status of the landfill operation, any future remedial action(s) which may be necessary as per Federal and State Regulations and the current closure project.
>
> Mr. Miller was provided a brief overview of the information requested and was informed that all actions performed to date have been in accordance with Federal and State Regulations and concurrence from the Maryland Department of the Environment. Mr. Miller was satisfied with the information provided, current status of the sampling protocol and the possible future remedial actions required to address environmental requirements.

Def.'s Reply, Ex. 15 at 2 (Mem. from Tarr to File of 9/10/04). Mr. Tarr provided courtesy copies of this memorandum to file to Mr. Erichsen, Director of St. Mary's County DPW&T and to the Deputy Director, John J. Groeger.

Having learned about Mr. Erichsen's January 23, 2004 letter in September of 2004, Marcas "commissioned ARCADIS G&M, Inc. to investigate the potential environmental impacts to the Property resulting from [the County's] Landfill." Second Am. Compl. ¶ 68. Meanwhile,

Mr. Erichsen wrote a memorandum to George G. Forrest, County Administrator, regarding the

Szlendak Meeting/First Colony and landfill related matters, stating in pertinent part,

> As you are aware, yesterday there was a meeting at Land Use & Growth Management on the above-referenced matter. In addition, on September 29, 2004 there is a follow-up meeting with Mr. Szlendak and Paul Summers to walk the subject properties and explain our operations further. Of particular interest may be the following items, which have also been attached for ease of reference.

- Our January 23, 2004 coordination letter with Mr. Szlendak advising him of the results of gas migration beyond the St. Andrews Landfill boundary line.

- Our May 10, 2004 formal letter to the MDE submitting the Fall 2003 Semi-Annual Gas Monitoring Report for their review.

- The MDE's June 24, 2004 approval of our remediation plan addressing the off-site gas migration after review by the Maryland Environmental Service.

  \*                              \*                              \*

- We met with P.F. Summers' representative, Mr. Chuck Miller, on September 9, 2004 and transmitted information both that day and the following day as evidenced by the attached transmittals.

- Landfill gas also can result [in] elevated readings in our groundwater monitoring wells. The County is installing eleven (11) blowers and gas flares in conjunction with the closure project, which is almost completed. The remediation trenches approved by the State will address the gas and groundwater monitoring results. In fact, the trenches may also be flared to avoid any odor-related side complaints near residential properties.

- Apparently P.F. Summers has conducted portions of a Phase I environmental study as a part of marketing the development of a portion of First Colony as residential Navy housing. He advised that he would forward the results to us in the future.

Def.'s Reply, Ex. 27 at 3 (Mem. from Erichsen to Forrest of 9/29/04 at 2).

That same day Mr. Tarr wrote the following memorandum to file.

This memorandum serves as a follow-up to the attached 9/29/04 memorandum to the County Administrator regarding the St. Andrews Landfill Environmental Sampling. On this date, a meeting was conducted and the following individuals were present: Mr. John Groeger, Deputy Director; Mr. Caz Szlendak, Porto Bello Development Company, Inc.; Mr. Paul Summers, PF Summers, Inc. and myself. The meeting was requested by Mr. Szlendak as a follow-up to the 9/28/04 meeting held at the Department of Land Use and Growth Management.

A brief overview of the information contained in the Landfill Gas Remediation Plan, prepared by the Maryland Environmental Service and approved by the Maryland Department of the Environment (MDE), was provided to Mr. Szlendak and Mr. Summers. The primary concern expressed by Mr. Szlendak was the extent of landfill gas migrating from the St. Andrews Landfill and its potential impact on the future development of residential dwellings in the PUD at First Colony.

Mr. Szlendak was informed that he will be receiving a revised Right-of-Entry Agreement from the County requesting continued access to his property . . . for the possibility of additional sampling associated with the landfill gas remediation plan, and 3) Access from his property for the construction of a trench system to prevent migration of landfill gas from out property in FY06, with the design in FY05.

*                              *                              *

Lastly, Mr. Szlendak was informed that the MDE has approved all efforts by the County to address the above mentioned issues and any future initiatives will be coordinated with the MDE. Mr. Szlendak requested to be kept aware of any remedial actions associated with his property and this Department agreed to same.

*Id.*, Ex. 27 at 2 (Mem. from Tarr to File of 9/29/04); Pl.'s Mem., Ex. 23 at 2 (Mem. from Tarr to File of 9/29/04).

About one month later, William Roger Truitt, Esquire, counsel for Marcas, sent the following letter to John P. Norris, III, County Attorney, St. Mary's County.

On behalf of my client, Marcas LLC, I would like to thank you and the other St. Mary's County officials who met with me and my client's representatives last Thursday in Leonardtown. I believe the meeting was productive in terms of the information

exchanged and I am hopeful that the County and my client can reach an amicable and timely resolution of the remaining First Colony development issues, including those associated with the St. Andrews Landfill.

At the conclusion of the meeting, Caz Szlendak provided County Administrator George Forrest with a copy of an October, 2003 Phase I Environmental Site Assessment performed by Geo-Technology Associates, Inc. ("GTA") and a January 19, 2004 letter from GTA reporting on the installation and field-screening of five soil-gas monitoring points on a portion of the First Colony PUD known as Settlers Landing, which is just north of the St. Andrews Landfill. This was a portion of the information requested from my client by George Erichsen.

The balance of information requested by Mr. Erichsen is enclosed and consists of a letter and report prepared by Mr. Lawrence Hosmer, a professional engineer with 34 years experience at more than 250 landfills across the country. Mr. Hosmer is a Senior Vice President of ARCADIS G&M, Inc., an international environmental consulting firm. The enclosed materials provide a more detailed version of Mr. Hosmer's evaluation of the St. Andrews Landfill than there was time to present to County officials last Thursday and include specific recommendations with respect to gathering more data and implementing certain remedial measures that will help ensure public safety.

Please note that Mr. Hosmer estimates that implementation of these recommendations by the County will cost in the range of $750,000. When amortized over 20 years at the County's current Maryland Water Quality Financing Administration rate (2.4%), the additional costs to protect future residents of First Colony amounts to approximately $50,000 per year. This compares to approximately $230,000 per year in additional property taxes that I understood the County is being paid by my client for the undeveloped portion of First Colony and to revenue several times that amount that the County will realize once the development is finished. Therefore, the County's prompt completion of a comprehensive remedial investigation of necessary and appropriate remedial measures for the St. Andrews Landfill is in the best financial interests of St. Mary's County.

The owners and developers of First Colony have already incurred more than $4.8 million of extraordinary expenses, including nearly $1.5 million in public water facilities which have

been dedicated to METCOM and provide protection to human health through the drilling of two deep wells into the Patapsco aquifer. A July 29, 2004 letter from Harry Blumenthal to Denis Canavan documenting these expenses is enclosed. It is clear, therefore, that significant off-site response and infrastructure costs have already been invested by the owners and developers of First Colony to assist the County's remediation efforts at the St. Andrews Landfill.

As we discussed at our meeting last Thursday and as detailed in the enclosed materials, very similar circumstances to the St. Andrews Landfill arose in connection with Harford County's Tollgate Landfill about 15 years ago. In that case, ARCADIS helped the County design and install an active landfill gas and groundwater extraction well system within a period of six months to forestall litigation threatened by the developer of adjacent condominiums that were impacted by the landfill. Not only was litigation avoided, but the aggressive engineering approach taken by the County was much less expensive than acquiring a buffer zone that may not have been adequate. Thanks to ARCADIS's design and the County's proactive approach, the Tollgate Landfill and its condominium neighbors co-exist today without any reported problems.

Please be aware that I have been advised by my client that Lincoln Properties Company, the contract purchaser for portions of the First Colony property, has just been awarded a contract for U.S. Naval housing. As a result, First Colony will need to make available 240 units for Naval housing between July 2005 and January 2006. Therefore, the environmental issues associated with the St. Andrews Landfill and the remaining development issues need to be resolved promptly.

After you and your client have had an opportunity to review these confidential settlement materials, please call me to discuss how and when the County plans to incorporate them into its remedial design. My client will cooperate with the County in granting access for testing on the First Colony property, with the services of Mr. Hosmer and others at his firm available to assist the County and its consultants in developing and implementing appropriate remedial responses for the St. Andrews Landfill. I look forward to hearing from you within the next 10 days concerning this matter.

Def.'s Reply, Ex. 47 at 2-4 (Letter from Truitt, Esq. to Norris, Esq. of 10/26/04 at 1-3); Pl.'s Mem., Ex. 24 at 2-4 (Letter from Truitt, Esq. to Norris, Esq. of 10/26/04 at 1-3).

The aforementioned report by Mr. Hosmer is dated October 27, 2004 and is addressed to

Mr. Truitt.

ARCADIS G&M, Inc. (ARCADIS) herewith transmits an initial report entitled "Remedial Program Evaluation for St. Andrews Landfill" (SAL), located in St. Mary's County, Maryland. The intent of this report was to review and evaluate basic data available for the site with respect to the potential for environmental releases to neighboring property to the east and northeast (onto Parcel 455 owned by the First Colony development), and to assess the potential exposure of proposed residences in that area to contaminants from the landfill. This situation is not uncommon, particularly in urban areas where development near existing landfills is proceeding. A very similar project at the Tollgate Landfill in Belair, Harford County, Maryland indicates expectation of environmental conditions in such an instance, and provides guidance for a reasonable and safe resolution. At the Tollgate Landfill, a proactive, aggressive landfill gas and leachate management system permitted the development on an adjacent property on an expedited schedule, and has resulted in protection of the public for the ensuing 15 years.

After reviewing the reports available to date regarding SAL, and meeting with St. Mary's County staff, ARCADIS has established the following conclusions and recommendations:

1.    Fill "data gaps": Data gaps have been noted based on the available reports. These data gaps can be resolved by a more comprehensive field investigation to determine . . . landfill gas migration, and geologic conditions in the vicinity of the northeastern boundary of SAL, and extending onto Parcel 455. Specifics with respect to the design and operation of the landfill, as well as the Maryland Environmental Service (MES) recommended design for the remedial system, would aid in refining the remedial program.

2.    Implement an active gas extraction system: An active landfill gas extraction system is recommended along the northeastern boundary of the SAL as a result of methane concentrations exceeding the regulatory limit for methane on property beyond the landfill boundary. Methane, at high levels, is unsafe due to its explosiveness if allowed to accumulate beneath structures. Additionally, VOCs that have been detected in the groundwater and surface water are most likely partitioning into the

subsurface, or migrating coincident with the landfill gas. Although the VOCs may be below maximum contaminant levels in the groundwater, the inhalation pathway may result in adverse health effects in residents at that location.

\*                              \*                              \*

6.    Enhance security:  A security fence should be installed to deter site access along the northeastern boundary. This additional security would reduce the risk of injury as well as maintenance due to lesser accessibility.

Before a final remedy can be implemented that is protective of future residents in the proposed First Colony development, further investigation of the landfill gas . . . on Parcel 455 is warranted. This information will identify risk factors to proceeding with development at this time, and serve as a basis for designing an appropriate mitigation system on the SAL by the County.  At this time, it is recommended that enhancements to the MES proposed remedy are warranted and necessary to protect public health and safety.

Our independent cost evaluation to implement the MES preferred alternative for a passive gas extraction system indicates a projected cost in the range of $170,000 to $200,000.  The additional cost to convert this passive gas extraction system into an active gas extraction system, as perceived by the County, is approximately $60,000.   These costs represent capital costs only, excluding operation, maintenance, and monitoring (O&M) activities which will be required regardless of the system instituted.  An opinion of probable construction cost for implementing a more comprehensive remedy that considers each of the six issues identified above, again excluding O&M, but including . . . an active gas extraction system, and an enclosed central flare will require funding at a level of approximately $750,000 above the MES preferred remedy cost, or a total on the order of $920,000 to $950,000.  The major components of this work would include:

Site preparation and construction support      $80,000

Supplemental cap                                         $220,000

Active gas management system, including trench
and enclosed flare                                         $225,000

\*                              \*                              \*

|                                          |           |
| ---------------------------------------- | --------- |
| Site security                            | $30,000   |
| Design, administration and contingency   | $265,000  |

> We trust this information, discussed in greater detail in the attached report, provides a basis to proceed with further discussions between First Colony and St. Mary's County. If you have any questions concerning the information provided herein, please do not hesitate to contact us.

Def.'s Reply, Ex. 11 at 2-4 (Letter from Hosmer to Truitt, Esq. of 10/27/04 at 1-3).

Meanwhile, on November 8, 2004, Richard N. Rose, Vice President, Lincoln Property Company Southwest, Inc., sent a letter to Mr. Szlendak of Marcas and Mr. Paul Summers of PF Summers Inc. regarding the August 11, 2004 Lot Purchase Contract between Marcas and Lincoln.

> It is my understanding from several conversations with Paul Summers that Marcas, LLC would be willing to provide Lincoln Property Company Southwest, Inc. or its assigns a total of 240 residential lots in its First Colony Development, under similar terms and conditions of the above referenced contract. There would be a minimum of 176 single family detached lots and a combination of 64 duplexes and triplexes.
>
> If you are in agreement with this please sign below and return a copy of this letter to me. Upon receipt, we will then prepare an amendment to document the corrected location of the land. Thank you and we look forward to working with you on this project.

Pl.'s Mem., Ex. 25 at 2 (Letter from Rose to Szlendak & Summers of 11/8/04). Both Mr. Szlendak and Mr. Summers signed and dated the document on November 8, 2004.

On November 15, 2004 a meeting was held involving five officials from the MDE, one individual from GCI, one official from MES and Mr. Tarr of St. Mary's County. Mr. Tarr prepared the meeting minutes.

> St. Andrews Landfill
> Landfill Gas Remediation Update

Proposed County schedule as per correspondence dated October 15, 2004

*The schedule as proposed to construct and install the passive/active trenches was discussed. Currently the system is being designed by the Maryland Environmental Service (MES) and is anticipated to be completed/submitted to the Maryland Department of the Environment (MDE) for review and approval by April 1, 2005; request for bid to construct by July 1, 2005; award/ initiate the project by August 1, 2005 and complete construction by November 30, 2005. At present, the County will proceed with the design and awaits a formal response from MDE regarding the proposed schedule.[8]*

Will additional sampling along the Eastern portion of property, slightly north of previous event based on investigation conducted by Geo-Technology Associates, Inc. as per their report date January 19, 2004, be required by MDE?

*Upon discussion of same, it was agreed that if the First Colony Developer is planning to perform their own investigation and provides same to the County and MDE in the near future, the results will be included in the design consideration for the landfill gas remediation system.*

Should the County convert proposed remediation from passive trenches to active?

*Upon discussion of same, the MDE expressed reservation in requiring the trenches to be active as they were originally approved. They have indicated that by making the trenches active, it may influence the migration of landfill gas from the landfill; thus they will conduct a meeting between their own staff to determine the status of passive v. active in l[i]eu of their previous approval of the remediation plan and if they revise their prior approval, the County will be notified immediately. The MDE recommends, as of this date, constructing the trenches to be active, however only implement same to be passive and if necessary, convert the trenches to an active system. The County advised that the design has begun in accordance with their approval to date.*

---

[8] On the meeting minutes, just above Items of Discussion, Mr. Tarr wrote, "The items below were discussed and subsequent recommendations/conclusion is italicized." Def.'s Reply, Ex. 12 at 3 (November 15, 2004 Meeting Minutes).

Should the County modify the approved existing gas extraction system installed as part of the closure to a single flare for both sides?

*The MDE has expressed an interest in the possible conversion of the landfill gas extraction system atop the landfills to utilize a centralized blower system possibly drawing a greater vacuum. This approach may further minimize the likelihood of gas migration, however, since the trench will be installed, too much oxygen may be introduced into the landfill and create landfill fires in the future which would be nearly impossible to extinguish once sta[r]ted. The County concurs with this observation. The MDE will provide their final recommendation in the near future once they have discussed and agreed upon same with their own staff. The County advised that sufficient time should be allowed to ascertain if the blowers and the planned trench remediation achieves the desired results.*

Def.'s Reply, Ex. 12 at 3-4 (MDE/St. Mary's County Meeting Minutes of 11/15/04 at 2-3).

On December 6, 2004 Mr. Tarr wrote another memorandum to file.

This Memorandum serves as an update to the file regarding the St. Andrews investigations previously performed, under way or planned for the future.

The St. Andrews Landfill continues to be monitored (. . . landfill gas) and the results of same are forwarded to the Maryland Department of the Environment (MDE) for their review and comment. To date, no comments have been received from the MDE regarding the results and based on historical meetings with the MDE, the monitoring has continued and no additional measures have been taken. The continued monitoring of the landfill has been consistent with direction from the MDE and the Director of this Department, Mr. George Erichsen, with no additional work being performed. . . .

Lastly, as of this date, no information has been provided to the County regarding the field investigations being performed by an Environmental Engineering Firm hired by Mr. Caz S[z]lendak for the First Colony property. Mr. Erichsen has provided direction to myself that the County will not perform additional work unless the MDE directs the County to perform same or if Mr. S[z]lendak does not provide the field results; the additional information, if available, will be utilized for the landfill gas remediation design. Mr. Erichsen has directed myself to continue with the schedule to

complete the landfill gas remediation project for the St. Andrews Landfill as proposed and current as of this date, regardless of the possible future development in the near future.

Pl.'s Mem., Ex. 26 at 2 (Mem. from Tarr to File of 12/6/04).

Ms. Hynson of MDE responded to Mr. Tarr's November 17, 2004[9] letter stating in pertinent part,

> This letter is in response to your submittal to the Maryland Department of the Environment (the "Department") dated November 17, 2004, consisting of meeting minutes from the November 15, 2004 joint meeting on St. Andrews Landfill. The meeting was held to discuss the proposed landfill gas remediation plan . . . .
>
> In response to the issues raised at the November 1[5]th meeting as well as your meeting minutes, the Department offers the following comments:
>
> East Side:
>
>> You state that the First Colony developer might be planning to conduct additional gas sampling along the northeastern portion of the property. The Department would accept the results of this sampling. If the developer does not conduct the sampling, the Department recommends that the County conduct additional sampling to determine the extent of gas migration from the landfill.
>
> The Department had previously approved the County's plan to install an active gas trench along the eastern portion of the landfill. Operating an active system beyond the limit of waste could intensify the negative pressure gradient outside the fill. This process could magnify the migration of landfill gas beyond the footprint of the landfill towards the property boundary, which could increase the partitioning of volatile compounds into the groundwater. It is possible that a passive trench might sufficiently reduce the offset gas concentrations. It is therefore recommended that the trench be operated as a passive trench initially, but be constructed so that the trench could be converted to an active trench quickly should subsequent sampling results indicate a more

---

[9] By a cover letter dated November 17, 2004, Mr. Tarr sent the November 15, 2004 Meeting Minutes to Martha Hynson. *See* Def.'s Reply, Ex. 12 at 2 (Letter from Tarr to Hynson of 11/17/04).

> proactive approach is necessary. It is recommended that monthly
> gas monitoring be done from new gas wells to be installed between
> the trench and the new development. Should the sampling results
> indicate that the passive trench was not sufficiently reducing the
> gas concentrations within a three-month period, the County would
> then convert to an active trench.

Def.'s Reply, Ex. 13 at 2 (Letter from Hynson to Tarr of 12/21/04 at 1).

On December 28, 2004 Mr. Hosmer submitted another report to Mr. Truitt, counsel for

Marcas, upon performing an additional site evaluation, stating in pertinent part,

> In response to the meeting with St. Mary's County Government
> (the "County") on October 22, 2004 and our subsequent
> discussions, a preliminary Supplemental Site Evaluation has been
> conducted for Parcel 455 of the First Colony Development in
> California, Maryland. The purpose of this evaluation was to
> confirm and further delineate the findings expressed in the
> document entitled "Remedial Evaluation Program for St. Andrew's
> Landfill, St. Mary's County, Maryland, prepared by ARCADIS
> G&M, Inc. (ARCADIS) and dated October 27, 2004. The
> ARCADIS report consolidated information previously prepared
> for, and made available by St. Mary's County relative to
> environmental conditions at the neighboring St. Andrew's Landfill
> (SAL), which borders Parcel 455 to the southwest and west. The
> data provided included . . . landfill gas monitoring activities at the
> SAL in the vicinity of the property boundary, prepared by GCI
> Environmental Services (GCI), and a subsequent "Landfill Gas
> Remediation Plan for the St. Andrew's Landfill", prepared by the
> Maryland Environmental Service (MES), both under contract to St.
> Mary's County.
>
> A preliminary field investigation program was developed to fill
> "data gaps", as identified in the ARCADIS report, to confirm the
> prior findings to the extent possible, and to extrapolate the
> database into areas of the site and media not previously addressed.
> The focus of this investigation was the two development modules
> on Parcel 455 that are slated for residential and/or mixed
> development in the immediate future, identified as POD 2 and
> POD 3, and the intervening conservation and recreational areas.
> These areas of development bound the SAL to the southwest and
> west. In addition, a site reconnaissance of POD 6 was also
> conducted to identify any evidence of environmental degradation
> that could adversely affect future development. Environmental
> Resources Management, Inc. (ERM) of Annapolis, Maryland

implemented the field program; the results of the data collection effort are presented by ERM in their report entitled "Submittal of Field and Laboratory Data Related to the Investigation of Parcel #455 Near St. Andrews Landfill (SAL), St. Mary's County, Maryland", dated December 20, 2004, a copy of which is attached.

SUMMARY OF FINDINGS

While not exhaustive with respect to data point distribution or comprehensiveness, the Supplemental Site Evaluation program confirmed that landfill gas . . . [has] migrated beyond the limits of the SAL and onto Parcel 455 of the First Colony Development. This finding is consistent with that of GCI, as consultant to St. Mary's County, and as predicted by ARCADIS in their October 27, 2004 report. Further, the current evaluation also included an environmental reconnaissance and preliminary investigations on the interior of POD 2 with respect to the presence of landfill gas to establish the extent of gas migration into that area. . . Limited analytical samples were collected for confirmation purposes. The goal of this data collection effort was . . . to identify a "zero-concentration" line for landfill gas migrating from the SAL onto Parcel 455.

The following specific findings were identified:

- While landfill gas continues to migrate onto Parcel 455, as previously concluded by GCI, the stream valleys are controlling the release and further migration of gas toward the east and north, away from the SAL. These streams, and the alignment of FDR Boulevard (indicated on Figure 1), therefore essentially represent the outer boundary of landfill gas migration observed to-date. The "zero-concentration" line presented on Figure 1 approximates this boundary; it may be observed that the area within the "zero-concentration" line appears, based on the development scheme currently under consideration, to be outside the footprint of residential construction for POD 3, and limited to conservation/recreational area between PODs 2 and 3 as well as along the perimeter of POD 2.

- Landfill gas monitoring in the past has included only the constituent methane, but had not considered other volatile organic compounds (VOC's) similar to those previously identified in the leachate and groundwater releases. The data collected during this investigation confirmed total VOC emissions near the stream valleys, but these VOC levels were not differentiated by compound; it is anticipated that the compounds present in the

leachate and contaminated groundwater will also be represented in the landfill gas.

*                              *                              *

- The SAL property is not secure from unauthorized access at the present time. After development on Parcel 455, access will become more readily available with the close proximity of residences, roadways and commercial establishments. This situation could cause significant potential public safety concerns through exposure to the environmental controls (i.e., open flame flares), mechanical and heavy construction equipment and physical hazards prevalent on the SAL. In addition, seeps, ponded liquids, gaseous emissions and other indications of environmental releases were present on the SAL during the investigations; these would create exposure pathways for humans unless unauthorized access is prevented through security controls (i.e., fencing).

DISCUSSION

The specifics of the data collection effort conducted during this Supplemental Site Evaluation are presented in the ERM report, attached, and are not reiterated herein. In general, these investigations served to independently document the findings presented above. They also serve to validate the conclusions drawn in the ARCADIS report concerning actions appropriate at the facility to assure protection of the public health and safety. All data available from the ERM data summary and the prior investigations by GCI, as consultants to the County, have been utilized in the following analysis.

Landfill Gas

The "zero-concentration" line for landfill gas migration, as determined utilizing a combination of the current data and that obtained previously, is approximately west of FDR Boulevard and generally south of POD 2, with limited indications at the perimeter of POD 2. It appears from the data collected during the Supplemental Site Evaluation that the topographically higher, less eroded areas of the site are overlain with a mantel of fine-grained soil that act as a "cap" where present. In these areas, gas is literally transmitted in the subsurface rather than discharged to the atmosphere since the subsurface soils are more porous and afford a "path of least resistance" to migration. However, near the stream valleys, where erosion has incised the surface fine-grained soils, the groundwater lends to discharge, and the landfill gas is free to

daylight at the surface. This situation was observed along the length of the stream traversing Parcel 455, particularly in the conservation/recreational area north of the recreational area, and to a lesser extent on the southern and western boundaries of POD 2. Along these stream reaches, methane and VOC emissions were observed where they were generally not observed in the higher elevations. However, at least one location in the higher elevations, SG-16, yielded positive landfill gas indications; this was in the vicinity of the highest results obtained previously by GCI, as would be expected.

The data collected at depth by GCI, as well as the several recent shallow locations, indicates that the migration of landfill gas onto Parcel 455 is occurring through the subsurface, with releases to the atmosphere at locations of enhanced permeability in the surface soils. Therefore, where landfill gas has been identified, residential construction with basements or other subsurface structures, as in the recreational area, is not recommended to assure the protection of public safety. This would include the outer perimeter of POD 2 and the entire conservation/recreational area. The interior of POD 2 was only explored with near-surface techniques; therefore, it is not certain, without additional study, whether landfill gas has migrated into this area. The presence of landfill gas at the perimeter of POD 2, and the potential for this gas to migrate upgradient toward the interior suggests that the possibility of gas migrating beneath structures in the interior of POD 2 is likely. Therefore, residential construction with basements in this area is also not recommended given that: 1.) Residences with basements would require mechanical systems to assure that no gas accumulation could occur; and 2.) Homeowner maintenance of such systems is not a reliable solution to mitigating this potential risk. The use of near-surface foundation/slab construction in the interior of POD 2 would not require such systems, and would therefore be protective. PODs 3 and 6 have not yielded any indication of landfill gas migration, and therefore could be constructed with basements.

In general, the release of landfill gas from the SAL onto Parcel 455 must be addressed to protect public safety after development of the parcel occurs, particularly with the placement of structures within close proximity of the property boundary in the recreational area and in POD 2, and to be in compliance with the Code of Maryland Regulations (COMAR) Title 26 (26.04.07.21), which specify that landfill gas in concentrations about 100% of the lower explosive limit (LEL) cannot be released at the property boundary of the landfill, a condition which currently exists at the SAL. As may be

observed on Figure 1, landfill gas levels above the regulatory limit have been identified at distances of up to 250 feet beyond the SAL boundary. Further, the potential composition of the landfill gas, containing VOC constituents, indicates that open flame flares along a remedial trench system along the boundary, as proposed by MES, may not be appropriate. Two issues result from the use of open flares: 1.) The combustion efficiency of an open flare is lower than can be achieved with an enclosed flare, and this greater destruction efficiency may be necessary to contain any emissions from the combustion of non-methanogenic VOCs present in the gas; and, 2.) The flame in an open flare presents a direct public safety issue for potential trespassers on the SAL.

The MES report suggests that an active gas extraction system along the SAL/Parcel 455 boundary is warranted if the property will be developed for residential use. We concur with this position and since such development is proceeding, the MES should be directed to design such a system to intercept landfill gas migrating from SAL toward Parcel 455. The components of such a system should include:

- A cutoff trench which extends to a minimum depth to intercept, and penetrate, the perennial groundwater table elevation along the entire boundary of the SAL/Parcel 455 boundary along an alignment near the toe of the landfill waste as opposed to at the property boundary;

- A relatively impermeable cap (consisting of a minimum of a two-foot thickness of compacted clay) constructed in the area between the exist[ing] landfill cap and exterior limit of the trench to assure capture of the gas for destruction;

- A collection system in the trench connected to a central blower system which removes the gas for destruction at a remote location: i.e., away from the boundary of the landfill;

- Either a central enclosed flare for gas destruction, or demonstration of the combustion and dispersion efficiency of non-methanogenic compounds by an open flare system; and

- Establishment of a long-term landfill gas monitoring network along the interior and exterior of the property boundary to confirm the conformance of the system with the design goals and the COMAR regulations.

It is suggested that such a system could be installed, after proper design, within a period of less than four months, and further, that design and permitting could be affected in less than three months. Therefore, an appropriate system could be installed within 7 months, a period within which residential development of the property could proceed, but during which no residency would be established. This schedule would permit the system to be started-up, balanced and become effective, and would also allow the existing landfill gas in storage in the subsurface on Parcel 455 to dissipate prior to residential use of Parcel 455. As stated in the ARCADIS report, it is anticipated that such a system could be constructed for a total cost of on the order of $690,000, including design, construction oversight and contingency; this amount is approximately $450,000 more than the system projected by the MES, but is also protective of human health and public safety. Given that residences will be located in close proximity to the remedial system and the SAL, public safety must be assured; the recommended system would be more protective from this perspective.

Security

Not only does the SAL represent a potential public health threat through releases to the environment, it can also represent a public safety issue when located in close proximity to a residential development. The SAL will represent an "attractive nuisance" in close proximity to residences, and in particular the active recreational area. The openness of the landfill surface will attract trespassers that could be harmed accidentally on the property. Further, the presence of mechanical equipment, particularly the open flares, could result in accidents, vandalism and liability exposure to St. Mary's County. It is therefore suggested that the boundary be closed to trespassers to the extent possible by the installation of a fence to prevent ready access to the landfill surface by vehicular and pedestrian traffic, and that mechanical equipment be located remote from residential areas and inside locked containments. While it is recognized that complete containment and protection is not possible, the incidental trespasser will be deterred.

Based on providing fencing along the Parcel 455/SAL boundary in the vicinity of the residential development, it is projected that this remedy will require on the order of $50,000 to implement.

POD 6

A site reconnaissance of POD 6 was independently conducted by ERM and the writer to identify any indications of environmental degradation of the property that would preclude immediate development. The indicators include vegetative stress; evidence of prior site disturbance and/or use for residential/commercial/industrial purposes; seeps, springs or discharges with visual indications of potential degradation (i.e., color, odor or residual staining); or atmospheric odors. No such evidence was apparent in the reconnaissance conducted by either party (see the ERM report).

CONCLUSIONS

The migration of landfill gas . . . from the SAL onto Parcel 455, in particular the areas programmed for the development of POD 2 and the conservation/recreational areas, was confirmed through the conduct of this preliminary Supplemental Site Evaluation. . . The nature and extent of the contamination on Parcel 455 is broadly defined by the data collected by ERM in this effort as well as the prior activities of GCI for the County and Geo-Technology Associates, Inc. (GTA) on POD 1.

*Id.*, Ex. 49 at 2-6, 8-9 (Letter from Hosmer to Truitt, Esq. of 12/28/04 at 1-5, 7-8).

Two days later Mr. Truitt, counsel for Marcas, sent the following letter to Mr. Norris, County Attorney for St. Mary's County.

This letter is sent on behalf of my client, Marcas LLC, as a follow-up to my October 26, 2004 letter to you and our subsequent conversations. Enclosed with this letter is a December 23, 2004 Supplemental Site Evaluation performed by J. Lawrence Hosmer, P.E., who was responsible for the preparation of other technical materials I forwarded to you on October 26, 2004. Also enclosed is a December 22, 2004 letter and data submission from Environmental Resources Management ("ERM"), summarizing a field investigation that was performed by ERM between November 17-22, 2004.

The enclosed documents demonstrate that landfill gas . . . from the County's St. Andrew's Landfill has migrated onto my client's property (Parcel 455). The impacted areas include the proposed conservation and recreation areas between PODs 2 and 3. In order to safely develop these areas, Mr. Hosmer has developed a remedial plan which is consistent with the proposal in his October 27, 2004 letter and the accompanying report from ARCADIS

G&M, Inc. that I forwarded to you previously. Based on the recent field work performed by ERM at the direction of Mr. Hosmer, it is anticipated that impacts to my client's property resulting from the St. Andrew's Landfill could be remedied by the County within seven months for approximately $700,000 if initiated early in 2005.

Please be aware that the U.S. Navy and Lincoln Properties, which had agreed to purchase all of the building lots in PODs 2, 3 and 6, now appear to be backing away from PODs 2 and 3 because of the Landfill's impacts. Accordingly, it is extremely important that the County immediately begin to implement the remediation program recommended by Mr. Hosmer so that Marcas LLC does not suffer interference with its contracts, its ability to develop the remainder of the First Colony property and other damages associated with the Landfill.

My client hereby requests a meeting during the first week of January with you and/or County Department of Public Works officials to review Mr. Hosmer's recommendations and to develop a timely implementation plan.

*Id.*, Ex. 48 at 2-3 (Letter from Truitt, Esq. to Norris, Esq. of 12/30/04 at 1-2); Pl.'s Mem., Ex. 27 at 2-3 (Letter from Truitt, Esq. to Norris, Esq. of 12/30/04 at 1-2).

On January 7, 2005 Bill D. McKissick, Jr., Esquire, another attorney representing Marcas, sent the following letter to Denis Canavan, Director, Department of Land Use and Growth Management, St. Mary's County.

My client, Marcas L.L.C, has proposed relocating Residential Development Area #2 as described in the Development Plan for First Colony to that area designated as Mixed Commercial Area #6. This letter addresses whether this change constitutes a "Major Change" or "Minor Change" pursuant to page 13 of the First Colony Development Plan. It is our position that this constitutes a Minor Change.

\*                         \*                         \*

The proposed relocation of the residential use to Mixed Commercial Area #6 will not reduce the open space acreage and will not result in substantive changes in the design standards of roads[,] utilities, water, electricity and drainage. The issue therefore remains as to whether the utilization of Mixed

Commercial Area #6 for residential use constitutes a substantive amendment to the final governing agreements or covenants of the First Colony P.U.D.

Page 32 of the Development Plan provides that in the "Mixed-Use Commercial" the specific permitted land uses and structures include "[a]ll permitted uses in the residential and retail/commercial districts." Accordingly, the Development Plan specifically permits residential development in Mixed Commercial Area #6. The utilization of Mixed Commercial Area #6 for residential development does not constitute a substantive amendment to the final governing agreements or covenants of the First Colony P.U.D.

\*                    \*                    \*

Accordingly, it is our opinion that the proposed used of Mixed Commercial Area #6 for residential development constitutes a Minor Change per page 13 of the Development Plan and will require Planning Commission approval in accordance with the process set forth in the Development Plan.

Def.'s Reply, Ex. 32 at 2, 3 (Letter from McKissick, Esq. to Canavan of 1/7/05 at 1, 2).

That same day, Mr. Erichsen sent the following letter to Mr. Dexter.

This Department is in receipt of your correspondences dated December 17 & 21 2004 regarding [landfill environmental monitoring]. . . .

Attached, please find an environmental investigation report drafted by Environmental Resources Management (ERM) dated December 22, 2004 for the First Colony Property, which resides to the Northeast of the St. Andrews Landfill (Landfill). The investigation was performed by ERM, under contract for Piper Rudnick, LLP, whom is legal counsel for the current offsite property owner/developer. As you are aware, the owner intends to proceed through the local approval process to possibly develop the property for residential purposes and conducted the above investigation as part of a site feasibility analysis. The County was previously informed by the property owner that this investigation would be performed and the results would be made available to the County and Maryland Department of the Environment (MDE) for their review and permanent record. As we advised Ms. Hynson on October 26, 2004, we are transmitting the investigation as received on December 30, 2004.

The legal counsel for the First Colony property owner hired an independent consultant (Hosmer & Hosmer) to review and provide additional comment which is also included. As you will note, the consultant believes that an <u>active</u> gas extraction system adjacent to the toe of the landfill, an impermeable cap/barrier and a collection system of pipes and gravel within the trench be incorporated into the collection trench to assure proper capture of the gas, a central enclosed flare or demonstration of the combustion efficiency of an open flare system and a gas monitoring system network to confirm conformance as required should be implemented. Based on your December 21, 2004 correspondence, you recommend the installation of a passive system, which can be quickly converted to an active system, if subsequent sampling indicates additional measures are required. With respect to the possible construction of homes on the adjacent site, we provided the developer's representative, Mr. P.F. Summers, a copy of the attached Gas Monitor that he agreed to utilize as a part of home construction. The County is currently considering whether to allow development of the affected areas without a Waiver and Estoppel Certificate. The recommendations of Hosmer & Hosmer appear not to be supported even by ERM's study, but we will need your concurrence prior to directing our consultant on how to proceed with design changes you deem appropriate.

This Department has contracted with the MES to provide the necessary design drawings to install the gas recovery system in order to address the presence of methane. In addition, on December 10, 2004, this Department met with the MES to discuss and conduct a field reconnaissance of the site for MES to acquire the necessary information to complete the design. The MES was instructed to design the system as directed by MDE, that is, to allow easy conversion from a passive to active system, if necessary.

\*                              \*                              \*

Hosmer & Hosmer recommends the installation of a perimeter fence or barricade around the landfill to prevent the possibility of trespassers entering the property. The County is currently evaluating its obligations and authority to factor the gas migration into the zoning and planning approval process, including the possibility of restricting certain areas from residential development and/or conditional approval, which requires homes to

be constructed with certain protective features such as gas monitors.

The gas recovery system is planned to be installed in accordance with the previously submitted timeline to your Department on November 4, 2004 (see below) which was also shared with the property owner's representative on December 30, 2004.

*Design to MDE for review and approval* – **April 1, 2005**
*Request for Bid (Advertisement) to Construct* – **July 1, 2005**
*Award/Initiate Construction Contract* – **August 1, 2005**
*Complete Construction* – **November 30, 2005**

As mentioned in your December 21, 2004 correspondence, methane has been found off-site, west of the Landfill. The current remediation plan previously approved by your Department recommends an active gas recovery system, however your recent correspondence recommends a passive system unless directed otherwise after review of the attached information provided by the offsite owner. Therefore, the system will be designed, installed and initially operated as a passive system and, if necessary, quickly converted to an active system based on your review of subsequent sampling events which you indicated would occur over "several months". Monitoring probes will be permanently installed up gradient and down gradient of the recovery system to monitor the effectiveness of the system.

The gas recovery system proposed nearest the onsite buildings associated with this Department will be relocated and placed adjacent to the old landfill. The relocation of the system will facilitate the capture of gas, eliminate any possible offsite migration and address the recent isolated issue of gas entering the Recreation & Parks Office. Again, permanent monitoring probes will be installed in the vicinity of the recovery system to ensure the proper capture of the gas. As you are aware, quarterly sampling for the presence of gas is conducted in the Scale House, Recreation & Parks Office and Transportation Shop. Based on the recent findings in the Recreation & Parks Office, continuous gas monitors (see attached) are being installed in the previously mentioned buildings to continuously sample the atmosphere.

This Department concurs with your recommendation to continue utilizing the existing gas extraction system atop the Landfill and monitor same periodically to ensure proper operation,

> particularly after the installation of the perimeter gas recovery
> system.

*Id.*, Ex. 51 at 2-3 (Letter from Erichsen to Dexter of 1/7/05 at 1-2); Pl.'s Mem., Ex. 28 at 2-3 (Letter from Erichsen to Dexter of 1/7/05 at 1-2).

On January 10, 2005 Mr. Norris, County Attorney sent the following letter to Mr. Truitt, counsel for Marcas.

> This letter responds to your letter dated December 30, 2004 regarding the impacts of St. Andrews Landfill gas migration to property owned by Marcas LLC (Parcel 455). While the County appreciates the efforts of your client to provide guidance and advice on the development of a remedial plan for the migrating landfill gas, your client must understand that the approach the County selects will be made in accordance with the procedures it has in place and based on the evaluation and advice of its consultants. That is not to say that the County will ignore the suggestions of ERM or Mr. Hosmer. In its decision-making, the County will take all suggestions and advice into account.
>
> In response to your assertion regarding potential damage suffered by Marcas, LLC, I would counter that your client assumed the risk of those damages long ago. Specifically you refer to "interference with its contracts, its ability to develop the remainder of the First Colony property and other damages associated with the landfill." No such damages could be attributed to the County based on the facts and applicable law. Marcas LLC acquired Parcel 455 on May 8, 1998 with full knowledge of the presence of St. Andrews Landfill, its potential to generate landfill gas and the potential for the gas to migrate to adjacent properties. The County began negotiating an access agreement with First Colony/Marcas LLC in 2000, if not earlier, for the purpose of installing and constructing groundwater monitoring wells on Parcel 455. The negotiations resulted in the Right of Entry Agreement, dated August 5, 2003, by and between the County and Marcas LLC. Typical of landfill closures, the issue of migrating landfill gas has been a focus of the landfill closure efforts. In closing the Landfill, the County has followed and complied with the landfill closure process governed by state and federal solid waste laws and regulations and overseen by the Maryland Department of the Environment ("MDE") and the landfill closure process has been conducted openly and publicly. Your client has had full access to public notices and public information hearings held in accordance with the law and regulations.

In light of these facts, Marcas LLC entered into the contracts with U.S. Navy and Lincoln Properties with full knowledge that the landfill gases were likely migrating from the St. Andrews Landfill onto and under Parcel 455. Also, since final zoning and planning approvals have not yet been issued, no property rights have vested related to your client's future development plans. In sum, although the negative consequences of U.S. Navy and Lincoln Properties withdrawing from prior agreements would be unfortunate for your client and the County, any monetary damages suffered by Marcas LLC would not be the responsibility of the County. It is very unlikely that the County could be found liable in tort for choosing a remediation plan in compliance with federal and state law. Should these parties decide to terminate their contract with Marcas LLC, such action could not be attributable to any wrongful conduct by St. Mary's County.

I reiterate that the County will continue to pursue the investigation and remediation of the landfill gas migration occurring from the St. Andrews Landfill in accordance with applicable federal and state law and as directed by MDE. It will continue to rely on the advice of the Department of Public Works and Transportation, its environmental consultants and Maryland Environmental Services, as well as the recommendations of MDE. The remedies selected and implemented will be more than adequate to protect your client's current property interests. The County readily accepts its responsibility to safeguard its residents; it has the obligation to stop the migration of methane . . . from beyond County boundaries and to control the methane extraction safely within its property, all in accordance with MDE requirements. The County does not have the obligation to meet the development schedule of Marcus LLC. Furthermore, the risk of direct impact from the release of methane gas is heightened when, or if, development is approved and substantially increased again when the area becomes occupied. This increased risk should not be assumed by the County since it is not the generator of the risk. However, if your client desires the more extensive and costly remedies outlined by Mr. Hosmer to further its future use plans for the property, the County could entertain such additions. The County's advisors would have to review and approve the enhancements. Such enhancements would need to be incorporated into the approved Plan so as not to delay its implementation, receive MDE approval and be paid for by your client. In addition, I am recommending that the County require the enclosed Waiver and Estoppel Certificate.

I will need to discuss these positions with the County Commissioners, but welcome the opportunity to meet with you and your client to discuss these matters and agree that the meeting should take place soon.

Def.'s Reply, Ex. 29 at 2-3 (Letter from Norris, Esq. to Truitt, Esq. of 1/10/05 at 1-2); Pl.'s Mem., Ex. 29 at 2-3 (Letter from Norris, Esq. to Truitt, Esq. of 1/10/05 at 1-2).

The following day, January 11, 2005, R. Jarl Bliss of Lincoln Property Company sent the following letter to Mr. Erichsen of St. Mary's County DPW&T.

As you know, Lincoln Property Company plans to acquire certain residential building lots from MARCAS, LLC in the First Colony Planned Unit Development (PUD) for purposes of constructing new homes for the U.S. Navy.

Lincoln Property Company understands that the First Colony PUD is situated adjacent to the St. Andrews Landfill which is owned and was formerly operated at St. Mary's County and is presently undergoing remediation and closure pursuant to the requirements of the Maryland Department of the Environment. It is also understood by Lincoln Property Company that most of the remediation has been completed and the County is in the process of designing additional landfill gas and sediment and erosion control facilities on the eastern perimeter of the Landfill which abuts the First Colony PUD. The County has advised it will have funding to begin construction of these additional facilities in July 2005 and expects completion within approximately 2-3 months thereafter. After construction is completed, the County has stated that it will initiate a comprehensive monitoring program to confirm that the Landfill's remedial facilities are preventing the migration of landfill gas into residential areas of First Colony.

I would appreciate your confirmation that my understanding concerning these matters is correct by signing below and returning a copy of this letter to my attention.

Def.'s Reply, Ex. 33 at 2 (Letter from Bliss to Erichsen on 1/11/05).

On February 4, 2005 the following letter was sent to Mr. Erichsen.

This letter is in response to your January 7, 2005 submittal to the Maryland Department of the Environment (the "Department"), concerning the St. Andrews Landfill ("landfill").

The submittal concerns the proposed landfill gas remediation plan. . . . at the landfill.

This Department has been working with the County for some time to remedy the migration of methane gas and volatile organic and inorganic compounds from the landfill. As you are aware, 40 CFR 258.20 governs the operating criteria, including explosive gases control and access requirements, for municipal solid waste landfills and requires that you take immediate steps to protect human health from potentially explosive conditions from the migration of methane gas from the landfill.

The County proposed to install an active gas trench on May 12, 2004. The Department approved this plan on June 24, 2004. Subsequently, on October 26, 2004, the County requested a meeting to discuss current . . . gas migration issues at the site. Representatives of the County met with the Department on November 15, 2004. The Department sent a letter to Mr. Richard Tarr on December 21, 2004 recommending that the active gas trench be installed as a passive trench initially, but be constructed so that the trench could be converted to an active trench quickly should subsequent monitoring results indicate that methane concentrations exceed regulatory limits.

The Department recognizes that there may be more than one option to control the migration of methane from the landfill. Three potential methods that we have been discussing are enhancing or upgrading the existing active gas collection system in the landfill, installing an active trench outside the landfill or installing a passive trench outside the landfill. There are advantages and disadvantages to each of these systems, as the Department has discussed with the County.

For example, an active gas collection system within the landfill has the risk of introducing oxygen into the landfill, which increases the potential for a landfill fire. This system has the advantage of controlling or eliminating the migration of Volatile Organic Compounds ("VOCs") and methane from the landfill. A passive trench outside the landfill may not be sufficient to reduce the concentration of methane at the property boundary and may allow VOCs to escape from the landfill and partition into the ground water. On the other hand, an active collection trench outside the landfill may increase the flow of VOCs from the landfill, increasing the potential for ground water contamination.

In consideration of the above discussion, it is the County's decision, with notification to the Department, which steps to implement to protect human health from the migration of methane from the landfill. The County is responsible to implement additional remediation plans if the initial steps prove insufficient to protect human health.

\*                                    \*                                    \*

Your letter indicates that the County is evaluating its obligations regarding site access by the public. 40 CFR 258.25 sets forth the federal requirements regarding control of public access to the site. This regulation indicates that the County must control public access as appropriate to protect human health and the environment.

Your letter states that the County will monitor the methane control systems and based on the Department's review and recommendation, make modifications to the systems. Please be advised, the Solid Waste Program is concerned about possible gas generation and migration from landfills into facility structures and across property boundaries. As you are aware, such migration can cause potential risks to on-site structures, neighboring homes, pedestrians, businesses and properties. The Department believes that continued and intensified gas monitoring of the landfill is needed to minimize the potential for risks caused by gas generation and migration. You must guard against any problems that may result from gas generation and migration into facility structures or across property lines. In accordance with the federal regulations, the County must immediately take all necessary steps to protect human health from potentially explosive conditions from the migration of methane gas from the landfill.

Your letter indicates that the County will design, install, complete construction and initially operate a passive system by November 30, 2005. We recommend that you expedite your schedule.

In addition, the Department recommends that you do more than utilize and monitor the existing gas collection system on top of the landfill. We recommend that you evaluate the effectiveness of this system and determine if modifications to this system can address the migration of methane and VOCs from the landfill.

Def.'s Reply, Ex. 14 at 2-3 (Letter from Hynson to Erichsen of 2/4/05 at 1-2); Pl.'s Mem., Ex. 8 at 2-3 (Letter from Hynson to Erichsen of 2/4/05 at 1-2).

On March 22, 2005 Mr. Tarr sent the following e-mail to Mr. Erichsen.

I met with the Maryland Environmental Service (M'S) yesterday, Monday, March 21, 2005, to discuss the progress and review for the landfill gas recovery system design for St. Andrews. The M'S subcontracted the design work to KCE Engineering, whom was present for the meeting and subsequent discussions.

Upon review of the drawings, it appears the recovery trench concept previously proposed and recommended by the M'S, and approved by the Maryland Department of the Environment (MDE) will prove difficult to implement in the field and possibly cost more than budgeted. The trench would extend to a depth of 40' in numerous locations which requires significant benching of the sides to prevent collapse(s) and/or special trenching machinery to install same; again significant cost. Also, the excess soil material would exceed 4000 cubic yards and transportation and disposal of same would prove difficult, especially along the back side of the Cells 1, 2 and 4 – not to mention the 4000 cubic yards of wash gravel to fill the trench.

The participants of the meeting discussed the feasibility of installing recovery wells instead of a trench at spacing sufficient enough to ensure gas recovery within the radius of influence of each well. The radius of influence is uncertain at this time and the M'S is planning to conduct onsite testing of the existing gas wells to determine same; once the radius is known, the appropriate number of wells will be proposed and located. The location of the well field is the same for recovery trench and the common header piping and flare locations are identical. Basically, the design concept is the same with the exception of the subsurface gas collection methodology. In addition, the wells may be easier to install and the amount of excess soil material will be minimal.

As you aware, the recovery trench was the system of choice from the onset, however based on review and the groundwater data and the fluctuations of same to during the dry seasons, the trench depth requires an additional depth of 5'-10' than previously anticipated to ensure gas does not migrate under the trench during the dry seasons. The one disadvantage of the wells as compared to the trench is the necessity to ensure adequate coverage between each well, depth is not a problem. The trench concept provides a uniform and consistent recovery method which provides nearly complete capture of subsurface gases, as long as it is deep enough. The wells will provide similar recovery values as long the proper

amount of wells are drilled. Based on the above comparison, it appears the constructability of the system now plays a significant factor for which system to install, not to mention the required funding levels.

The M'S is preparing a cost estimate for each system for comparison and the pros-cons of each. In addition, the drawings will be finalized with each system identified, with the exception of the #wells, so that this Department may review same with the MDE and acquire[] their feedback. I expect a submittal from the M'S some time next week.

I trust this information will prove useful and if you have any further questions, please don't hesitate to inquire re: same.

Def.'s Reply, Ex. 16 at 2 (E-mail from Tarr to Erichsen of 3/22/05).

On May 19, 2005 Martha Hynson sent a letter to Mr. Erichsen. The first four paragraphs of the letter state,

This letter is in response to your April 11, 2005 submittal to the Maryland Department of the Environment (the "Department") concerning the St. Andrews Landfill (the "landfill"). The submittal includes an update of the proposed landfill gas remediation plan for the site.

In your submittal, it states that the Maryland Environmental Service (MES) has begun evaluating the use of a series of gas extraction wells to be connected together by a shallow header, and installed along the path of the gas interceptor trench originally proposed on May 12, 2004. Preliminary review of the gas interceptor trench indicates that the trench might not be cost effective and an alternative design, such as the gas extraction wells, should be considered.

The Department has the same concerns about the active gas extraction wells that it had about an active gas extraction trench: the vacuum outside the landfill may draw additional gases including methane and volatile organic compounds ("VOCs") out of the landfill. . . . In addition, the wells may not be sufficient to reduce the concentration of methane at the property boundary and inside structures sufficiently to satisfy the requirements of Code of Federal Regulations 40 CFR Part 258.20, thus requiring additional remediation. However, the testing proposed by MES appears to be necessary to design the system that the County is now considering.

As we stated in our February 4, 2005 letter to you, the federal regulations require that you take immediate corrective measures to protect human health from potentially explosive conditions from the migration of methane gas from the landfill. Your January 7, 2005 letter indicated that the County would design, install, complete construction, and initially operate a passive trench system by November 30, 2005. With the County now considering an alternative design, the Department is concerned this deadline will not be met. The County must inform the Department of which steps it plans to implement to protect human health from the migration of methane from the landfill. The Department requests that you take whatever steps are required to meet your target date to have a methane remediation system installed by November 30, 2005. Following installation, the remediation system will be evaluated to determine if it has effectively reduced methane concentrations to below the Lower Explosive Limit at the property boundary.

Def.'s Reply, Ex. 15 at 2-3 (Letter from Hynson to Erichsen of 5/19/05 at 1-2).

On June 2, 2005 Mr. Tarr sent the following letter to Mr. Dexter.

This Department is in receipt of the Maryland Department of the Environment's (MDE) May 19, 2005 correspondence regarding [St. Andrew's Landfill gas remediation design update]. We appreciate your review and comment of the April 5, 2005 proposal from the Maryland Environmental Service (MES) to convert the "trench" concept to a series of extraction wells. The "well" concept is intended to extract landfill gas from the subsurface and eliminate any further migration of landfill gas from the property. As you are aware, the installation of the "trench" concept will prove too difficult and may take a significant amount of time to construct. The "well" concept will allow proper placement of an extraction system down to the water table and based upon the testing proposed by the MES, direct the quantity of wells to ensure adequate extraction laterally.

As noted in the MDE correspondence, the Department has concerns regarding the potential to draw additional gases out of the landfill . . .at the site. Please note, the proposed system is designed to operate as a passive system, with the potential to be converted to an active system if the landfill gases are not reduced to a level as required by 40 CFR Part 258, which is consistent with your prior correspondence dated December 21, 2004.

In addition, MDE's February 4, 2005 correspondence indicates three (3) potential methods exist to control the migration of landfill gas: 1) installation of a passive system around the perimeter of the landfill, as discussed above; 2) installation of an active extraction system around the perimeter of the landfill, as discussed above, and 3) the enhancement of the existing extraction system atop the landfill(s).  As per the MDE December 21, 200[4] correspondence, the Department recommended no changes to the gas extraction system atop the landfill(s) and monitor periodically to ensure they are operating as designed.   In addition, the Department has concerns that landfill fires may occur and the suppression of methanogenic bacteria due to excessive air entering the landfill may be caused due to too much vacuum being induced atop the landfill(s).  Please note, recently a prominent landfill gas extraction system supplier/distributor was on site and installed vacuum/blowers on all the vents atop Cells 3 & 5 and replaced the existing vacuum/blowers atop Cells 1, 2 & 4 to ensure the extraction system(s) is working as intended.

On the other hand, the MDE's correspondence dated February 4, 2005 recommends the County do more than utilize and monitor the existing gas collection system atop the landfill and "*evaluate the effectiveness of this system and determine if modifications to this system can address the migration of methane and VOC's from the landfill.*"  Also, the MDE's correspondence dated May 19, 2005 recommends the County evaluate enhancing current extraction system atop the landfill(s) and perform a comparison of the costs and feasibility of same against the proposed "well" extraction system around the perimeter of the landfill.   Upon conclusion of the above, conflicting recommendations are being provided to the County at this time, which may exasperate the design and construction schedule and the decision for which system is ultimately installed.  The MDE previously stated in the February 4, 2005 correspondence " . . . *it is the County's decision, with notification to the Department, which steps to implement to protect human health from the migration of methane from the landfill.*"

The previous direction and follow-up correspondences seem to conflict with one another; however, based upon preliminary discussions on June 1, 2005 with Mr. Andrew Grenzer regarding this issue . . ., it was agreed a meeting is the most constructive means to fully comprehend the direction MDE is providing to the County in order to continue moving forward.  We trust you are in agreement with the above and look forward to your

positive response.    In the Interim, if you should have any
questions, please do not hesitate to contact this Department.

*Id.*, Ex. 17 at 2-3 (Letter from Tarr to Dexter of 6/2/05 at 1-2).

On July 7, 2005 Mr. Tarr sent another letter to Mr. Dexter.

We appreciate the opportunity to meet with Maryland
Department of the Environment (MDE) staff, Mr. Edward Carlson,
Mr. Andrew Grenzer and Mr. Richard Glover on June 21, 2005 to
discuss the above referenced.   In addition to your staff, Mr.
William Chicca[10] and Mr. Jason Baer from the Maryland
Environmental Service (MES) and myself were in to provide a
progress update for the St. Andrews Landfill; more specifically, to
obtain further input and direction needed to complete the landfill
gas remediation design and assessment of corrective measures.

It was mutually agreed that the proposed landfill gas
recovery trench design previously proposed for the area(s) to the
south and east of the property is not the preferred method of
landfill gas extraction to eliminate the migration of landfill gas
from the property, and that the current extraction system atop the
landfill be evaluated and modified to further enhance landfill gas
extraction utilizing a[] centralized vacuum system.  In addition, if
the centralized system does not completely eliminate landfill gas
migration in isolated areas, extraction wells will be installed and
connected to the centralized system to enhance the overall
extraction of landfill gas.  The area(s) to the north of the property
will not be modified and the recovery trench design will be
installed as previously proposed.    An evaluation and
recommendation of the proposed alternatives will be provided as
part of the final design submittal to support the final alternative(s)
implemented for each area of the St. Andrews Landfill property.

On June 28, 2005, Mr. Baer and I met with staff from the
Naval Air Station Patuxent River to tour the landfill gas extraction
system utilized on a landfill similar in size to the St. Andrews
Landfill.   The extraction system extracts/flares the landfill gas
utilizing a vacuum/blower system and timer to ensure extraction
and combustion at a rate faster than it is being produced; however,
minimizing the introduction of atmospheric air which could
possibly initiate fires within the landfill.   The Navy provided
copies of the plans and specifications (attached) to the County and
MES and will use same as a basis of design for the St. Andrews
Landfill.  As a result of the site visit, the County met with MES

---

[10] The Court notes, in an earlier correspondence, the surname was spelled *Chica*.

staff on June 30, 2005 to discuss the design modifications necessary for the St. Andrews Landfill and we are confident that the extraction system can be operational in accordance with the construction deadline previously submitted based on the following milestones:

**August 31, 2005**:  Design complete – Submit to MDE for review and approval; initiate  procurement process
**September 30, 2005**:    MDE concurrence – Award contract/initiate construction
**November 30, 2005**:  Construction complete

*                              *                              *

In the interim, if you should have any questions, please do not hesitate to contact this Department.

*Id.*, Ex. 19 at 2 (Letter from Tarr to Dexter of 7/7/05).

Approximately 10 months later Brenda Keister, MDE, sent the following memorandum to Ed Carlson, MDE, stating in pertinent part,

Gas monitoring results for the 1st and 2nd quarter of 2005 showed methane levels exceeded the LEL at four wells (GW-1 thru GW-4) along the landfills northeast perimeter and well GW-8 located just north of the old unlined cells in March.  These same 5 wells and GW-9 exceeded the LEL again in June.

St. Mary's County is currently developing a remedial plan to prevent the migration of methane gas.

Pl.'s Mem., Ex. 16 at 2 (Mem. from Keister to Carlson of 5/16/06).

On June 15, 2006 Ed Carlson sent the following e-mail to Mr. Tarr.

Thanks for the update on the status of the remediation at the St. Andrew's Landfill.

Your email indicates MES will provide you the completed design drawings and technical specifications for the St. Andrew's Landfill Gas Remediation System on or before June 30th.  When will you submit these drawings to the Department?  The Department will expedite the review of these drawings once they are received and plan on getting comments to you within a week or 10 days.  If the Department is able to approve the drawings when they are

submitted, when will construction begin and when will the system be functioning?

What is the status of the development project on the properties near and adjacent to the landfill?  Please update us on the status of the development on the nearby properties and plans to prevent potential risks caused by St. Andrew's landfill to these properties and on site structures before the active gas system can be installed.  The Department believes that aggressive gas monitoring of the St. Andrew's landfill is needed to minimize the potential for risks caused by gas generation and migration at this site.

*Id.*, Ex. 32 at 2-3 (E-mail from Carlson to Tarr of 6/15/06 at 1-2); Def.'s Reply, Ex. 36 at 2-3 (E-mail from Carlson to Tarr of 6/15/06 at 1-2).

The following day Mr. Tarr responded.

The MES will be submitting the plans & specs no later than June 30 and the MES will be forwarding same directly to your Department for review.  We plan to begin the solicitation process (no later than August 2006) as soon as we receive the package and allow at least ninety (90) days on the street for the potential bidders and then award same upon approval by your Department.  If any changes must be made based on comments rec'd by your Department, we will also be requesting the bidder(s) to hold their pricing for thirty (30) to sixty (60) days to address, if any, changes to the plans.  Once the solicitation is approved/awarded to the contractor, I would anticipate the project being operational no later than December 2006 – the most complex component of the project is construction and installation of the flare unit.

The owner of the property is aware of the landfill gas issue and the County has attempted to acquire a right-of-entry agreement with same; to date the County has been unsuccessful.  We recognize the importance of sampling and will continue to do so, especially after the remediation system is installed to evaluate the effectiveness.  Development of the property which has been identified by the County and property owner as being impacted by the landfill gas remains undeveloped to date.  Specifically, property development rights/agreements between the County and the developer were revised to allow the developer to "switch" commercial vs. residential rights on the parcel impacted by the landfill gas delaying development of the site until the remediation system has been installed and has addressed the landfill gas migration.

Pl.'s Mem., Ex. 32 at 2 (E-mail from Tarr to Carlson of 6/15/06); Def.'s Reply, Ex. 36 at 2 (E-mail from Tarr to Carlson of 6/15/06).

On January 22, 2007 Marcas filed a Complaint against the Board of County Commissioners of St. Mary's County in the United States District Court for the District of Maryland. *See* Document No. 1. On March 15, 2007 Martha Hynson of MDE sent the following letter to Mr. Tarr of St. Mary's County DPW&T.

> This letter is in response to the draft Assessment of Corrective Measures for the St. Andrews Landfill ("ACM") dated January 2007, which was submitted to the Maryland Department of the Environment (the "Department") by St. Mary's County (the "County"). The Department has reviewed the draft document and recommends the County revise the ACM subject to the following recommendations and comments.
>
> The ACM must clearly define the area of the site that it addresses. The Department believes that the ACM should address Area B of the St. Andrews Landfill.
>
> \*                          \*                          \*
>
> The ACM does not address trespassers to the site as potential receptors. Because the site is not fenced and security is limited, the possibility for trespass is high. There is evidence of trespassers near well MW-9 and GW-3. The road in this area provides easy access to trespassers. Other areas of the site are also accessible to trespassers. The ACM should evaluate trespassers as potential receptors and potential exposure routes. The County may take measures to prevent trespassers to the site.
>
> \*                          \*                          \*
>
> The Department looks forward to working with the County in developing and implementing the appropriate corrective measure at the St. Andrews Landfill. The Department reserves the right to make additional recommendations and requirements to the ACM as necessary.

*Id.*, Ex. 54 at 2, 4 (Letter from Hynson to Tarr of 3/15/07 at 1, 3); Pl.'s Mem., Ex. 9 at 2, 4 (Letter from Hynson to Tarr of 3/15/07 at 1, 3).

On March 30, 2007 Mr. Tarr sent an e-mail to Mr. Dexter regarding MES's proposal for landfill gas delineation at St. Andrew's Landfill.

> I'm inquiring as to the status of the review/comment for the above referenced which was provided to the MDE during our meeting on Feb. 23, 2007. The MES proposal as drafted outlined a series of . . . gas wells both onsite and offsite relating to the St. Andrews property. Once the additional sample points are installed, monitoring will commence accordingly and the data generated will be used to evaluate the overall effectiveness of the landfill gas remediation system . . . .
>
> As an update re: the landfill gas remediation system, the gas system for Area B, Cells 1, 2 & 4 was activated on March 8, 2007. We anticipate Cells 3 & 5 becoming effective the week of April 2, 2007 and Gas Collection Areas 1 & 2 during the month of April. Weekly sampling of the perimeter gas wells surrounding Area B, Cells 1 – 5 has been conducted and the results are promising. Historically Gas Wells 1 through 4 have revealed LEL levels in excess of 100%, as of today, Gas Wells 1 & 2 were 0% LEL, Gas Well 3 was above 100% LEL, though the % volume for CH4 seems to be declining and Gas Well 4 was 2% LEL. Gas Wells 5 & 6 were also 0% LEL.
>
> Once the landfill gas readings are below the regulatory limit of 100% for the property line as identified in 40 CFR 258.23 and COMAR 26.04.07.21, what additional landfill gas measures must the County conduct other than maintain the landfill gas extraction system?
>
> I look forward to the comments/suggestions the MDE may have re: the above referenced subject and if you have any questions, please don't hesitate to call.

Pl.'s Mem., Ex. 36 at 2 (E-mail from Tarr to Dexter of 3/30/07).

Four months later Mr. Tarr sent another e-mail to Mr. Dexter.

> As an update re: the landfill gas remediation system, the gas system for Area B, Cells 1, 2 & 4 was activated on March 8, 2007 and Cells 3 & 5 became effective the week of April 16, 2007. Sampling of the perimeter gas wells surrounding Area B, Cells 1 – 5 has been conducted weekly and the results (attached) are promising. Historically Gas Wells have revealed LEL levels in excess of 100% and wells 5 & 6 – 0%; as the data suggest, the gas

levels have declined and are expected to be managed by the extraction system.

Since the beginning of June, Gas Wells 1 through 3 have been in compliance. Gas Well 4 seems to be manageable with the extraction system, though a higher vacuum is necessary within the landfill nearest the well. It is important to note, the County issued a change order to the manufacturer of the extraction system to install a[n] electronically controlled variable flow device to adjust the vacuum of the flare, as opposed to the manually adjusted valve, in an attempt to compensate for atmospheric/barometric fluctuations. In addition, the device will allow the County to increase the vacuum within the landfill nearest GW4 and not effect the rest of the landfill; the goal is to eliminate the presence of gas in GW4 as we did with GW 1 through 3. The flare manufacturer has notified the County and they will be installing the device the week of July 30 or August 6, 2007.

As for Gas Collection Areas 1 & 2, the extraction wells for Area 1 are scheduled to be drilled the week of July 30 and operational shortly thereafter. The County and MES have decided to modify the extraction system for Area 2; revise the system to install extraction wells within the waste and plumb same to the flare system rather than extraction wells around the perimeter of the waste cells and manage the gas with solar powered flares. We anticipate this is the most aggressive approach to facilitate the extraction of gas from within the waste as the flare has capacity to handle the additional volume. The MES has discussed this w/your staff and they have given us verbal approval to move forward; MES is in the process of following up via written notification with your staff. MES is currently surveying the site and once completed, the well placement and piping will be designed and constructed shortly after Area 1 is complete.

I look forward to the comments/suggestions the MDE may have re: [St. Andrew's Landfill gas extraction system update] and if you have any questions, please don't hesitate to call.

Def.'s Reply, Ex. 56 at 2 (E-mail from Tarr to Dexter of 7/25/07).

On August 6, 2007 Marcas and the Board of County Commissioners for St. Mary's

County, Maryland executed a Right-of-Entry Agreement. On August 30, 2007 Marcas filed an

Amended Complaint against the Board of County Commissioners of St. Mary's County. *See* Document No. 21.

On September 5, 2007 Pamela D. Marks, and counsel for Marcas, sent the following letter to The Honorable Francis Jack Russell, President, St. Mary's County Board of County Commissioners.

> On March 29, 2007, Marcas provided notice pursuant to Section 7002(c) of the [Resource Conservation and Recovery Act ("RCRA")], 42 U.S.C. § 6972(c), of its intent to amend its complaint for ongoing violations of the [RCRA] and regulations promulgated thereto in its legal action in the United States District Court for the District of Maryland against the Board of County Commissioners of St. Mary's County ("the County") for ongoing violations of the [RCRA], 42 U.S.C. § 6901, *et seq.* and regulations promulgated pursuant thereto, at the St. Andrews Landfill ("SAL") located at 44825 St. Andrews Church Road in California, Maryland. Pursuant to [RCRA] Section 7002(b), 42 U.S.C. § 6972(b), this notice letter provides clarification of the notice provided in the March 29, 2007 letter.

> The County continues to operate the SAL in violation of the County's Refuse Disposal Permit, the [RCRA] and regulations promulgated pursuant thereto. In addition, the County's storage, treatment, and transportation and/or disposal of solid wastes at the SAL may present an imminent and substantial endangerment to health or the environment. On information and belief, the County is allowing: (1) known carcinogens and other pollutants to discharge from the SAL into waters of the United States without a permit in violation of the requirements of § 402 of the Clean Water Act, 33 U.S.C. § 1342; (2) methane to exceed its lower explosive limit at SAL's property line; and (3) uncontrolled public access so as to expose the public to health and safety hazards at the SAL, in violation of 40 C.F.R. §§ 257.3-3 (a), 258.27, 257.3-8 (a), 258.23, 258.25, and 257.3-8 (d), and any other applicable regulations, restrictions, or requirements concerning landfill gas, leach[]ate, and public access control, and the County's Refuse Disposal Permit. Pursuant to 40 C.F.R. § 258.1 (h), a landfill that fails to satisfy the criteria in 40 C.F.R. Part 258, including but not limited to, criteria in 40 C.F.R. §§ 258.27, 258.23, or 258.25, constitutes an open dump prohibited by Section 4005 of the [RCRA], 42 U.S.C. § 6945. In addition, the County stores, treats, transports, and disposes of solid and hazardous wastes at the SAL in a manner

> which presents an imminent and substantial danger to health or the environment.
>
> Marcas is a limited liability corporation registered under the laws of Maryland. It owns property adjacent to the SAL and its property and the surrounding environment are being impacted by the unlawful discharge of pollutants, exceedances of the lower explosive limit of methane and uncontrolled public access that exposes the public to potential health and safety hazards.
>
> If the County has reason to believe that the SAL is exempt from the requirements of the [RCRA], is in compliance with the [RCRA] and its Refuse Disposal Permit or otherwise has a defense liability, please advise us of the specific bases for its exemption, compliance or defense. Please direct all correspondence regarding this matter to my attention.

Pl.'s Mem., Ex. 37 at 2-3 (Letter from Marks, Esq. to The Honorable Russell of 9/5/07 at 1-2).

On July 25, 2008 Martha Hynson, MDE, sent the following letter to Mr. Erichsen, Director, St. Mary's County DPW&T.

> This letter is in response to the request for modification to the design of the gas collection system (also known as Gas Collection Area 2) for Area A at St. Andrew's Landfill located in St. Mary's County. The Maryland Department of the Environment (the "Department") has reviewed the revised design drawings for the gas collection system and hereby approves the plan.
>
> Please notify the Department in writing at least five working days prior to installation of the gas collection system. Upon completion of the project, the County must submit as-built drawings of the system to the Department.

Def.'s Reply, Ex. 22 at 2 (Letter from Hynson to Erichsen of 7/25/08).

On October 24, 2008 Marcas filed a Second Amended Complaint. *See* Document No. 47.

Each and every month St. Mary's County collects sampling data to determine whether methane gas above the LEL of 5% continues to be present at the property boundary between St. Andrew's Landfill and Marcas' property and/or on Marcas' property. As recent as October 2010 methane gas above the LEL of 5% was detected in the subsurface soils on Marcas' property as

well as at the property boundary between Marcas' property and St. Andrew's Landfill. Pl.'s Suppl. Mem. Supp. Mot. Partial Summ. J., Ex. 2 at 35-36.

<u>**JURISDICTION AND VENUE**</u>

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 as to Counts I (Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*), VI ([Resource Conservation and Recovery Act], 42 U.S.C. § 6972(a)(1)(A)), and VII ([Resource Conservation and Recovery Act], 42 U.S.C. § 6972(a)(1)(B)). The remaining four counts — II (Trespass), III (Private Nuisance), IV (Interference with Business or Economic Relationship) and V (Strict Liability for Abnormally Dangerous or Ultrahazardous Activity) — are claims under the laws of the State of Maryland. Pursuant to 28 U.S.C. § 1367(a), "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The Court finds the four state claims are in fact so closely related to the three counts under federal law that the four state claims form part of the same controversy.

Venue is proper in this judicial district based on Defendant's residence in this judicial district, 28 U.S.C. § 1391(b)(1). Venue is also proper in this judicial district because "a substantial part of the events or omissions giving rise to the claim occurred", 28 U.S.C. § 1391(b)(2), in Maryland. Additionally, pursuant to 42 U.S.C. § 9613(b), "[v]enue shall lie in any district in which the release or damages occurred or in which the defendant resides, may be found, or has his principal office."

## **STANDARD OF REVIEW**

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388

F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, the Court must consider "each motion separately on its own merits to determine whether either of the parties deserve judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted).  The Court applies the same standards of review.  *Monumental Paving & Excavating, Inc. v. Penn. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citing *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S. 1215 (1985)).

## DISCUSSION

A.     *The County's Motion for Partial Summary Judgment*

*1.     Whether Count VI, a Claim under 42 U.S.C. § 6972(a)(1)(A), Must Be Dismissed as a Matter of Law?*

The County argues that Count VI must be dismissed as a matter of law because Maryland is an "authorized state" with regard to hazardous waste under the Resource Conservation and Recovery Act ("RCRA").  As an authorized state Maryland operates its hazardous waste program *in lieu of* the Federal Program.  The Maryland hazardous waste program thus preempts the Federal Program.  Since the Federal hazardous waste program is superseded by the Maryland hazardous waste program, a citizen suit under RCRA cannot be used to bring a claim regarding alleged hazardous waste governed by the Maryland hazardous waste program.

In its Opposition, while acknowledging Maryland's hazardous waste program supersedes the Federal hazardous waste program, Marcas asserts its claim is brought under the Municipal Solid Waste Landfill ("MSWLF") program. Although the Environmental Protection Agency ("EPA") determined Maryland's municipal solid waste landfill program was partially adequate, the federal minimum criteria for MSWLF nonetheless apply and therefore Marcas is entitled to enforce this Federal program through a citizen suit pursuant to 42 U.S.C. § 6972(a)(1)(A). Furthermore Marcas contends the County is confusing the management of the hazardous waste program under Subtitle C of RCRA and the management of municipal solid waste landfills under Subtitle D of RCRA.

By way of background, under RCRA, a State seeking to administer and enforce a hazardous waste program may develop such a program, provide notice to the public and an opportunity for a hearing and then submit it to the Administrator of the EPA for approval. 42 U.S.C. § 6926(b). The State of Maryland in fact submitted such a proposal to the EPA. On October 26, 1984 the EPA issued a notice in the Federal Register regarding its intention to tentatively grant Final Authorization for Maryland's hazardous waste program to operate in lieu of the Federal program. Hazardous Waste Management Program, 49 Fed. Reg. 43,072 (Oct. 26, 1984).

On January 25, 1985 the EPA issued a notice of final determination on Maryland's application for final authorization. Hazardous Waste Management Program, 50 Fed. Reg. 3,511 (Jan. 25, 1985). "Maryland is granted final authorization to operate its hazardous waste program subject to the Hazardous and Solid Waste Amendments of 1984 (Pub. L. 98-616, November 8, 1984)." 50 Fed. Reg. 3,511 at *3. "As a result of the HSWA, there will be a dual State/Federal regulatory program in Maryland. To the extent the authorized State program is unaffected by the

HSWA, the State program will operate in lieu of the Federal program." *Id.* The Final Authorization for Maryland became effective on February 11, 1985.

In October of 1991 the EPA promulgated revised criteria for municipal solid waste landfills found in 40 C.F.R. Part 258. This Part, otherwise known as Subtitle D of RCRA, directs States to develop permitting programs to ensure compliance by MSWLFs with the Federal criteria outlined in 40 C.F.R. Part 258. Maryland, specifically the Maryland Department of the Environment ("MDE"), applied for a partial determination of the adequacy of its program. The EPA issued a notice of its tentative determination on March 21, 1995. Municipal Solid Waste Permit Program, 60 Fed. Reg. 14,938 (Mar. 21, 1995).

On July 25, 1995 the EPA issued its final determination giving partial approval to the State of Maryland's program. State's Municipal Solid Waste Landfill Permitting Program, 60 Fed. Reg. 39,385 (Aug. 2, 1995). Notwithstanding this partial approval, the federal municipal solid waste landfill criteria apply to all permitted and unpermitted municipal solid waste landfills in Maryland. Moreover, "Section 4005(a) of RCRA provides that citizens may use the citizen suit provisions of Section 7002 of RCRA to enforce the Federal MSWLF criteria in 40 CFR Part 258 independent of any State/Tribal enforcement program." *Id.* at 39,387.

Subtitle C of RCRA (§§ 3001 – 3011), 42 U.S.C. §§ 6921 – 6931, concerns Hazardous Waste Management. Subtitle D of RCRA (§§ 4001 – 4009), 42 U.S.C. §§ 6941 – 6949) concerns State or Regional Solid Waste Plans. Solid waste "means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities. . . ." 40 C.F.R. § 257.2 (2011). The primary distinction between the two subtitles is

Subtitle C concerns the "cradle to grave" regulation of the disposal of hazardous waste and Subtitle D "governs the disposal of nonhazardous solid waste." *See Sierra Club v. EPA*, 992 F.2d 337, 339 (D.C. Cir. 1993).

This litigation concerns St. Andrew's Landfill, the alleged non-compliance by the County in operating this landfill and the alleged carcinogens and other pollutants emanating from St. Andrew's Landfill. In filing its citizen suit, Marcas asserts the County, in operating St. Andrew's Landfill, is in violation of regulations, conditions, requirements and prohibitions mandated by RCRA. Furthermore Marcas contends St. Andrew's Landfill, as operated by the County, fails to meet certain criteria outlined in 40 C.F.R. Part 258 for MSWLFs.

> *Municipal solid waste landfill (MSWLF) units* means a discrete area of land or an excavation that receives household waste. . . A MSWLF unit also may receive other types of RCRA Subtitle D wastes, such as commercial solid waste, nonhazardous sludge, conditionally exempt small quantity generator waste and industrial solid waste. Such a landfill may be publicly or privately owned. A MSWLF unit may be a new MSWLF unit, an existing MSWLF unit or a lateral expansion.

40 C.F.R. § 258.2.

It is undisputed that St. Andrew's Landfill meets the definition of a MSWLF. Disposal operations at St. Andrew's Landfill were discontinued in Cells 1, 2 and 4 in November 1997, in Cell 3 in February 1999 and the disposal of rubble was discontinued in June 2001. Second Am. Compl. ¶ 25; Answer ¶ 25. Since St. Andrew's Landfill received waste *after* October 9, 1991, the minimum national criteria under RCRA, as amended, apply to this landfill. *See* 40 C.F.R. § 258.1(c).

Because the revised criteria for MSWLFs, as contained in 40 C.F.R. Part 258, contain minimum national criteria, and notwithstanding whether a state's permitting program is approved in full or in part or is nonexistent, the minimum federal landfill criteria apply to all permitted and

unpermitted MSWLF facilities in the United States. Therefore, even though Maryland's MSWLF permitting program has been partially approved by the EPA, Maryland's MSWLF permitting program does not operate *in lieu of* the minimum federal program since the minimum national criteria apply to *all* MSWLFs. This fact is evident by the following statement by the EPA when it partially approved Maryland's permitting program. "Section 4005(a) of RCRA provides that citizens may use the citizen suit provisions of Section 7002 of RCRA *to enforce the Federal MSWLF criteria in 40 CFR Part 258 independent of any State/Tribal enforcement program*." 60 Fed. Reg. at 39,387 (emphasis added). Thus, contrary to the County's contention, the partially approved Maryland MSWLF permitting program does not supersede the minimum national criteria for MSWLF under the federal program. *Cf. Orange Env't, Inc. v. County of Orange*, 860 F. Supp. 1003, 1021 (S.D.N.Y. 1994) ("While § 6926(b) authorizes states to carry out their own hazardous waste management programs in lieu of the Federal program promulgated under subchapter III, RCRA's open dumping provisions are found in subchapter IV, which seeks to develop and encourage methods to dispose of solid waste in an environmentally sound manner, 42 U.S.C. § 6941, and are not superseded by state programs authorized to carry out the goals of subchapter III."). Subchapter III of RCRA, as listed under Chapter 82–Solid Waste Disposal of Title 42, addresses Hazardous Waste Management. Subchapter IV, as listed under Chapter 82-Solid Waste Disposal of Title 42, concerns State or Regional Solid Waste Plans. Since the claim regarding St. Andrew's Landfill is governed by Subtitle D/Subchapter IV of RCRA, the minimum national criteria is not superseded by the partially approved State of Maryland MSWLF permitting program.

The County cites as authority *Blumenthal Power Company, Inc. v. Browning-Ferris, Inc.*, No. MJG-94-2612, 1995 U.S. Dist. LEXIS 6469 (D. Md. Apr. 18, 1995). This Court finds that

case distinguishable.  The complaint in *Blumenthal Power* alleged a violation of the hazardous waste provisions of RCRA, meaning Subtitle C/Subchapter III, *not* a violation of the MSWLF provisions under Subtitle D/Subchapter IV of RCRA.  Because Maryland is an authorized state to operate its own hazardous waste program, the court in *Blumenthal Power* found Maryland law superseded federal law.

In its Reply, the County makes the following concession.

> In Defendant's Motion for Partial Summary Judgment, Defendant asserted that Plaintiff's 42 U.S.C. §6972(a)(1)(A) was precluded because EPA-authorized state regulations operated in lieu of the Federal regulations, leaving a Plaintiff with no recourse under this RCRA provision.  In light of the authority cited by Plaintiff, Defendant concedes that such an argument does not properly distinguish between hazardous and solid waste, between Subtitle C and Subtitle D of RCRA.

Def.'s Reply at 36-37 n.10.

Plaintiff's claim under 42 U.S.C. § 6972(a)(1)(A) is not precluded as a matter of law.  For the above reasons, the County is not entitled to judgment as a matter of law with regard to Count VI.

### 2. Whether Plaintiff Pled Ninety Days' Notice per 42 U.S.C. § 6972(a)(1)(B)?

The County contends Marcas failed to plead ninety (90) days' notice, that this notice requirement must be strictly enforced in accordance with *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989) and that because Marcas failed to plead, the County is entitled to the entry of judgment in its favor as to Count VII.  Marcas claims it satisfied the pre-suit 90 days' notice requirement.  Marcas alleges it notified all appropriate agencies on September 5, 2007, thirteen months before adding Count VII to its Second Amended Complaint.  Additionally, Marcas notes it pled sixty (60) days' notice in paragraph 122 of Count VI, and incorporated all previously listed paragraphs in paragraph 129 of Count VII.  "This allegation, taken together with Marcas'

provision of pre-suit notice that complies with RCRA, satisfies Marcas' pleading obligations under the liberal federal notice pleading standards." Pl.'s Mem. at 29.

In its Reply the County rejects Marcas' contention that the 90 days' notice requirement for Count VII is incorporated by reference of the 60 days' notice requirement for Count VI. "This is simply insufficient because such an argument would only incorporate a pleading that includes *60-days notice* to satisfy a pleading requirement that, by statute, requires *90 days notice*. Plaintiff simply does not allege compliance with the ninety day provision of 42 U.S.C. § 6972(b)(2)(A)." Def.'s Reply at 37. The County further argues "[n]o excuse exists for a pleading deficiency when Plaintiff has filed two amended complaints with a year in between them." *Id.* at 38 (footnote omitted).

42 U.S.C. § 6972(b)(2)(A) states,

> No action may be commenced under subsection (a)(1)(B) of this section prior to ninety days after the plaintiff has given notice of the endangerment to
>
> > (i)     the Administrator;
> >
> > (ii)    the State in which the alleged endangerment may occur;
> >
> > (iii)   any person to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in subsection (a)(1)(B) of this section,
>
> except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of subchapter III of this chapter.

On September 5, 2007 counsel for Marcas addressed a letter to the President of the Board of County Commissioners of St. Mary's County, stating in the first paragraph,

> On March 29, 2007, Marcas provided notice pursuant to Section 7002(c) of the [Resource Conservation and Recovery Act

("RCRA")], 42 U.S.C. § 6972(c), of its intent to amend its complaint for ongoing violations of the [RCRA] and regulations promulgated thereto in its legal action in the United States District Court for the District of Maryland against the Board of County Commissioners of St. Mary's County ("the County") for ongoing violations of the [RCRA], 42 U.S.C. §§ 6901, *et seq.* and regulations promulgated pursuant thereto, at the St. Andrews Landfill ("SAL") located at 44825 St. Andrews Church Road in California, Maryland. Pursuant to [RCRA] Section 7002(b), 42 U.S.C. § 6972(b), this notice letter provides clarification of the notice provided in the March 29, 2007 letter.

Pl.'s Mem., Ex. 37 (Letter from Marks, Esq. to the Honorable Russell of 9/5/07 at 1). Copies of this letter were mailed to United States EPA ("USEPA") Administrator, the USEPA Regional Administrator, the Director of MDE Waste Management Administration, the County Attorney for St. Mary's County, and another attorney of record.

In Count VII of the Second Amended Complaint, excluding the paragraph incorporating previous paragraphs by reference, Marcas alleges

> 130. Defendant has contributed or is contributing to the past or present storage, treatment, transportation, or disposal of solid and hazardous wastes which present an imminent and substantial endangerment to health or the environment.

> 131. Defendant did not and does not now comply with the requirements for the management of hazardous waste at the Landfill under Subchapter III of the [RCRA].

> 132. Defendant did not and does not now possess a permit for the disposal or management of hazardous waste at the Landfill.

> 133. Defendant's Landfill has not been designed, operated, or closed in accordance with the requirements of Subchapter III of the [RCRA] or its implementing regulations.

> 134. Pursuant to 42 U.S.C. § 6972(a), Defendant should be enjoined from further violations of the [RCRA].

Second Am. Compl. ¶¶ 130-34.

Although Marcas failed to *plead* that ninety days' notice was given, this is not fatal under *Hallstrom*. The issue in *Hallstrom* concerned petitioners' failure to *serve* a notice and then wait sixty days before commencing suit. A review of the procedural history in this case will elucidate the matter.

Marcas initially filed its Complaint on January 22, 2007. *See* Document No. 1. On March 29, 2007 Marcas served the required parties a notice of its intent to amend its Complaint for ongoing violations. On August 30, 2007 Marcas filed its Amended Complaint. *See* Document No. 21. As noted *supra* on September 5, 2007 Marcas served another notice to the required parties clarifying the notice provided in the March 29, 2007 letter. On October 24, 2008 Marcas filed its Second Amended Complaint. *See* Document No. 47.

Count VII, [Resource Conservation and Recovery Act ("RCRA")], 42 U.S.C. § 6972(a)(1)(B), was not part of Marcas' original Complaint. This purported violation was also not alleged in the Amended Complaint. Only with the filing of the Second Amended Complaint was this claim added. Marcas contends, with the September 5, 2007 letter clarifying the March 29, 2007 notice, Marcas expressed an intention "to bring claims under RCRA, including its claim under 42 U.S.C. § 6972(a)(1)(B) to the parties required to be notified under 42 U.S.C. § 6972(b). Thus, at the latest, Marcas provided pre-suit notice of its intent to bring its claim under 42 U.S.C. § 6972(a)(1)(B) more than thirteen months before it included those claims in its October 24, 2008 Second Amended Complaint." Pl.'s Mem. at 28-29 (citation omitted). The Court agrees.

The County's reliance on *Clayton v. Stephens*, 6 F. Supp. 2d 480 (E.D.N.C. 1996) is misplaced. In *Clayton* the basis for dismissing the plaintiff's RCRA claim was not the failure to plead that notice was given to the required parties pursuant to 42 U.S.C. § 6972. The basis for dismissing the plaintiff's RCRA claim was the failure to give *actual* notice (and waiting the

mandatory time period) before commencing the lawsuit. The plaintiff argued that the required parties were given *constructive* notice. The court noted the U.S. Supreme Court in *Hallstrom* strictly interprets and applies the notice and waiting period requirement and thus "constructive notice cannot satisfy the requirements of § 6972." *Clayton*, 6 F. Supp. 2d. at 488. Because Marcas provided *actual* notice to the required parties and waited more than ninety days after this notice (September 5, 2007) before filing its Second Amended Complaint (October 24, 2008), Marcas has complied with the requirements of § 6972(b)(2)(A).

The County does not assert that Marcas failed to give the required notice pursuant to § 6972. The County is not entitled to judgment on the grounds that Marcas failed to plead ninety days' notice.

Having resolved the issue about the ninety days' notice, the Court is now confronted with an issue not raised by either party. Since Count VII concerns hazardous waste management under subchapter III (or Subtitle C) of RCRA, the Court must determine whether Maryland's hazardous waste management program supersedes federal law.

Maryland's hazardous waste program was approved to operate in lieu of the Federal hazardous waste program effective February 11, 1985. *See* Hazardous Waste Management Program, 50 Fed. Reg. 3,511 (Jan. 25, 1985). At the time the EPA approved Maryland's program, a recent law had been passed, the Hazardous and Solid Waste Amendments of 1984 ("HSWA"). In approving Maryland's program, the EPA noted the impact of HSWA.

> Prior to the Hazardous and Solid Waste Amendments (HSWA) amending RCRA, a State with Final Authorization administered its hazardous waste program entirely in lieu of the EPA. EPA's regulations no longer applied in the authorized State, and EPA could not issue permits for any facilities the State was authorized to permit.

Now, however, under section 3006(g) of RCRA, 42 U.S.C. 6926(g), the new requirements and prohibitions imposed by the HSWA take effect in authorized States at the same time as they take effect in non-authorized States. EPA is directed to carry out those requirements and prohibitions in authorized States, including the issuance of full or partial permits, until the State is granted authorization to do so.

As a result of the HSWA, there will be a dual State/Federal regulatory program in Maryland. To the extent the authorized State program is unaffected by the HSWA, the State program will operate in lieu of the Federal program. EPA will administer and enforce the portions of the HSWA in Maryland until Maryland receives authorization to do so. Among other things, this will entail the issuance of Federal RCRA permits for those areas in which the State is not yet authorized. Once the State is authorized to implement a HSWA requirement or prohibition, the State program in that area will operate in lieu of the Federal provision. Until that time the State will assist EPA's implementation of the HSWA under a Cooperative Agreement.

HSWA-related requirements that are more stringent than the State's program apply in Maryland. Any State requirement that is more stringent than an HSWA also remains in effect; thus, the universe of the more stringent provisions in the authorized State program and today's approval defines the applicable requirements in Maryland. (Maryland is not being authorized now for any requirement implementing the HSWA).

50 Fed. Reg. 3,511 at *3. The Court has searched for but has not located any information indicating whether Maryland has received authorization from EPA to enforce HSWA, meaning that Maryland's hazardous waste management program (including those provisions of HSWA) operates in lieu of the Federal program and thus supersedes Federal law. The court in *Blumenthal Power* defined the scope of Maryland's authority. "Maryland is authorized to operate a pre-HSWA program only. *See* 50 Fed. Reg. 3,511 (Jan. 25, 1985) (granting Maryland authority to run its own hazardous waste program.)" *Blumenthal Power*, 1995 U.S. Dist. LEXIS 6469 at *6.

At this stage of the litigation this Court lacks sufficient information to determine whether the alleged violations by the County under Subchapter III/Subtitle C of RCRA falls within the purview of Maryland or the purview of the EPA under the "dual State/Federal regulatory program in Maryland." Therefore the Court will hold in abeyance its ruling with regard to Count VII.

*3. Whether St. Mary's County Is Immune from Suit in Federal Court under the Eleventh Amendment to the U.S. Constitution Because It Is an Arm of the State of Maryland?*

The County argues that under expansive criteria of the "arm of the state" test, the court should find the County is an arm of the State of Maryland and, therefore, immunity under the Eleventh Amendment to the U.S. Constitution extends to the County. Factors indicative of the County being an "arm of the state" include (a) the laws creating the county commissions whereby there is a dependence on and close relationship to the State of Maryland, (b) the State of Maryland specifically delegated to the County the authority to operate landfills, including St. Andrew's Landfill, on the State's behalf, (c) the State of Maryland oversees, with strict authority, the County's operation of St. Andrew's Landfill, and (d) the delegated task of operating St. Andrew's Landfill on behalf of the State of Maryland is a governmental function, without any element of private interest.

In its Opposition Marcas contends there is a long-standing proposition that the Eleventh Amendment does not apply to counties. Marcas rejects the County's suggestion that it qualifies as an "arm of the state."

"[O]nly States and arms of the State possess immunity from suits authorized by federal law." *Northern Ins. Co. of New York v. Chatham County, Georgia*, 547 U.S. 189, 193 (2006). The U. S. Supreme Court has repeatedly declined to extend sovereign immunity to counties. *Id.*

There are instances where counties may perform certain powers of a State. Exercising such power of the State does not however convert a county to an "arm of the state."

> By its terms, the protection afforded by [the Eleventh] Amendment is only available to "one of the United States." It is true, of course, that some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself. But the Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a "slice of state power."

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 400-01 (1979) (footnote omitted).

The County concedes it does not receive direct funding from the State of Maryland. Moreover, if an adverse judgment was entered against the County, it is unlikely such a judgment would have a great impact on the State of Maryland. Def.'s Mot. at 13 n.10.

The County has failed to present any evidence that it is an "arm" of the State of Maryland for purposes of the Eleventh Amendment. The Court finds the County, though created by the State, functions independently of the State and has the authority to sue or be sued. The Court therefore finds the County is *not* immune from suit pursuant to the Eleventh Amendment to the U.S. Constitution. Summary judgment will not be entered in favor of the County on this issue.

4.      *Whether Common Law Governmental Immunity Bars Plaintiff's Tort Claims?*

The County contends common law governmental immunity or "residual" immunity predates the Eleventh Amendment to the U.S. Constitution, a fact the U.S. Supreme Court has recognized. The County asserts this "residual" immunity applies to counties as well as States and arms of the State. In *Northern Insurance Co. of New York v. Chatham County, Georgia*, in *dicta*, the U.S. Supreme Court rejected the notion that "residual" immunity applies to counties.

The County notes the holding in *Northern Insurance* is very narrow, restricted to the application of residual sovereign immunity in admiralty suits.

The Court has reviewed the *Northern Insurance* decision. The holding in the case is not as narrow as the County suggests. In that case the U.S. Court of Appeals for the Eleventh Circuit concluded that, at common law, there existed a "residual" immunity that would protect political subdivisions, such as counties, from suits where a county is exercising a slice of state power. The U.S. Supreme Court addressed that issue in its opinion.

> The County argues that this Court's cases recognize a distinct "residual" immunity that permits adoption of a broader test than we apply in the Eleventh Amendment context to determine whether an entity is acting as an arm of the State and is accordingly entitled to immunity. But this Court's use of that term does not suggest the County's conclusion; instead, this Court has referenced only the States' residuary and inviolable sovereignty" that survived the Constitution.

*Northern Insurance*, 547 U.S. at 194 (citations omitted).

Second, the County argues its reliance on common law governmental immunity is grounded in state law. "[A] state, by statute or through it[]s common law, may provide its political subdivisions with sovereign immunity to a degree greater than the Supreme Court's arm of the state test permits. This court must look to state law to determine what common law sovereign immunity is available to the County under Maryland law." Def.'s Mot. at 23.

The existence of common law governmental immunity for counties and municipalities is not as broad as the County suggests. "Until the twentieth century, local governments generally had no immunity under Maryland common law in either tort or contract actions." *Housing Auth. of Baltimore City v. Bennett*, 359 Md. 356, 358, 754 A.2d 367, 368 (2000). Through judicial decisions a distinction developed whereby "local governments enjoyed immunity in certain types of tort actions based on activity characterized as 'governmental' but had no immunity in tort

actions based on activity categorized as 'private' or 'corporate' or 'proprietary.'" *Id.* at 359, 754 A.2d at 368 (citation omitted). In *Bennett* the court noted there is no local governmental immunity for contract actions, nuisance actions,[11] tort actions based on violations of the Maryland Constitution or tort liability based on violations of federal constitutional or statutory rights. *Id.* at 358-60, 754 A.2d at 368-69.

A bright line does not exist in defining governmental activities versus private or proprietary activities. The Court of Appeals of Maryland recognizes the distinction is sometimes "illusory in practice." *Austin v. Mayor & City Council of Baltimore*, 286 Md. 51, 59, 405 A.2d 255, 259 (1979) (*quoting E. Eyring & Sons Co. v. City of Baltimore*, 253 Md. 380, 382, 252 A.2d 824 (1969)). Because there is no universal or all inclusive test used to determine governmental versus private function, the Maryland courts typically look to the jurisdiction's public policy. The Maryland courts also consider the following guidelines,

> Where the act in question in sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the pub[]lic health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature.

*Id.* at 59-60, 405 A.2d at 259 (*quoting E. Eyring & Sons Co.*, 253 Md. at 383).

Contrary to the County's contentions, there is not a blanket common law governmental immunity that the County may assert against Marcas' tort claims. The Court therefore must examine the facts and the law with regard to each alleged tortious action.

---

[11] The County concedes it is not entitled to "sovereign immunity" as to Count III, private nuisance, of Marcas' Second Amended Complaint. *See* Def.'s Mot. at 24 ("St. Mary's operation of the Landfill was a governmental function that would, under Maryland common law pre-[Local Government Tort Claims Act] entitle the County to sovereign immunity against all Plaintiff's tort counts except Count Three."). In its motion Marcas notes "[t]he County correctly concedes that it has no immunity for nuisance claims." Pl.'s Mem. at 37 n.43.

5.      *Whether the County Is Immune from Suit as to Count II, Trespass?*

The County asserts, because the State of Maryland delegated authority to the County to operate St. Andrew's Landfill and because the County operates St. Andrew's Landfill for the benefit of the public and to promote the public welfare, the County is exercising a slice of state power and thus is immune from liability under Maryland law.  In its Opposition Marcas claims there is no local government immunity for trespass under Maryland law.  Citing *Guest v. Commissioners of Church Hill*, 90 Md. 689, 45 A. 882 (1900) and *Cahill v. Mayor & City Council of Baltimore*, 93 Md. 233, 48 A. 705 (1901), Marcas contends Maryland courts have permitted claims of trespass against municipal corporations and therefore have long held that governmental immunity is not a defense to a claim of trespass.

The Court has reviewed the *Guest* and *Cahill* decisions.  Both cases involved municipal corporations diverting the natural flow of surface water to another property, causing damage to that other property.  In such an instance the Court of Appeals of Maryland noted "[t]he injury is regarded as the direct result of the corporate act which is in the nature of a trespass by the corporation upon the occupation and enjoyment of premises by their owner."  *Guest*, 90 Md. at 694, 45 A. at 884.  In *Cahill* the Court of Appeals stated "when a municipal corporation by a change in the grade of streets and the construction of drains, diverts the surface-water from its natural flow, concentrates it in volume and throws it upon the land of an abutting owner, such action is *an invasion of the adjoining property* and the municipality is liable for the injury thereby caused and it makes no difference whether the drains were constructed negligently or not."  *Cahill*, 93 Md. at 238-39, 48 A. at 708.

A trespass, an act of interfering with the exclusive possession of another's land, is a tort which historically has been exempt from an assertion of governmental immunity.  "'In the

trespass and nuisance cases, sovereign immunity conflicts with the rules of the common law that strictly protect privately owned real property from direct physical invasions. . . Trespass to real estate by water backed up or diverted as a result of municipal interference with the free flow of natural streams has long been held actionable.'" *Hebron Savings Bank v. City of Salisbury*, 259 Md. 294, 303, 269 A.2d 597, 601 (1970) (quoting A. James Casner & Edgar Fuller, *Municipal Tort Liability in Operation*, 54 Harv. L. Rev. 437, 443-44). The Court finds the County is not immune from suit as to Count II and therefore is not entitled to judgment as a matter of law.

6. *Whether the County Is Immune from Suit as to Count IV, Interference with Business or Economic Relationship?*

Maryland law recognizes the tort of interference with business or economic relationship. The elements of this tort are "'(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[] in [its] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant[] (which constitutes malice); and (4) actual damage and loss resulting.'" *Spengler v. Sears, Roebuck & Co.*, 163 Md. App. 220, 242, 878 A.2d 628, 641 (citing *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 504, 665 A.2d 297 (1995) (quoting *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 652, 650 A.2d 260 (1994)).

Before resolving whether governmental immunity shields the County from suit as to Count IV, this Court must first resolve whether the County's operation of St. Andrew's Landfill was governmental or private. In its Answer to Marcas' Second Amended Complaint the County admitted, in every day parlance and not as defined under CERCLA, it has owned and operated St. Andrew's Landfill since 1974. Second Am. Compl. ¶ 24; Answer ¶ 24; *see* Pl.'s Mem., Ex. 7 ("Active land-filling operations under the authority of the Board of County Commissioners was conducted between 1974 and 2001 under a State approved Refuse Disposal Permit.").

"'The general rule at common law is that in collecting and disposing of garbage or rubbish a municipal corporation exercises a governmental rather than a private function, and accordingly is immune from liability for torts committed in the performance of such function.'" *Tadjer v. Montgomery County, Maryland*, 300 Md. 539, 547, 479 A.2d 1321, 1325 (1984) (quoting Annot., 156 A.L.R. 714, 716 (1945)). As noted by Marcas, the County charges a fee for varying types of solid waste or refuse deposited at the landfill. For instance, residential solid waste delivered to convenience centers is not assessed a fee, although a permit is required. For residential solid waste, up to ¼ ton load, there is a flat fee of $5.00 per pick up for items to be delivered at a sanitary landfill only. For excessive loads of residential solid waste there is a fee of $35.00 per ton for items to be delivered at a sanitary landfill only. *See* Pl.'s Mem., Ex. 39 at 10 (Fee Schedule: St. Mary's County Public Solid Waste Acceptance Facilities). "The fact that a fee [is] charged for material deposited in [a] landfill is not necessarily dispositive of the issue of whether [a landfill is] a proprietary or governmental function." *Tadjer*, 300 Md. at 548, 479 A.2d at 1325.

Based on the record presently before the Court, there is no evidence whether the fees assessed by the County were substantially in excess of the County's expenses for operating St. Andrew's Landfill (indicating a profit-making venture) or equal to or below the County's expenses for operating the landfill. "[M]unicipal immunity is not automatic, but when the municipality or county is engaged in a governmental function, immunity attaches." *Burns v. Mayor & City Council of Rockville, Maryland*, 71 Md. App. 293, 298, 525 A.2d 255, 257 (1987).

This Court has located at least one decision where a municipality asserted governmental immunity in response to a tortious interference with contractual and prospective business relations claim. *See Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 658 (D. Md. 2009).

During a motions hearing Plaintiffs acknowledged that they could not pursue their claim of interference with prospective business relations directly against the municipality. That court thus dismissed the count. *Id.*

"If . . . the income was not adequate to maintain the landfill or if the income were barely adequate to cover expenses, we would agree that this landfill operation was a governmental function. On the other hand, if the income derived was in an amount substantially in excess of the County's expenses for rent, operation and the like, so that the landfill was a real moneymaking proposition, it would be a proprietary function." *Tadjer*, 300 Md. at 549-50, 479 A.2d at 1326. The record in this case must be supplemented with information about the fees collected in relation to the expenses incurred for operating St. Andrew's Landfill. The Court therefore *defers* ruling on Count IV.

> 7.    *Whether the County Is Immune from Suit as to Count V, Strict Liability for Abnormally Dangerous or Ultrahazardous Activity?*

Governmental immunity *may* be a defense to a strict liability tort. This Court has not located any Maryland cases where governmental immunity was raised as a defense to a strict liability claim. In *dicta* however the Court of Appeals of Maryland indicated a county or municipality may be immune from suit for a strict liability claim. "Preliminary, we note that, even if the *doctrine of governmental immunity* were to protect Riverdale from the Board's claims based on negligence and *strict liability*, the doctrine of governmental immunity would have no application to the Board's nuisance claim." *Board of Educ. of Prince George's County v. Mayor & Common Council of the Town of Riverdale*, 320 Md. 384, 387-88, 578 A.2d 207, 209 (1990) (emphasis added).

Because there is insufficient information before this Court to determine whether the County's operation of St. Andrew's Landfill is governmental or proprietary, the Court *defers* ruling on Count V.

B.    *Marcas' Motion for Partial Summary Judgment*

1.    *Whether Marcas Is Entitled to Recover Response Costs Pursuant to CERCLA?*

Pursuant to 42 U.S.C. § 9607(a) Marcas asserts it is entitled to recover the response costs it incurred in investigating and monitoring the nature and extent of contamination from St. Andrew's Landfill.  To satisfy a § 9607(a) claim, Marcas must demonstrate four elements: (1) a release or threatened release of a hazardous substance, (2) the release must be from a "facility" as defined in the statute, (3) the party must have incurred response costs consistent and necessary with the National Contingency Plan ("NCP") and (4) the party that owns or operates the facility which released or threatened to release a hazardous substance must be a "covered person" under § 9607(a).  *Westfarm Assocs. Ltd. P'ship v. International Fabricare Inst.*, 846 F. Supp. 422, 429 (D. Md. 1993).  Marcas contends it has satisfied all four elements and thus is entitled to judgment as a matter of law.

Specifically, as to the first element, Marcas notes it is undisputed that hazardous substances have been released from the landfill.  According to Marcas, the County has admitted that vinyl chloride and methane, both hazardous substances, have been released from St. Andrew's Landfill.  Second, there is no dispute that St. Andrew's Landfill is a "facility" as defined under CERCLA, 42 U.S.C. § 9601(9).  Third, Marcas asserts it has incurred $35,751.33 for investigating and monitoring the extent of contamination.  Such expenses are recoverable under CERCLA.  Moreover, citing *Westfarm Associates*, Marcas contends it may recover its preliminary investigative and monitoring costs without establishing the consistency of those

costs with the NCP.  Finally, with regard to the fourth element, Marcas states it is undisputed that the County is a "covered person" under 42 U.S.C. § 9607(a)(1) because the County has admitted to owning or operating St. Andrew's Landfill.

In its Opposition the County does not dispute the four part test to establish liability under CERCLA as outlined by Marcas.  The County concedes (1) methane and volatile organic compounds ("VOCs") have been released from St. Andrew's Landfill onto Marcas' property, (2) St. Andrew's Landfill is a facility under 42 U.S.C. § 9601(9) and (4) the County is the owner and operator of the facility under 42 U.S.C. § 9601(20)(A).  The County claims the third element has not been met, namely, that the alleged response costs were necessary and in compliance with the NCP.  The Court therefore should not grant judgment as a matter of law in favor of Marcas.  Moreover, the County asserts there is a question of fact about the necessity of the alleged response costs.

In support of its assertion about a material dispute, the County notes Marcas fails to cite any facts indicating the response costs were necessary.  Although Marcas included a declaration by a consultant and invoices in support of its motion, the invoices do not describe the work performed or provide an explanation for the necessity.  The County further proclaims Marcas' response costs were unnecessary because in early 2002 Marcas had knowledge about the County's subsurface testing and monitoring plan for St. Andrew's Landfill which had been approved by the MDE.  Moreover in 2004 the County retained the Maryland Environmental Service ("MES") to investigate and prepare a remediation plan, including investigating contamination on Marcas' property.  "[Marcas] was aware of the MES work and was continuously updated on the County's progress through numerous meetings and

communications."  Def.'s Reply at 23.  In essence, the County asserts Marcas' response costs were duplicative of the County's efforts and thus unnecessary.

Second, the County contends Marcas' response costs were incurred as part of the commercial development of the property, not in response to any threat to public health. "[Marcas'] true motivation for the alleged response costs was the contractual duty it incurred by operation of Sections 5(A) and (B) of its August 2004 Land Purchase Contract with Lincoln Development, which required [Marcas] to provide Lincoln Property Development with all environmental studies of the land and open up the land to a 'study period' to evaluate the suitability of the land for development."  Def.'s Reply at 25-26.

Third, the County claims Marcas, as a plaintiff pursuing a private CERCLA action, has the burden of demonstrating it acted consistently with the NCP to recover response costs. According to the County, Marcas has failed its burden.  There is no evidence of substantial compliance with the NCP.  Without demonstrating substantial compliance, a court cannot find CERCLA liability.

Finally, the County contends Marcas seeks, not only expenses incurred to date, but all future remediation costs.  Even if the court finds CERCLA liability, the County asserts Marcas is not entitled to a blanket award of future remediation costs.  "CERCLA generally does not provide for the present recovery of future costs of restoration but instead it 'provides for a declaratory judgment action to establish liability for *future* response costs.'"  Def.'s Reply at 30 (citation omitted).

In its Reply, citing *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F. Supp. 318 (D. Md. 1993), Marcas contends, the fact that it may use information from the preliminary investigative and monitoring efforts to assess the environmental condition of land slated for

development, does not make the costs incurred "unnecessary" response costs under CERCLA. Second, neither CERCLA nor the NCP mandates that Marcas cease its investigation solely because the County is conducting its own investigation. Third, Marcas claims there is a more lenient standard for preliminary investigative and monitoring costs as opposed to a more stringent standard for actual cleanup in demonstrating substantial compliance with the NCP. "Courts have thus held that a plaintiff may recover as response costs preliminary investigative and monitoring costs without the need to establish the consistency of those investigative efforts with the NCP because the investigative and monitoring efforts are *per se* consistent with the NCP." Pl.'s Reply at 8. Finally, Marcas concedes, as to future costs, it is not entitled to an award of actual costs now but an order on liability as to those costs.

The Court begins its analysis by identifying the elements of § 9607 CERCLA liability claim. Liability may be imposed as follows: "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for. . . any other necessary costs of response incurred by any other person consistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(2), (a)(4)(B). Marcas therefore must establish (a) a release or threatened release of hazardous material, (b) from a "facility", (c) owned or operated by a "covered person", and (d) the response costs to the release or threatened release of hazardous material is necessary and consistent with the national contingency plan.

Under CERCLA a "release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment. . . ." 42 U.S.C. § 9601(22). CERCLA defines "environment" to include "any

other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." *Id.* § 9601(8)(B).  Methane and VOCs have been identified as hazardous materials.  *See* 40 C.F.R. § 302.4 (Designation of hazardous substances), Table 302.4 (List of Hazardous Substances and Reportable Quantities) (2011).  Neither side disputes the hazardous nature of methane and VOCs.  The first element is established.

Under CERCLA a facility is defined as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft. . . ."  42 U.S.C. § 9601(9)(A).  St. Andrew's Landfill is a facility under CERCLA.  Both parties concur.  The second element is established.

The County has managed St. Andrew's Landfill since approximately 1974, *see* Pl.'s Mem., Ex. 7,[12] through its DPW&T.  The County therefore qualifies as an "owner or operator" which, under CERCLA, means "(ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility."  42 U.S.C. § 9601(20)(A)(ii).  Furthermore, a "covered person" is defined as "the owner or operator of . . . a facility[.]"  *Id.* § 9607(a)(1).  Neither party disputes this element.  Thus the third element is established.

The parties dispute whether Marcas has satisfied the fourth element, namely, the response costs incurred were necessary and consistent with the national contingency plan.  Marcas argues it has satisfied the fourth element; the County points to deficiencies in Marcas' proof.  The Court considers these arguments below.

---

[12]  "Active land-filling operations under the authority of the Board of County Commissioners was conducted between 1974 and 2001 under a State approved Refuse Disposal Permit."

The Court begins with the County's assertion that Marcas' response costs were unnecessary because, as early as 2002, Marcas was on notice that the County had implemented a subsurface testing and monitoring plan approved by the MDE. Two years later the County retained MES to investigate and prepare a remediation plan to include contamination to Marcas' property. The County contends, under such circumstances, the retention of an environmental consultant by Marcas was duplicative and unnecessary.

The County does not identify the provision of CERCLA which states that if an owner or operator of a facility releases hazardous material and thereafter that owner or operator initiates an investigation to determine the extent and nature of contamination, that the aggrieved party is precluded from obtaining an independent assessment about the nature and extent of contamination to its property. Nor has the Court located such a provision.

Second, the County contends the declarations submitted by Marcas' consultants and invoices in support of its motion, fail to describe the work performed or any explanation for the necessity of the response costs. The National Contingency Plan, authorized by 42 U.S.C. § 9605, is outlined in 40 C.F.R. Part 300. This part describes a remedial preliminary assessment and a remedial site inspection. Section 300.420 concerns remedial site evaluation. "The purpose of this section is to describe the methods, procedures, and criteria [a private person] shall use to collect data, as required, and evaluate releases of hazardous substances, pollutants, or contaminants. The evaluation may consist of two steps: a remedial preliminary assessment (PA) and a remedial site inspection (SI)." 40 C.F.R. § 300.420(a) (2011). A remedial PA "shall consist of a review of existing information about a release such as information on the pathways of exposure, exposure targets, and source and nature of release." *Id.* § 300.420(b)(2). A remedial site inspection is conducted after the remedial preliminary assessment. "The remedial

SI shall build upon the information collected in the remedial PA. The remedial SI shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling." *Id.* § 300.420(c)(2).

The County has apparently overlooked the October 27, 2004 "Remedial Program Evaluation for St. Andrews Landfill" prepared by ARCADIS G&M Inc.,[13] consultants retained by Marcas, as well as the December 28, 2004 "Supplemental Site Evaluation" by Mr. Hosmer.[14] These reports describe in detail the release, the probable nature of the release and recommended remedial actions. This is all the NCP requires. *HRW Systems*, 823 F. Supp. at 344. The County acknowledged receipt of these reports when the County Attorney, Mr. Norris, wrote the following in the January 10, 2005 letter to Mr. Truitt, counsel for Marcas.

> While the County appreciates the efforts of your client to provide guidance and advice on the development of a remedial plan for the migrating landfill gas, your client must understand that the approach the County selects will be made in accordance with the procedures it has in place and based on the evaluation and advice of its consultants. That is not to say that the County will ignore the suggestions of ERM or Mr. Hosmer. In its decision-making, the County will take all suggestions and advice into account.

Def.'s Reply, Ex. 29 at 2 (Letter from Norris, Esq. to Truitt, Esq. of 1/10/05 at 1); Pl.'s Mem., Ex. 29 at 2 (Letter from Norris, Esq. to Truitt, Esq. of 1/10/05 at 1).

The County further contends the reports by Marcas' consultants were not consistent with the NCP because the reports were generated as part of the commercial development of Marcas' property, not due to any threat to public health. There is evidence in the record to support such

---

[13] "The intent of this report was to review and evaluate basic data available for the site with respect to the potential for environmental release to neighboring property to the east and northeast (onto Parcel 455 owned by [Marcas]), and to assess the potential exposure of proposed residences in that area to contaminants from the landfill." Def.'s Reply, Ex. 11 at 1.

[14] "The purpose of this evaluation was to confirm and further delineate the findings . . .A preliminary field investigation program was developed to fill 'data gaps', as identified in the ARCADIS report, to confirm the prior findings to the extent possible, and to extrapolate the database into areas of the site and media not previously addressed." Def.'s Reply, Ex. 49 at 1.

an assertion.  On September 29, 2004 Mr. Erichsen, Director, St. Mary's County DPW&T, wrote

a memorandum to George C. Forrest, County Administrator, regarding a Szlendak Meeting-First

Colony and landfill related matters.  Approximately a month earlier Marcas, as the seller, and

Lincoln Property Company Southwest ("Lincoln") as the buyer, executed a Lot Purchase

Agreement whereby Marcas agreed to sell and Lincoln agreed to buy certain residential building

lots in the First Colony Planned Unit Development.  *See* Pl.'s Mem., Ex. 21; Def.'s Reply, Ex.

50.  In the September 29, 2004 memorandum Mr. Erichsen wrote in pertinent part,

> Apparently P.F. Summers[15] has conducted portions of a Phase I
> environmental study as a part of marketing the development of a
> portion of First Colony as residential Navy housing.  He advised
> that he would forward the results to us in the future.

Def.'s Reply, Ex. 27 at 3 (Mem. from Erichsen to Forrest of 9/29/04).

Additionally, in an October 26, 2004 letter from Mr. Truitt, Marcas' counsel, to Mr.

Norris, County Attorney for St. Mary's County, Mr. Truitt wrote in pertinent part,

> At the conclusion of [last Thursday's] meeting, Caz Szlendak
> provided County Administrator George Forrest with a copy of an
> October, 2003 Phase I Environmental Site Assessment performed
> by Geo-Technology Associates, Inc. ("GTA") and a January 19,
> 2004 letter from GTA reporting on the installation and field-
> screening of five soil-gas monitoring points on a portion of the
> First Colony PUD known as Settlers Landing, which is just north
> of the St. Andrews Landfill.  This was a portion of the information
> requested from my client by George Erichsen.
>
> The balance of information requested by Mr. Erichsen is enclosed
> and consists of a letter and report by Mr. Lawrence Hosmer, a
> professional engineer with 34 years experience at more than 250
> landfills across the country.  Mr. Hosmer is a Senior Vice
> President of ARCADIS G&M, Inc., an international environmental
> consulting firm.  The enclosed materials provide a more detailed
> version of Mr. Hosmer's evaluation of the St. Andrews Landfill
> than there was time to present to County Officials last Thursday
> and include specific recommendations with respect to gathering

---

[15] Construction contractor.

more data and implementing certain remedial measures that will help ensure public safety.

Please note that Mr. Hosmer estimates that implementation of these recommendations by the County will cost in the range of $750,000. When amortized over 20 years at the County's current Maryland Water Quality Financing Administration rate (2.4%), the additional costs to protect future residents of First Colony amounts to approximately $50,000 per year. This compares to approximately $230,000 per year in additional property taxes that I understood the County is being paid by my client for the undeveloped portion of First Colony and to revenue several times that amount that the County will realize once the development is finished. Therefore, the County's prompt completion of a comprehensive remedial investigation of necessary and appropriate remedial measures for the St. Andrews Landfill is in the best financial interests of St. Mary's County.

Def.'s Reply, Ex. 47 at 2-3 (Letter from Truitt, Esq. to Norris, Esq. of 10/26/04 at 1-2); Pl.'s Mem., Ex. 24 at 2-3 (Letter from Truitt, Esq. to Norris, Esq. of 10/26/04 at 1-2).

The first two sentences of Mr. Hosmer report states,

ARCADIS G&M, Inc. (ARCADIS) herewith transmits an initial report entitled "Remedial Program Evaluation for St. Andrews Landfill" (SAL), located in St. Mary's County, Maryland. The intent of this report was to review and evaluate basic data available for the site with respect to the potential for environmental releases to neighboring property to the east and northeast (onto Parcel 455 owned by [Marcas]), and to assess the potential exposure of proposed residences in that area to contaminants from the landfill.

Def.'s Reply, Ex. 11 at 2.

It is apparent from the cited documents that some reports were prepared *before* St. Mary's County notified Marcas of landfill gas migrating from St. Andrew's Landfill and other reports were prepared *after* Marcas became aware of this danger. The County asserts Marcas was notified in a letter dated January 23, 2004. Marcas however claims it was unaware of hazardous substances migrating from St. Andrew's Landfill until September 8, 2004. Based on

Marcas' assertion, the Court finds Marcas is entitled to its past response costs for those investigative reports prepared after September 8, 2004.

Moreover, at this stage of the litigation, Marcas needs to show only that it has incurred some costs consistent with the NCP to maintain its CERCLA claim. *Weyerhaeuser Corp. v. Koppers Co.,* 771 F. Supp. 1406, 1413 (D. Md. 1991). A court determines which costs incurred by a plaintiff is recoverable only after liability is established. *Id.* at 1414. The Court finds Marcas has established a *prima facie* case of CERCLA liability by showing at least some costs incurred are in compliance with the NCP and thus recoverable. At this stage of the litigation Marcas is entitled to judgment as to liability. *Id.*

Marcas is entitled to the amount of its past response costs under CERCLA, the amount for *post-September 8, 2004* investigating and monitoring, as recoverable investigative costs consistent with the NCP. *Id.* That amount is presently unknown. It is not clear to the Court whether the amount claimed ($35,751.33) includes *both* pre-and post-September 8, 2004 investigative costs *or* only post-September 8, 2004 investigative costs. Marcas therefore will need to supplement the record with proof of its expenses. With regard to any future costs, a declaratory judgment as to liability may be entered at this stage of the litigation. *Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 753-54 (D. Md. 2001). Marcas must prove the amount of future costs at trial.

For the above reasons, Marcas is entitled to judgment as a matter of law as to Count I.

2. *Whether the County's Operation of St. Andrew's Landfill Violates RCRA?*

Marcas contends the County is presently violating RCRA because methane gas emanating from St. Andrew's Landfill exceeds the lower explosive limit ("LEL") for methane gas and because the County is not controlling access to St. Andrew's Landfill. Marcas seeks an

injunction from the Court to have the County comply with the regulations immediately. Because of the County's ongoing RCRA violations, Marcas asserts it is entitled to judgment as to Count VI.

Specifically, Marcas claims St. Andrew's Landfill constitutes an "open dump" pursuant to 40 C.F.R. § 258.1(h) because the landfill fails to satisfy the criteria under § 4005 of RCRA, 42 U.S.C. § 6945. Marcas notes this section authorizes citizen suits to enforce compliance with federal minimal criteria for municipal solid waste landfills. *Id.* § 6945(a) ("The prohibition contained in the preceding sentence shall be enforceable under section 6972 [Citizen suits] of this title against persons engaged in the act of open dumping."). Marcas asserts it may seek such enforcement irrespective of whether the EPA approved a state's solid waste management program.

Marcas alleges the County is violating 40 C.F.R. §§ 258.23(a)(2), 258.61(a)(4) because methane gas levels at the boundary of St. Andrew's Landfill exceeds the LEL. Sampling data indicate such violations began in 2004 and are ongoing. According to Marcas, the County's own expert conceded the concentration of methane gas at the property boundary between St. Andrew's Landfill and Marcas' property has exceeded the LEL for five years. Furthermore, the County has acknowledged noncompliance with the regulations in various documents. On this basis alone, Marcas is entitled to judgment as a matter of law as to Count VI.

Marcas contends a second basis for entering judgment in its favor as a matter of law is the failure of the County to control access to St. Andrew's Landfill. According to Marcas, despite MDE explaining to the County its obligation to control access to the site in accordance with 40 C.F.R. § 258.25, the County has failed to comply.

In its Opposition the County notes, in initiating a citizen suit under 42 U.S.C. § 6972(a)(1)(A), Marcas must meet three elements, namely (a) there must be a violation under RCRA, 42 U.S.C. §§ 6901 *et seq.*, (b) the alleged violation must be a present one and (c) there must be compliance with the 60-day notice provision as outlined in 42 U.S.C. § 6972(b)(1)(A). The County contends Marcas has satisfied the third element only.

The County rejects Marcas' assertion that the County is violating three regulatory requirements: (a) 40 C.F.R. § 258.25 by not restricting access to St. Andrew's Landfill, (b) 40 C.F.R. § 258.23(a)(2) by exceeding the LEL for methane gas at the boundary of St. Andrew's Landfill and (c) 40 C.F.R. § 258.61(a)(4) for not maintaining a gas monitoring system after closure of a landfill. Since the County is not violating any of these provisions, St. Andrew's Landfill is not an "open dump." Additionally, because there are material questions of fact, judgment should not be entered in favor of Marcas with regard to Count VI.

More specifically, the County contends it is in compliance with 40 C.F.R. § 258.25 because it has restricted vehicular entrance to St. Andrew's Landfill and there are natural barriers around the landfill, *i.e.*, a 300 foot tree line, contours of the land and a creek. The fact that a fence has not been erected around St. Andrew's Landfill does not constitute a violation.

With regard to 40 C.F.R. § 258.61(a)(4), the County notes, with the approval of MDE, since July 2001, it has maintained nine gas monitoring probes throughout St. Andrew's Landfill. Additionally the County has installed a gas extraction system for Area B Cells 1 – 5, which were activated between March and April of 2007. Since the County does not violate this regulatory provision, St. Andrew's Landfill is not an "open dump" and Marcas lacks a viable claim under 42 U.S.C. § 6972(a)(1)(A).

Finally the County argues Marcas inappropriately cites 40 C.F.R. § 258.23(a)(2) as the governing regulation. This provision cautions owners or operators of municipal solid waste landfill ("MSWLF") units to ensure the concentration of methane gas does not exceed the LEL at the landfill's property boundary. The County acknowledges methane gas has exceeded the LEL at the boundary of St. Andrew's Landfill, and therefore, § 258.23(a)(2) does not govern but instead § 258.23(c), outlining what an owner or operator of MSWLF must do when methane gas exceeds the LEL at the property boundary. The County argues it is complying with § 258.23(c) as it has been proactive in seeking MDE approval for its remediation steps since detecting methane gas exceeding the LEL.

Alternatively, if the Court determines the County's actions should be evaluated pursuant to § 258.23(a), the County argues it must be *in violation* of the regulation before liability is found. "There is a material question of fact regarding whether or not subsurface gas migration of methane and other gases continues to impact the Marcas property." Def.'s Reply at 35.

In its Reply Marcas asserts the County is in violation of 40 C.F.R. § 258.23(a)(2) because methane gas has been and is still in excess of the LEL at and beyond the boundary of St. Andrew's Landfill. "Nothing in RCRA or its regulations . . . excuses the County from compliance with 40 C.F.R. § 258.23(a)(2), regardless of whether or not it is in compliance with 40 C.F.R. § 258.23(c)." Pl.'s Reply at 10. Marcas argues the County is in violation of applicable RCRA requirements if it was in violation at the time the Complaint was filed. Not only was the County in violation when the Complaint was filed, Marcas notes the County continues to violate 40 C.F.R. § 258.23(a)(2) up to and including October 2010, the last month of sampling data filed in this litigation.

With regard to 40 C.F.R. § 258.25, Marcas notes the County admits it has not erected a fence to control public access to St. Andrew's Landfill. Marcas contests the County's characterization that MDE's reference to a fence was merely guidance to the County for drafting its assessment of corrective measures. MDE advised the County of the high possibility for trespass and limited security at St. Andrew's Landfill and the County has failed and continues to fail to control public access.

A.    40 C.F.R. § 258.23(a)(2)

The Court begins its analysis with the elements for asserting a claim under 42 U.S.C. § 6972(a)(1)(A). In filing a citizen suit, a plaintiff must establish (a) defendant is alleged *to be in violation of*[16] a permit, standard, regulation, condition, requirement, prohibition or order of RCRA, that is prospective only, meaning the violation must be ongoing or recurring, *see Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57-59 (1987) (interpreting the meaning of the phrase "to be in violation of" to commence a citizen suit under the Clean Water Act, the identical language to commence a citizen suit under RCRA), and (b) a plaintiff has complied with the 60 days' notice provision. Since the County concedes Marcas complied with the second element, the Court will focus on the first element.

Below is a compilation of data supplied by the County identifying the occasions when methane gas was detected exceeding the LEL either on the property boundary between St. Andrew's Landfill and Marcas' property and/or on Marcas' property.

| Conducted by | DATE | LOCATION | LOW RANGE: | HIGH RANGE[17]: |
|---|---|---|---|---|

---

[16] "The most natural reading of 'to be in violation of' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation — that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57 (1987).

[17] If there is no range in percentage by volume and one figure only is reported, that percentage is placed in the "High Range" column.

| | | | Methane Levels by volume | Methane Levels by volume |
|---|---|---|---|---|
| GCI | Nov. 2003 & Jan. 2004 | Plaintiff's Property | 8.0% | 68.0% |
| [18] | January 2007 | Property boundary between Landfill & Plaintiff's Property[19] ("Boundary") | 45.0% | 64.8% |
| | February 2007 | Boundary | 49.9% | 68.6% |
| | March 2007 | Boundary | 40.9% | 67.5% |
| | April 2007 | Boundary | 30.5% | 41.1% |
| | May 2007 | Plaintiff's Property | 22.8% | 31.2% |
| ERM | June 2007 | Plaintiff's Property | 9.9% | 73.7% |
| ERM | July 2007 | Plaintiff's Property | 12.2% | 63.1% |
| | August 2007 | Boundary | 15.8% | 48.7% |
| | September 2007 | Boundary | 53.3% | 59.2% |
| MES | October 2007 | Boundary | 13.6% | 52.4% |
| ERM | November 2007 | Plaintiff's Property | 6.3% | 36.7% |
| MES | November 2007 | Plaintiff's Property | 8.9% | 22.2% |
| MES | November 2007 | Boundary | 31.6% | 62.8% |
| | December 2007 | Boundary | | 65.5% |
| | January 2008 | Boundary | | 33.4% |
| | February 2008 | Boundary | | 13.0% |
| MES | March 2008 | Plaintiff's Property | 17.3% | 25.9% |
| MES | March 2008 | Boundary | 43.7% | 45.4% |
| | April 2008 | Boundary | | 12.2% |
| | May 2008 | Plaintiff's Property | | 10.7% |
| MES | June 2008 | Plaintiff's Property | 29.5% | 46.9% |
| MES | June 2008 | Boundary | 24.6% | 32.6% |
| | July 2008 | Boundary | | 17.0% |
| | July 2008 | Plaintiff's Property | | 22.8% |
| MES | August 2008 | Plaintiff's Property | | 21.9% |
| MES | September 2008 | Plaintiff's Property | | 14.4% |
| | October 2008 | Boundary | | 49.4% |
| | October 2008 | Plaintiff's Property | | 20.6% |
| | November 2008 | Boundary | 27.8% | 49.7% |
| | November 2008 | Plaintiff's Property | 6.7% | 32.2% |
| | December 2008 | Boundary | | 43.8% |
| | December 2008 | Plaintiff's Property | | 32.6% |
| | January 2009 | Boundary | | 36.9% |
| | January 2009 | Plaintiff's Property | 8.6% | 34.9% |

[18] When Marcas does not identify the entity which conducted the sampling, the space will be left blank.

[19] In its Supplemental Memorandum, Marcas identifies the Property as "*First Colony*" instead of "*Plaintiff's Property*" as identified in the Second Amended Complaint. For simplicity's sake, the Court will refer to the Property as *Plaintiff's Property*.

| | | | | |
|---|---|---|---|---|
| | February 2009 | Boundary | | 13.5% |
| | February 2009 | Plaintiff's Property | | 21.7% |
| | March 2009 | Plaintiff's Property | | 33.7% |
| | April 2009 | Plaintiff's Property | | 19.6% |
| | May 2009 | Boundary | 11.1% | 36.9% |
| | May 2009 | Plaintiff's Property | 18.9% | 32.5% |
| | June 2009 | Plaintiff's Property | | 25.4% |
| | July 2009 | Boundary | 10.9% | 35.4% |
| | July 2009 | Plaintiff's Property | 14.4% | 29.4% |
| | August 2009 | Boundary | | 5.2% |
| | August 2009 | Plaintiff's Property | | 23.9% |
| | September 2009 | Boundary | | 11.5% |
| | September 2009 | Plaintiff's Property | | 27.8% |
| | October 2009 | Boundary | 10.3% | 30.6% |
| | October 2009 | Plaintiff's Property | 13.0% | 24.8% |
| | November 2009 | Boundary | 9.6% | 39.1% |
| | November 2009 | Plaintiff's Property | 8.6% | 26.1% |
| | December 2009 | Boundary | 29.2% | 38.9% |
| | December 2009 | Plaintiff's Property | | 16.8% |
| | January 2010 | Boundary | | 50.9% |
| | January 2010 | Plaintiff's Property | | 18.8% |
| | February 2010 | Boundary | 34.2% | 40.1% |
| | February 2010 | Plaintiff's Property | 7.9% | 37.8% |
| | March 2010 | Boundary | 23.6% | 23.8% |
| | March 2010 | Plaintiff's Property | | 17.9% |
| | May 2010 | Boundary | | 11.7% |
| | May 2010 | Plaintiff's Property | | 27.3% |
| | June 2010 | Plaintiff's Property | | 6.3% |
| | July 2010 | Plaintiff's Property | | 24.2% |
| | August 2010 | Plaintiff's Property | | 22.1% |
| | October 5, 2010 | Boundary | | 11.0% |
| | October 5, 2010 | Plaintiff's Property | 8.4% | 13.2% |
| | October 28, 2010 | Plaintiff's Property | | 11.1% |

"[T]he harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Gwaltney of Smithfield*, 484 U.S. at 59. Marcas filed its Complaint on January 22, 2007, *see* Document No. 1, an Amended Complaint on August 23, 2007, *see* Document No. 21 and a Second Amended Complaint on October 24, 2008, *see* Document No. 47. As reflected in the table above, the concentration of methane gas exceeding the LEL has been detected from as

early as November 2003 through October 2010. Marcas has clearly demonstrated a *present*, *ongoing* violation at the time it filed its original complaint.

40 C.F.R. § 258.23(a)(2) states,

> Owners or operators of all MSWLF units must ensure that: The concentration of methane gas does not exceed the lower explosive limit for methane at the facility property boundary.

The table above documents repeated instances where the concentration of methane gas exceeded the LEL. There is thus no dispute that, contrary to the directive of § 258.23(a)(2), St. Andrew's Landfill *is exceeding* the LEL for methane at its property boundary. The Court finds unpersuasive the County's argument that because methane levels have exceeded the LEL in the past, that the County's behavior should be evaluated based on the obligations of § 258.23(c),[20] not § 258.23(a)(2). The Court concurs with Marcas' assertion, namely, "the County's lengthy discussion of its efforts to comply with 40 C.F.R. § 258.23(c) is itself an admission that the County is in violation of 40 C.F.R. § 258.23(a)(2)." Pl.'s Reply at 11.

Moreover, the County acknowledged its continuing obligation to comply with 40 C.F.R. § 258.23. In a March 30, 2007 e-mail to Mr. Dexter of MDE, Mr. Tarr of St. Mary's County DPW&T wrote in pertinent part,

> Once the landfill gas readings are below the regulatory limit of 100% for the property line as identified in 40 CFR 258.23 and COMAR 26.04.07.21, what additional landfill gas measures must

---

[20] (c) If methane gas levels exceeding the limits specified in paragraph (a) of this section are detected, the owner or operator must:

(1) Immediately take all necessary steps to ensure protection of human health and notify the State Director;

(2) Within seven days of detection, place in the operating record the methane gas levels detected and a description of the steps taken to protect human health; and

(3) Within 60 days of detection, implement a remediation plan for the methane gas releases, place a copy of the plan in the operating record, and notify the State Director that the plan has been implemented. The plan shall describe the nature and extent of the problem and the proposed remedy.

(4) The Director of an approved State may establish alternative schedules for demonstrating compliance with paragraphs (c)(2) and (3) of this section.

the County conduct other than maintain the landfill gas extraction system?

Pl.'s Mem., Ex. 36 at 2 (E-mail from Tarr to Dexter of 3/30/07).

B.    40 C.F.R. § 258.61(a)(4)

As noted previously St. Andrew's Landfill discontinued land-filling of waste in 1999 and discontinued disposal of rubble in 2001.  *See* Second Am. Compl. ¶ 25; Answer ¶ 25.  Part 258 of 40 C.F.R. includes regulations governing post-closure care requirements.   Among those requirements is the following,

> Following closure of each MSWLF unit, the owner or operator must conduct post-closure care.   Post-closure care must be conducted for 30 years, except as provided under paragraph (b) of this section, and consist of at least the following:  Maintaining and operating the gas monitoring system in accordance with the requirements of § 258.23.

40 C.F.R. § 258.61(a)(4).

In support of its contention that the County is violating § 258.61(a)(4), Marcas asserts,

> Because it is undisputed that the County was in violation of 40 C.F.R. § 258.23(a)(2) when Marcas filed its Complaint and continues to violate 40 C.F.R. § 258.23(a)(2) up to and including April 2009, the last month for which the County has provided sampling data,[21] the County is in violation of both 40 C.F.R. § 258.23(a)(2) and 40 C.F.R. § 258.61(a)(4).

Pl.'s Reply at 11-12.

The Court disagrees with Marcas' assertion that merely because the County is violating 40 C.F.R. § 258.23(a)(2), the County is also violating 40 C.F.R. § 258.61(a)(4).   Although § 258.61(a)(4) refers to being "in accordance with the requirements of § 258.23", Marcas has overlooked the context of this subsection.   During post-closure care a MSWLF unit, such as St. Andrew's Landfill, must *maintain and operate the gas monitoring system* in accordance with §

---

[21]  Marcas filed a Supplemental Memorandum in Support of its Motion for Partial Summary Judgment (Document No. 102) on November 12, 2010 listing sampling data up to and including October 2010.

258.23.  The requirements of maintaining and operating a gas monitoring system are outlined in § 258.23*(b)* as follows:

> (b) Owners or operators of all MSWLF units must implement a routine methane monitoring program to ensure that the standards of paragraph (a) of this section are met.
>
> (1) The type and frequency of monitoring must be determined based on the following factors:
>
> (i) Soil conditions;
>
> (ii) The hydrogeologic conditions surrounding the facility;
>
> (iii) The hydraulic conditions surrounding the facility; and
>
> (iv) The location of facility structures and property boundaries.
>
> (2) The minimum frequency of monitoring shall be quarterly.

Marcas does not allege that the County did not maintain and operate a gas monitoring system.  In fact, the data Marcas cites as proof that the methane level has been and continues to exceed the LEL comes from *the County's routine methane monitoring program*.  As early as June 2001 the County retained the services of GCI Environmental Services which installed nine landfill gas monitoring probes around the perimeter of St. Andrew's Landfill.  *See* Def.'s Reply, Ex. 4 at 2.  The Court finds no violation of 40 C.F.R. § 258.61(a)(4).

C.      40 C.F.R. § 258.25

Finally Marcas asserts it is entitled to judgment as a matter of law as to Count VI because of the undisputed fact that the County is in violation of 40 C.F.R. § 258.25, which defines access requirements.

> Owners or operators of all MSWLF units must control public access and prevent unauthorized vehicular traffic and illegal dumping of wastes by using artificial barriers, natural barriers, or both, as appropriate to protect human health and the environment.

The issue regarding unrestricted access to St. Andrew's Landfill was first raised by Marcas' consultant, Mr. Hosmer, in his December 2004 Supplemental Site Evaluation, first in a paragraph under "Summary of Findings" and later in the "Discussion" portion of the report.

> The SAL property is not secure from unauthorized access at the present time. After development on Parcel 455, access will become more readily available with the close proximity of residences, roadways and commercial establishments. This situation could cause significant potential public safety concerns through exposure to the environmental controls (i.e. open flame flares), mechanical and heavy construction equipment and physical hazards prevalent on the SAL. In addition, seeps, ponded liquids, gaseous emissions and other indications of environmental releases were present on the SAL during the investigations; these would create exposure pathways for humans unless unauthorized access is prevented through security controls (i.e., fencing).

> \*                    \*                    \*

> Security

> Not only does the SAL represent a potential public health threat through releases to the environment, it can also represent a public safety issue when located in close proximity to a residential development. The SAL will represent an "attractive nuisance" in close proximity to residences, and in particular the active recreational area. The openness of the landfill surface will attract trespassers that could be harmed accidentally on the property. Further, the presence of mechanical equipment, particularly the open flares, could result in accidents, vandalism and liability exposure to St. Mary's County. It is therefore suggested that the boundary be closed to trespassers to the extent possible by the installation of a fence to prevent ready access to the landfill surface by vehicular and pedestrian traffic, and that mechanical equipment be located remote from the residential areas and inside locked containments. While it is recognized that complete containment and protection is not possible, the incidental trespasser will be deterred.

> Based on providing fencing along the Parcel 455/SAL boundary in the vicinity of the residential development, it is projected that this remedy will require on the order of $50,000 to implement.

Def.'s Reply, Ex. 49 at 4, 8-9.

In the January 7, 2005 letter from Mr. Erichsen of St. Mary's County DPW&T to Mr. Dexter of MDE, Mr. Erichsen responded to Mr. Hosmer's suggestion for fencing.

> Hosmer & Hosmer recommends the installation of a perimeter fence or barricade around the landfill to prevent the possibility of trespassers entering the property. The County is currently evaluating its obligations and authority to factor the gas migration into the zoning and planning approval process, including the possibility of restricting certain areas from residential development and/or conditional approval, which requires homes to be constructed with certain protective features such as gas monitors.

Def.'s Reply, Ex. 51 at 3 (Letter from Erichsen to Dexter of 1/7/05 at 2); Pl.'s Mem., Ex. 28 at 3 (Letter from Erichsen to Dexter of 1/7/05 at 2).

On February 4, 2005 Ms. Hynson of MDE sent a letter to Mr. Erichsen in response to Mr. Erichsen's letter of January 7, 2005. In her letter Ms. Hynson makes two references to access requirements in the second and the eighth paragraphs.

> This Department has been working with the County for some time to remedy the migration of methane gas and volatile organic and inorganic compounds from the landfill. As you are aware, 40 CFR 258.20 governs the operating criteria, including explosive gases control and access requirements, for municipal solid waste landfills and requires that you take immediate steps to protect human health from potentially explosive conditions from the migration of methane gas from the landfill.
>
>         *                       *                       *
>
> Your letter indicates that the County is evaluating its obligations regarding site access by the public. 40 CFR 258.25 sets forth the federal requirements regarding control of public access to the site. This regulation indicates that the County must control public access as appropriate to protect human health and the environment.

Def.'s Reply, Ex. 14 at 2, 3 (Letter from Hynson to Erichsen of 2/4/05 at 1, 2); Pl.'s Mem., Ex. 8 at 2, 3 (Letter from Hynson to Erichsen of 2/4/05 at 1, 2).

On June 16, 2006 Mr. Tarr of St. Mary's County DPW&T responded to an e-mail he received the previous day from Mr. Carlson of MDE. In the second paragraph Mr. Tarr noted,

> The owner of the property is aware of the landfill gas issue and the County has attempted to acquire a right-of-entry agreement with same; to date the County has been unsuccessful. . . *Development of the property which has been identified by the County and property owner as being impacted by the landfill gas remains undeveloped to date. Specifically, property development rights/agreements between the County and the developer were revised to allow the developer to "switch" commercial vs. residential rights on the parcel impacted by the landfill gas delaying development of the site until the remediation system has been installed and has addressed the landfill gas migration.*

Def.'s Reply, Ex. 36 at 2 (E-mail from Tarr to Carlson of 6/16/06); Pl.'s Mem., Ex. 32 at 2 (E-mail from Tarr to Carlson of 6/16/06) (emphasis added).

Finally, on March 15, 2007, Ms. Hynson of MDE sent a letter to Mr. Tarr of St. Mary's County DPW&T in response to St. Mary's County draft Assessment of Corrective Measures ("ACM") dated January 2007. Ms. Hynson made several recommendations and comments including the following about access to St. Andrew's Landfill.

> The ACM does not address trespassers to the site as potential receptors. Because the site is not fenced and security is limited, the possibility for trespass is high. There is evidence of trespassers near well MW-9 and GW-3. The road in this area provides easy access to trespassers. Other areas of the site are also accessible to trespassers. The ACM should evaluate trespassers as potential receptors and potential exposure routes. The County may take measures to prevent trespassers to the site.

Def.'s Reply, Ex. 54 at 4 (Letter from Hynson to Tarr of 3/15/07 at 3); Pl.'s Mem., Ex. 9 at 4 (Letter from Hynson to Tarr of 3/15/07 at 3).

Approximately a year later, March 17, 2008, Mr. Tarr was deposed by Marcas. The following colloquy concerned purportedly unrestricted access to St. Andrew's Landfill.

> Q:    The recommendations in [the GCI[22] report of October 2003] were not implemented?
>
> *                          *                          *
>
> A:    The trench was not implemented . . .

_____
[22] GCI is an environmental consultant hired by the County.

\*                           \*                           \*

A:      Nor the site security.  I think he refers to it as a fence.  It talks about site security.

\*                           \*                           \*

Q:      What about the security fence?

A:      That has not been installed.

Q:      Why not?

A:      You would have to check with Mr. Erichsen on that one.

Q:      What is your understanding of why it has not been installed?

A:      You would have to check with Mr. Erichsen on that one.

Q:      You have no understanding of why it hasn't been installed?

A:      The decision has been made not to put it up as of yet.

Q:      My question is:  What is your understanding of why it has not been installed to date?

A:      What is my understanding?

Q:      Yes, what's your understanding?

A:      That it's not needed.

Pl.'s Mem., Ex. 10 (Tarr Dep. 184:5 - 6, 9 - 10, 12 - 13, 185:3 – 20).

Based on the documents cited above, the Court notes that the issue of fencing was first raised by Marcas' environmental consultant because of the pending development plans ("*After development on Parcel 455, access will become more readily available with the close proximity of residences, roadways and commercial establishments.*").  Second, Mr. Hosmer expressed concerns about mechanical equipment, especially open flares, being an attractive nuisance.  On

August 11, 2004 when Marcas agreed to sell and Lincoln agreed to buy certain residential building lots, POD 2 and POD 3 were the lots designated for construction of new homes for the U.S. Navy. *See* Pl.'s Mem., Ex. 21; Def.'s Reply, Ex. 50. According to Marcas, it did not become aware of the landfill gas migration onto its property until September 8, 2004, not in January 2004 as the County claims. It was only after this notice in September that Marcas retained ARCADIS to investigate the potential impacts of the gas migration onto the Marcas' property.

In the December 2004 Supplemental Site Evaluation report, Mr. Hosmer assessed the environmental degradation to POD 2 and to the conservation/recreational area between PODs 2 and 3, slated for residential and/or mixed development in the immediate future, as well as POD 6. Mr. Hosmer's findings as to POD 6 were,

> A site reconnaissance of POD 6 was independently conducted by ERM and the writer to identify any indications of environmental degradation of the property that would preclude immediate development. The indicators include vegetative stress; evidence of prior site disturbance and/or use for residential/commercial/industrial purposes; seeps, springs or discharges with visual indications of potential degradation (i.e., color, odor or residual staining); or atmospheric odors. No such evidence was apparent in the reconnaissance conducted by either party (see the ERM report).

Def.'s Reply, Ex. 49 at 9.

On January 7, 2005 Bill D. McKissick, Jr., counsel for Marcas, sent a letter to Denis Canavan, Director, St. Mary's County Department of Land Use and Growth Management, requesting to relocate Residential Development Area (POD 2) to the area designated as Mixed Commercial Development (POD 6). *See id.*, Ex. 32 at 2. This request to switch PODs for residential development is not surprising, particularly in light of Mr. Hosmer's conclusion in the December 2004 report. "The migration of landfill gas . . . from the SAL onto Parcel 455, *in*

*particular the areas programmed for the development of POD 2* and the conservation/recreational areas, was confirmed through the conduct of this preliminary Supplemental Site Evaluation." *Id.*, Ex. 49 at 9 (emphasis added). By June 2006 Mr. Tarr noted that Marcas' property remained undeveloped to date, and the property developments rights between the County and the developer were revised "to allow the developer to 'switch' commercial vs. residential rights on the parcel impacted by the landfill gas delaying development of the site until the remediation system has been installed and has addressed the landfill gas migration." *Id.*, Ex. 36 at 2; Pl.'s Mem., Ex. 32 at 2.

Although Ms. Hynson of MDE raised issues about access to St. Andrew's Landfill in a March 15, 2007 letter, it is unclear, with the "switch" from POD 2 to POD 6, and the lack of development on the parcel impacted by migrating landfill gas, whether unauthorized or uncontrolled access to the site continues to be a concern necessitating the installation of fencing. The premise for the need of fencing, according to Mr. Hosmer, is the close proximity of residences, roadways and commercial establishments *after development of Parcel 455*. Moreover, Mr. Erichsen, the Director of St. Mary's County DPW&T, never directed that fencing be installed because, according to Mr. Tarr, Mr. Erichsen, was of the opinion that the fencing is "not needed." It is unclear to the Court exactly what portions around St. Andrew's Landfill is unrestricted. Purportedly, there is restricted vehicular access to the landfill along with natural barriers around the landfill. The Court thus finds there is a genuine dispute of material fact regarding whether the County is in violation of 40 C.F.R. § 258.25. Because the Court finds the County violated and is violating 40 C.F.R. § 258.23(a)(2), finds the County did not violate 40 C.F.R. § 258.61(a)(4) and, finds there is a genuine dispute of material fact regarding a possible

violation of 40 C.F.R. § 258.25, judgment as a matter of law will not be entered in favor of Marcas as to Count VI.

      *3.*      *Whether Marcas Is Entitled to Judgment as to Count III, Nuisance?*

Marcas contends, as a matter of law, the County is liable for a private nuisance because the ongoing release of methane gas and other hazardous substances from St. Andrew's Landfill has materially diminished the value of Marcas' property and seriously interferes with Marcas' ordinary comfort and enjoyment of its property. Specifically, Marcas claims as undisputed the release of methane gas, vinyl chloride and other organic compounds from St. Andrew's Landfill have contaminated Marcas' property and therefore satisfies the second element of a private nuisance action, *i.e.,* serious interference with the ordinary use and enjoyment of one's property. As proof of the first element for a private nuisance action, Marcas asserts the invasion of hazardous substances onto its property has diminished the value of the property in three critical ways. First, the hazardous substances and pollutants are unquestionably harmful to human health and the environment. Second, the contamination is ongoing as the County has failed to stop it. Third, the County has refused or failed to clean up the contamination. Not only has the County failed to remediate the contamination, the County has also attempted to shift responsibility for the contamination onto Marcas. This is exemplified by the County's effort to tie Marcas' efforts to develop the property for residential and commercial use to Marcas, having Marcas assume any liability resulting from Marcas' intention to proceed with its development plans despite full knowledge that methane gas and other substances harmful to human health and the environment have migrated onto Marcas' property from the adjacent landfill. "By requiring Marcas to sign a Waiver and Estoppel Certificate as a prerequisite to development, the County was requiring Marcas to assume all liability risk arising from the County's contamination." Pl.'s

Mem. at 33.  Unwilling to assume such liability, Marcas asserts the property presently has little to no value.

In its Opposition the County argues summary judgment as to Count III should be denied because there are several genuine disputes of material fact.  Furthermore, Marcas has not demonstrated the interference with the use and enjoyment of its property was substantial and unreasonable.

The County disputes the opinion of Marcas' real estate appraiser claiming Marcas' properties, *i.e.,* individual PODs, are close to non-marketable.  The County's designated real estate expert challenges, as inconsistent with accepted appraisal methodology and principles, the methodology employed by Marcas' real estate expert.  Additionally the County contends Marcas has distorted the facts about which properties were affected by landfill gas migration.  "The record includes evidence that [Marcas] has developed POD 6 for residential use and the delay in other POD development is likely due, not to landfill gas migration, but to the lack of a strong local market, a desire to bring other residential spaces along after mixed-use development has occurred, and a lack of financing."  Def.'s Reply at 45-46.

Third, the County refutes any assertion of lost profit by Marcas because it lost density when it swapped POD 6 for POD 2.  "[A]ny argument concerning lost density is fundamentally flawed because the facts demonstrate that the northern and northeastern portion of POD 3 were not impacted with landfill gas because no gas well on that portion of the POD showed excessive levels of landfill gas, making POD 3 . . .  available for development to comply with the real estate contract between Lincoln Property and Marcas (the "Lincoln contract")."  *Id.* at 46.

Fourth, the County asserts a genuine dispute exists concerning Marcas' ability to satisfy its obligations under the Lincoln contract even if landfill gas had not infiltrated the property.

The County notes Marcas never took the necessary steps for building units in POD 2 or POD 3 by filing a required concept plan or individual site plan. Moreover, the military wanted single family homes with detached garages in close proximity to preexisting commercial stores and restaurants near POD 6 than the originally offered POD 2. "In fact, environmental concerns were never raised in the context [of] the swap in the POD designations." *Id.*

Fifth, the County contends Marcas has not demonstrated that the County has failed or refused to remediate the contamination. The County asserts the record clearly demonstrates it has taken extensive steps to remediate the contamination. For instance, with the installation of the active landfill gas extraction system, landfill gas migration onto Marcas' property has been eliminated except for a single gas monitoring well at POD 3. *Id.* at 47. According to the County's expert, there is presently no environmental impact to residential POD 1, commercial POD 2 or residential POD 6 emanating from St. Andrew's Landfill. *Id.*

Sixth, the County denies any insinuation by Marcas that its use and enjoyment of its property has been interfered with due to a delayed response by the County in responding to environmental hazards. The County contends it has followed the proper sequence of steps in response to the landfill gas migration in its efforts to mitigate the contamination. "The only delay that [Marcas] can claim, between late 2004 and 2005, was due to the originally proposed landfill gas mitigation system (a passive interceptor trench between the County and Marcas properties) would have been difficult to implement and potentially create negative impacts to groundwater and increase the likelihood of landfill fires." *Id.* at 47. This necessitated the County to start the process over again. The County asserts it has been diligent in its remediation efforts. The County notes Marcas was aware the County needed access to its property to

continue its remediation effort; nevertheless, Marcas allowed three and a half years to elapse before granting the County's requested right-of-way.

Seventh, with regard to Marcas' charge that the County purposely delayed Marcas' development of its property, Marcas has presented an inaccurate history. The proposed Waiver and Estoppel Certificate did not delay the development of Marcas' property. The County notes the proposed Waiver and Estoppel Certificate, an attachment to former St. Mary's County Attorney John Norris' January 10, 2005 letter to Mr. Truitt (Marcas' counsel), is a "draft" as clearly labeled on the face of the proposed waiver. This proposed waiver was merely a recommendation by the County Attorney. The waiver was never submitted for approval to the Board nor did the Board ever require such a waiver. *Id.* at 49.

If the County's intention was to force Marcas to develop its property *after* consenting to the waiver, the County's flexibility in working with Marcas, such as allowing Marcas to swap POD 2 and POD 6 and to facilitate the traffic mitigation concerns associated with the residential development, is contrary to an alleged intention to delay. The County argues its flexibility "demonstrates that there are genuine disputes regarding whether the County was purposely interfering with [Marcas'] use of [its] property and development thereof. The County has placed no restrictions on the development of the Marcas property, nor did the County act to block development." *Id.* at 49. Notably, on June 22, 2007, the County approved residential POD 1 for a site approval plan.

Eighth, although Marcas alleges subsurface migration of landfill gas interfered with Marcas' use and enjoyment of the property, the County contends Marcas has not demonstrated the interference was substantial. To prove a substantial interference Marcas must prove actual physical discomfort and annoyance to individuals of ordinary sensibilities. Marcas cannot prove

substantial interference because there was no physical damage to the property, only alleged economic loss. According to the County, the law of Maryland requires physical discomfort and annoyance.

Finally, to recover damages, the County asserts Marcas must show substantial and unreasonable interference with the use and enjoyment of its property. A mere diminution in the value of a property is an insufficient basis to recover damages.

In its Reply Marcas claims the questions raised by the County go to the extent of damages, not to the issue of liability. However, if any of the issues raised by the County may be construed as questioning liability, Marcas contends the County does not identify genuine disputes as to any material fact.

Marcas reiterates what it asserts are the undisputed facts that the County has substantially and unreasonably interfered with Marcas' use and enjoyment of its property: (a) the County has contaminated Marcas' property; (b) the contamination is ongoing; (c) the County has failed and/or refused to abate the contamination and prevent additional migration of methane gas and other hazardous substances; (d) the County has failed and/or refused to clean up and remediate the contamination of Marcas' property; and (e) the County has precluded the development of residential areas on Marcas' property next to St. Andrew's Landfill. Citing *Exxon Corporation v. Yarema*, 516 A.2d 990 (Md. Ct. App. 1986), Marcas states there is precedent under Maryland law where gasoline contamination onto an adjacent property was deemed a recoverable nuisance. The plaintiffs in the *Yarema* case needed to demonstrate a causal link between the damage to their property from the contamination by the defendant. Marcas argues it is undisputed that the injuries to the use and enjoyable of its property are causally linked to the contamination from St. Andrew's Landfill.

Marcas rejects the County's contentions about complying with the standard of care. "As a matter of law, nuisance is a strict liability claim." Pl.'s Reply at 16. Thus standard of care is not relevant.

According to Marcas, the County attempts to create genuine disputes when, in fact, none exist. For instance, the County tries to downplay the effect of the proposed Waiver and Estoppel Certificate. The County Attorney however continued to insist Marcas sign the waiver as reflected in his May 3, 2005 letter to Marcas' counsel.

> In light of yesterday's meeting at Land Use & Growth Management, it would seem to behoove us to begin to address your proposed revisions to the Waiver and Estoppel Certificate. In particular, you were to propose revisions consistent with our discussion following the transmittal of the Certificate to Mr. Truitt. Not finalizing that agreement and the details regarding transfer of the 18-acre parcel to the County to be used to acquire a school site will delay the findings of the Department of Land Use & Growth Management; a result for which I do not want to be responsible. I therefore invite the receipt of your proposed amendments at your earliest convenience.

Pl.'s Mem., Ex. 30 at 2 (Letter from Norris, Esq. to McKissick, Esq. of 5/3/05).

Marcas rejects any assertion by the County that it was concerned about the public health in light of Marcas' proposed residential development on contaminated property. If that was the County's overriding concern, the County would not have allowed any residential development under any circumstances. "As is evident from the County's willingness to allow residential development if Marcas assumed all liability risk and indemnified the County, the County was solely concerned with the liability risk to the County resulting from constructing homes on the contaminated property and people living there." Pl.'s Reply at 17.

Contrary to the County's insinuation, there is no evidence that Marcas was unable to satisfy the Lincoln contract even if there had not been any environmental contamination.

Specifically the County suggests Marcas could not satisfy its obligation of presenting a concept site plan for 240 residences under the Lincoln contract. "The County's suggestion ignores that Marcas presented a site plan that reflected the actual, reduced number of residences that could be constructed due to the County's contamination. As a result of the County's contamination and insistence that Marcas sign the Waiver and Estoppel Certificate, it would have been futile for Marcas to pursue a Concept Site Plan for all 240 residences contemplated under the Lincoln contract." *Id.* at 18.

Finally, Marcas notes, because the homes to be constructed under the Lincoln contract would provide housing to military members during a time of war, the development of these homes was not subject to St. Mary's County local land use requirement. *See id.*, Exs. 44-45. Marcas therefore argues the Lincoln contract was a unique opportunity which Marcas lost due to the County's contamination. The uniqueness of this contract further undermines the County's contention that Marcas could not fulfill the County's land use requirements in the absence of environmental contamination.

To establish a private nuisance Marcas must show unreasonable and substantial interference with the use and enjoyment of its property. *Washington Suburban Sanitary Comm'n v. CAE-LINK Corp.*, 330 Md. 115, 125, 622 A.2d 745, 750 (1993). The unreasonable and substantial interference "must cause actual physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits[.]" *Id.* at 126, 622 A.2d at 750 (citation omitted). Both parties acknowledge the harmful effects to human health caused by methane gas and VOCs. Because those harmful effects are well-known, Marcas need not demonstrate a specific individual's actual physical discomfort and annoyance. As Marcas' expert, Mr. Hosmer noted, "[a]lthough the VOCs may be below maximum contaminant levels in the groundwater, the

inhalation pathway may result in adverse health effects in residents at that location." Def.'s Reply, Ex. 11 at 3 (Letter from Hosmer to Truitt, Esq. of 10/27/04 at 2). The County claims Marcas cannot show substantial interference because there was no physical damage to the property. To prove nuisance a plaintiff need not show physical damage to the property. "Nuisance is not contingent upon whether the defendant *physically impinged on plaintiff's property*, but whether the defendant substantially and unreasonably interfered with plaintiff's use and enjoyment of its property." *Yarema*, 69 Md. App. at 148, 516 A.2d at 1002 (emphasis added).

40 C.F.R. § 258.23(a)(2) directs that owners or operators of municipal solid waste landfills must ensure "[t]he concentration of methane gas does not exceed the lower explosive limit for methane at the facility property boundary." Sampling taken at the direction of St. Mary's County shows through October 2010 that releases from St. Andrew's Landfill have in fact exceeded the lower explosive limit for methane gas. The ongoing releases of methane gas satisfy the *unreasonable* criteria in establishing a nuisance claim.

Marcas has demonstrated the release of methane gas has interfered with its use and enjoyment of its property. In his Supplemental Site Evaluation report Mr. Hosmer stated "where landfill gas has been identified, residential construction with basements or other subsurface structures, as in the recreational area, is not recommended to assure the protection of public safety." Def.'s Reply, Ex. 49 at 5 (Letter from Hosmer to Truitt, Esq. of 12/28/04 at 4). The County does not contest Mr. Hosmer's assessment. Moreover, the County acknowledged the "dangers" related to the release of methane gas and VOCs from the landfill. The County's effort, via the proposed Waiver and Estoppel Certificate, to have Marcas assume all risks from developing the property, despite ongoing releases of gases and compounds, clearly demonstrates

the County's concern about possible liability. There is no doubt that the releases from St. Andrew's Landfill has interfered with Marcas' use and enjoyment of its property.

The release of methane gas onto another's property may constitute a nuisance. *See Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 255 (D. Md. 2000) ("the allegations of the amended complaint indicate that methane gas from adjoining properties interfered merely with plaintiff[s'] use and enjoyment of their properties. . . such an interference, if properly pled, would amount to a claim of nuisance. . . ."). A nuisance may occur in a variety of forms.

> I apprehend, no distinction between any of the cases, whether it be smoke, smell, noise, vapors or water, or any gas or fluid. The owner of one tenement cannot cause or permit to pass over, or flow into his neighbor's tenement any one or more of these things in such a way as materially to interfere with the ordinary comfort of the occupier of the neighboring tenement, or so as to injure his property.

*Susquehanna Fertilizer Co. v. Spangler*, 86 Md. 562, 570, 39 A. 270, 272 (1898) (quoting, *Crump v. Lambert*, (1867) L.R. 3 Eq. 409).

"In this State it is well settled that when a municipal corporation has the power to abate a nuisance it is liable to persons injured in consequence of its failure to exercise such power. . . ." *Taylor v. Mayor & City Council of Baltimore*, 130 Md. 133, 148, 99 A. 900, 906 (1917). Marcas is entitled to judgment as a matter of law as to Count III, *Nuisance*. The amount of damages, if any, shall be determined at a later proceeding.

4.      *Whether Marcas Is Entitled to Judgment as to Count II, Trespass?*

This Court has found, *supra*, that governmental immunity does not shield the County against a claim for trespass and thus the County is not entitled to judgment as a matter of law for trespass (Count II). Now the Court must decide whether Marcas is entitled to judgment as a matter of law as to Count II.

Marcas argues, with the release of methane gas and VOCs from St. Andrew's Landfill (a force by the County against Marcas' property), the County has interfered with Marcas' possessory interest in its property without Marcas' consent. Citing *JBG/Twinbrook Metro Ltd. v. Wheeler*, 346 Md. 601, 697 A.2d 898 (1997), Marcas asserts the Court of Appeals of Maryland has recognized the subsurface migration of gasoline from one property onto an adjacent property constitutes a trespass. According to Marcas, in this same case the court declared that the "intrusion need not be intentional or negligent to constitute a trespass." Pl.'s Mem. at 34.

In its Opposition the County claims Maryland law does not recognize subsurface migration as a trespass. Even if Maryland law recognizes subsurface migration as a trespass, the element of intent is lacking. Notably, the case cited by Marcas, *JBG/Twinbrook Metro*, does not stand for the proposition that subsurface migration from one property owner to another would constitute a trespass. The County notes the Court of Appeals of Maryland did not address that specific issue because no objection was made to the definition of trespass given by the circuit court. Second, the County claims it lacks the requisite intent to contaminate Marcas' property and thus no trespass has occurred. The County challenges Marcas' reliance on *obiter dictum* when the Court made a reference to the proposition that a trespass can be unintentional and non-negligent. Def.'s Reply at 40. Maryland law requires a conscious decision or volitional act to be on another's property, without the owner's consent, for a trespass to be found. Third, to prove trespass Marcas must show which area of Marcas' property the trespass, by subsurface migration, occurred. The County notes Marcas refers to sampling data showing methane gas above the lower explosive limit level but there is a genuine dispute of material fact because Marcas has failed to allege what portion of its property, *i.e.,* which POD, has ongoing contamination.

In its Reply Marcas claims, as undisputed, the invasions of its property by contaminants from the County-operated landfill. In response to issues raised by the County, Marcas asserts the fact that the Court of Appeals of Maryland did not squarely find subsurface migration contamination constitutes a trespass does not mean a trespass did not occur. Marcas asks this Court to "follow the clear weight of authority and find that subsurface migration of contaminants constitutes a trespass." Pl.'s Reply at 20. Contrary to the County's citation of *In re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 457 F. Supp. 2d 298 (S.D.N.Y. 2006) to buttress the County's position that Maryland law has not definitely established a trespass occurs when there is a subsurface migration of contaminants, Marcas claims the Southern District of New York court reasoned that the Court of Appeals of Maryland would in fact recognize subsurface migration of contaminants as a trespass. Marcas asks this Court to follow the reasoning of *In re: MTBE* and find the County liable for trespass.

This Court begins its analysis by reviewing the *JBG/Twinbrook Metro* decision. In that case during the jury trial before the Circuit Court for Montgomery County, Judge McGuckian defined trespass for the jury as follows: "'[a] trespass occurs when a person without authority, privilege or permission enters the land of another *or permits a substance under that person's control to enter the land of another without authority, privilege or permission.*'" *JBG Twinbrook/Metro*, 346 Md. at 618, 697 A.2d at 907 (emphasis added). The Court of Appeals of Maryland noted that none of the defendants objected to the instruction. In a footnote the court stated "[b]ecause the issue is not before us, we *express no opinion as to whether the instruction correctly states the Maryland law to be applied to the subsurface migration across a property line of a pollutant in or on ground water.*" *Id.* at 619 n.12, 697 A.2d at 907 n.12 (emphasis added).

In that same decision the Court of Appeals of Maryland summarized the case of *Rockland Bleach & Dye Works Co. v. H.J. Williams Corp.*, 242 Md. 375, 219 A.2d 48 (1966). In the *Rockland Bleach & Dye* case, the defendant, a contractor working for the State Road Commission, created a fill 50 feet high and 390 feet wide adjacent to the plaintiff's reservoir which supplied a significant amount of water daily for plaintiff's bleach and dye works. When a rain storm struck, earth from the fill washed into the reservoir completely blocking the intake and feeder pipes. The plaintiff sued the defendant for trespass. A directed verdict was granted for defendant. On appeal the Court of Appeals of Maryland reversed. In reversing the directed verdict the Court remarked "'when an adjacent property is invaded by an inanimate or intangible object it is obvious that the defendant must have some connection with or some control over the object in order for an action in trespass to be successful against him.'" *JBG/Twinbrook Metro*, 346 Md. at 623, 697 A.2d at 909 (quoting *Rockland Bleach & Dye*, 242 Md. at 387, 219 A.2d at 54). In a footnote the Court of Appeals of Maryland made the following observation: "*Rockland Bleach & Dye* involved surface waters while the instant matter is concerned with the subsurface percolation of liquids. No party in this case argues that the distinction makes any difference from the standpoint of the Maryland law of trespass. *See* note 12, *supra*." *JBG/Twinbrook Metro*, 346 Md. at 387, 697 A.2d at 909.

Both Marcas and the County cite *In re: MTBE* to support their contrary viewpoints. The question before the Southern District of New York was "whether invasion by invisible particles of MTBE beneath the earth may constitute a trespass." *In re: MTBE*, 457 F. Supp. 2d at 313. The Southern District of New York noted the question has not been definitely answered by the Maryland courts. The Southern District of New York reviewed the *JBG/Twinbrook Metro* case and noted the Court of Appeals of Maryland declined to address whether the instruction by the

circuit court (that subsurface contamination from an adjacent property constitutes a trespass) was correct under Maryland law. "Thus, it is still unclear whether an invasion by a substance through groundwater constitutes a trespass." *Id.* at 314. This supports the position advocated by the County.

The Southern District of New York then noted how Maryland courts have recognized tunneling under another's property constitutes a trespass and that particles traveling on the surface of land to another's property may constitute a trespass.

> It makes no sense to say that particles beneath the surface that are transported through the groundwater to plaintiffs' well cannot constitute a trespass. . . Maryland allows claims for trespass where a defendant caused an invading substance to enter plaintiff's property without actually entering himself. As alleged, this is a case where a polluting substance was allegedly deposited in plaintiffs' wells, thus interfering with the plaintiffs' exclusive possessory interests by causing substantial damage to plaintiffs' drinking water. For these reasons, I predict that Maryland courts confronted with Exxon's argument would reject it as "hyper-technical" and rely on the Restatement and modern tort law to allow plaintiffs' trespass claim to proceed.

*Id.* at 315-16.

The Southern District of New York further observed that, historically, invasions by invisible particles such as smoke and dust were considered non-physical and thus could not constitute a trespass but instead were categorized as a nuisance. With modern scientific advances, many courts have abandoned the viewpoint that an invasion of particles, smoke or dust is non-physical. Hence, the division between trespass and nuisance has begun to coalesce. *Id.*

This Court finds the analysis of the Southern District of New York persuasive in the *In re: MTBE* case and thus hereby adopts its analysis. The Court therefore finds the subsurface contamination from St. Andrew's Landfill to Marcas' property constitutes a trespass under Maryland law. *Contra NVR Homes*, 193 F.R.D. at 255 (finding no actionable claim of trespass

against former developers who concealed from purchasers that homes were built on top of a former solid waste dump site, even though methane gas was emanating from the parcels formerly owned by the developers, since the methane gas interfered with the plaintiffs' use and enjoyment of the properties, not with the plaintiffs' possession of their land).

Contrary to the County's assertion, Marcas does not have to prove the subsurface contamination of Marcas' property was intentional. "A trespass is an intentional or negligent intrusion upon or to the possessory interest in property of another. In other words, a trespass can be actionable whether the intrusion was done in a negligent or intentional manner. The intentions of the defendant are simply not material." *Ford v. Baltimore City Sheriff's Office*, 149 Md. App. 107, 129, 814 A.2d 127, 139 (2002) (citations omitted). To prove a trespass Marcas must demonstrate (1) a physical act or force against its property and (2) done without Marcas' consent, interfering with Marcas' possessory interest in its property. *Id.*, 814 A.2d at 139. Both elements have been established by Marcas.

For the reasons outlined *supra*, Marcas is entitled to judgment as a matter of law as to Count II, Trespass. The amount of damages, if any, shall be determined at a later proceeding.

## <u>CONCLUSION</u>

For the above reasons, the County's motion for partial summary judgment will be denied. Marcas' motion for partial summary judgment will be granted in part and denied in part. An Order will be entered separately.


<u>September 28, 2011</u>             _____/s/_____
        Date                           WILLIAM CONNELLY
                               UNITED STATES MAGISTRATE JUDGE