IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARCAS, L.L.C.                                        *

        PLAINTIFF,                            *

        v.                                              *                        8:07-CV-00196-WGC

BOARD OF COUNTY COMMISSIONERS        *
OF ST. MARY'S COUNTY,
                               *

        DEFENDANT.                            *

**THIRD AMENDED COMPLAINT**

        Plaintiff Marcas, L.L.C. ("Marcas" or "Plaintiff") by its attorneys Thomas M. DiBiagio, Bikram Bandy, and McKenna Long & Aldridge LLP, and pursuant to Federal Rule of Civil Procedure 15(a)(2), hereby files this Third Amended Complaint against Defendant Board of County Commissioners of St. Mary's County ("St. Mary's County" or "Defendant"), sued solely in their official capacities.  In support thereof, Plaintiff alleges as follows:

**INTRODUCTION**

        1.      This suit is brought under the federal Comprehensive Environmental Response, Compensation and Liability Act, Solid Waste Disposal Act, tort law, 42 U.S.C. § 1983, and state common law for the sudden and accidental releases of hazardous substances and other pollutants by Defendant onto the property of Plaintiff.  Defendant's actions have damaged or threatened the environment and public health and safety and have harmed Plaintiff through damage to and loss of value of Plaintiff's property, as well as interference with Plaintiff's efforts to use, develop, and sell Plaintiff's property.  In addition, this suit challenges application of the cap on damages set forth in Maryland's Local Government Tort Claims Act (Md. Code Ann., Cts. & Jud. Proc. § 5-303(a)) ("LGTCA") to limit

Defendant's liability for the damage it has caused to Plaintiff's property because such application violates the federal and Maryland constitutions.

2.      Plaintiff seeks its necessary costs of response to Defendant's releases of hazardous substances under the federal Superfund statute as alleged in Count One; injunctive relief and damages in nuisance and trespass by Defendant as  alleged in Counts Two and Three; damages for Defendant's wrongful interference with Plaintiff's business relationships as set forth in Count Four; damages in strict liability for Defendant's harm to Plaintiff's property and business interests, as alleged in Count Five; injunctive relief and attorneys' fees and costs under the Federal Solid Waste Disposal Act in Counts Six and Seven; damages stemming from Defendant's unconstitutional attempt to apply the LGTCA Damages Cap to prevent Plaintiff from receiving just compensation for the full extent of the damage Defendant caused to Plaintiff's property, as alleged in Counts Eight and Nine; declaratory relief under 28 U.S.C. § 2201(a) that application of the LGTCA Damages Cap to prevent Plaintiff from recovering for the full amount of the damage Defendant caused to Plaintiff's property violates the federal and Maryland constitutions, as alleged in Count Ten; and damages in inverse condemnation under the federal and Maryland constitutions as alleged in Counts Eleven and Twelve.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the causes of action alleged herein arise under the laws of the United States, or are supplemental or pendent thereto.  This action involves application of the Solid Waste Disposal Act, 42 U.S.C. § 6901, et  seq. and application of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601, et seq., which provides that "the United States district courts shall have exclusive original jurisdiction over all controversies  arising under this chapter." 42 U.S.C. § 9613(b).

4.      Certain of Plaintiff's claims arise under state law.  The Court has supplemental jurisdiction over these claims arising under Maryland state law pursuant to 28 U.S.C. § 1367(a), as they form part of the same case or controversy as Plaintiff's federal statutory claims.

5.      Defendant is subject to the personal jurisdiction of this Court because Defendant does business within the State of Maryland.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the Defendant does business in Maryland, and because the acts giving rise to Plaintiffs' claims have occurred within the District of Maryland.  Venue is also proper in this District pursuant to CERCLA, 42 U.S.C. § 9613(b), because this is the District in which the hazardous substance releases occurred and response costs were incurred.

## PARTIES

7.      Plaintiff, Marcas, L.L.C. is a Limited Liability Corporation, registered under the laws of Maryland, doing business in Maryland.

8.      Defendant, Board of County Commissioners of St. Mary's County, Maryland, is  the duly elected body of five officials that governs the affairs of St. Mary's County under the  powers, duties, and restrictions set forth in Article 25 of the Annotated Code of Maryland.

## FACTUAL BACKGROUND

**A.      Acquisition of the Property and Approval of the Planned Unit Development Project**

9.      The property that is the subject of Plaintiff's claims is a tract of land consisting of approximately 227 acres, located in California, Maryland, at St. Mary's County Tax Map 34, Parcel 455 (the "Property").

10.      Cazimir Szlendak, a person who directly or indirectly has an interest in Plaintiff, acquired the Property in 1978.

11.     Plaintiff acquired the Property on April 10, 1998 from Cazimir Szlendak.

12.     In June 1996, Plaintiff's representatives met with officials from the St. Mary's County Department of Public Works and expressed concern about future impacts on the Property from the County's St. Andrews Landfill ("Landfill") that is adjacent to the Property.  The County officials explained the plans for leachate collection and landfill expansion to Plaintiff's representatives and advised them that the Landfill should not adversely affect development of the Property.  (Leachate is a liquid that has passed through or emerged from waste in a landfill and contains soluble, suspended or miscible contaminants removed from such waste.)  To date, Defendant has not constructed any facilities to collect leachate from the Landfill and releases of leachate from the Landfill have adversely impacted and continue to adversely impact Plaintiff's Property.

13.     In November 1996, Porto Bello Development, Inc., a related entity to Plaintiff, applied to Defendant for the Property to be rezoned to a classification designated as a "Planned Unit Development ("PUD").  The proposed PUD was to be known as the "First Colony Planned Unit Development" or "First Colony PUD."  As described in the application, the First Colony PUD is a 227 acre parcel of land which is, for development purposes, "planned as a single unit rather than as an aggregate of individual lots." The St. Mary's County Planning Commission recommended approval of the application, subject to certain terms and conditions, on October 27, 1997.

14.     The rezoning and creation of the First Colony PUD was approved by Defendant through the adoption of Ordinance Z98-03 (the "Ordinance"), on June 9, 1998 and recorded in the Land Records of St. Mary's County.  The approval of the First Colony PUD granted Plaintiff  significant development rights through affirmative governmental action authorizing up to 400  dwelling units and 1,049,500 square feet of commercial, retail, and office floor area in various  discreet sections, known as "Pods."

15.     The Ordinance provides that "it is the intent of the St. Mary's Comprehensive Plan to encourage commercial and residential growth in the Development District so as to allow for the efficient use of existing infrastructure facilities and to lessen development pressures on the more rural areas of St. Mary's County."  The "Findings" of the Ordinance state that "the proposed development complies with the purposes of the PUD district as set forth in § 38.5 of the St. Mary's County Zoning Ordinance, and provides for the safety, convenience and amenity of the residents of the development and the neighboring area."  Moreover, the adopting ordinance found that the project was "consistent with the housing demand, and with commercial retail and commercial office demands of the County . . . ."  The findings made by St. Mary's County in adopting the First Colony PUD demonstrate the clear intent of the Defendant to authorize the First Colony PUD to develop at a higher density and with a wider variety of uses than projects not approved through the PUD process.

16.     Subsequent to St. Mary's County's approval of the First Colony PUD, Plaintiff expended in excess of five million dollars in providing both on-site and off-site infrastructure, including but not limited to major capital improvements such as roads and water facilities to accommodate not only the full build-out of the First Colony PUD but also other developments  approved by the Defendant.

17.     Following approval pursuant to the PUD process, whereby a unique ordinance was written to streamline plan review process requirements specific to the First Colony PUD, Plaintiff reasonably expected and relied upon its expectation that all pre-construction approvals by St. Mary's County needed to complete development of Pods 2 and 3 with the uses and at the density envisioned by the Ordinance would be achievable within the framework and schedule established by the Ordinance. The build-out plan approved by St. Mary's County for the First Colony PUD provided for construction of 400 residential units, including residential units in Pods 2 and 3.

18.     On August 11, 2004, in reasonable reliance upon Defendant's approval of the First

Colony PUD, Plaintiff entered into a contract with Lincoln Property Company Southwest, Inc.

("Lincoln").  Lincoln was seeking to be awarded a contract for the procurement of U.S. Naval housing

to be utilized for the nearby Patuxent Naval Air Station.  If Lincoln were awarded the contract, Plaintiff

was obligated to deliver 120 lots for residential units on Pods 2 and 3 to Lincoln for use under Lincoln's

contract with the U.S. Navy.  Plaintiff was to receive $12 million under the contract.  Lincoln was

awarded the contract, and on or about October 26, 2004, Plaintiff notified Defendant that as a result of

this award, the environmental issues associated with the St. Andrews Landfill needed to be resolved

promptly.

19.     In late 2004, as the existence and extent of the landfill gas, leachate and contaminated

groundwater problems on the Property were confirmed through Plaintiff's investigation, it was clear that

Pods 2 and 3 were not suitable for residential housing because of the migration of landfill gas, leachate

and contaminated groundwater from the Landfill.  It was also clear that these Pods would remain

unsuitable for residential development in the absence of adequate remediation of the contamination from

the Landfill.

20.     Because of contamination on Pods 2 and 3, Lincoln questioned the suitability of Pods 2

and 3 for residential development.  As a result, Plaintiff and Lincoln on November 30, 2004 amended

their contract to provide for Plaintiff to deliver 100 residential lots on Pod 6 for Lincoln to use, rather

than 120 lots for residential units on Pods 2 and 3, as contemplated in the August 11, 2004 contract.

Plaintiff was to receive $10 million under the November 30, 2004 amendment to the contract.

21.     By February 7, 2006, Plaintiff had secured a traffic mitigation agreement with the

Defendant and, by May 16, 2006, Plaintiff had secured a schools mitigation agreement with the

Defendant.  In so doing, Plaintiff had removed all impediments to proceeding with detailed site plan

processing with St. Mary's County under the First Colony PUD for the residential development of Pods 2 and 3, but could not proceed with such development plans because of adverse impacts to Plaintiff's Property resulting from the sudden and accidental releases from Defendant's adjacent St. Andrews Landfill.

**B.      History of the St. Andrews Landfill**

22.      The St. Andrews Landfill is located approximately one-half mile south of the intersection of MD Route 4 and MD Route 235 in central St. Mary's County.  The Landfill is generally southwest of and adjacent to the Plaintiff's Property.

23.      Defendant began purchasing land for the St. Andrews Landfill in 1971 and completed land acquisition in 1984, for a total site area of approximately 270 acres. The Landfill includes four sanitary waste disposal cells (Cells 1-4) and one rubble disposal cell (Cell 5).

24.      Active land-filling operations were conducted and wastes were disposed at the Landfill beginning in approximately 1974 under the authority of Defendant.

25.      Defendant was in 1974 and continues to be the owner and operator of the Landfill.

26.      Disposal operations at the Landfill were conducted until Defendant discontinued waste disposal in Cells 1, 2, and 4 in November 1997 and in Cell 3 in February 1999.  The disposal of rubble was discontinued in June 2001.

27.      Since at least 1994, groundwater monitoring wells sampled by St. Mary's County  on the north and east borders of the Landfill have exceeded safe drinking water levels for a  number of volatile organic compounds ("VOCs").

28.      At the time Defendant approved the First Colony PUD in 1998, a monitoring well (W-4) located within approximately 200 feet of Plaintiff's property consistently had exceeded  maximum

7

allowable contaminant levels for tetrachlorathene and vinyl chloride, a known human  carcinogen, since at least 1994.

29.     Plaintiff did not have knowledge at the time Defendant approved the First Colony PUD in 1998 that monitoring well W-4 consistently had exceeded maximum allowable contaminant levels for tetrachlorathene and vinyl chloride, a known human carcinogen, since at least 1994.

30.     The groundwater in the vicinity of this monitoring well migrates onto Plaintiff's Property and likely discharges to a stream on Plaintiff's Property.

31.     Unsafe levels of these and other chemicals migrating from the Landfill continue to exist today in groundwater at this and other monitoring wells located on and near Plaintiff's Property.

32.     In September 1998, an employee of the Maryland Environmental Service working at the St. Andrews Landfill reportedly was exposed to methane gas and other chemicals at the Landfill and was hospitalized after being diagnosed with toxic pneumonia and congestive heart failure.

33.     Defendant did not disclose the September 1998 employee exposure and hospitalization incident to Plaintiff, and Plaintiff was not aware of this incident until recently.

34.     Inspections of the St. Andrews Landfill in 1999 by the Maryland Department of the Environment ("MDE") revealed numerous leachate seeps flowing from the Landfill to adjacent waters of the State, including the headwaters of the St. Mary's River.

35.     St. Mary's County did not report the results of MDE's 1999 inspections to Plaintiff.

36.     As a result of its inspections of the Landfill, MDE issued a site complaint to St. Mary's County, ordering the Defendant to contain and collect leachate seeps to prevent further discharges.

37.     Observations made as recent as January 12, 2007, confirm that leachate continues to discharge from the Landfill to waters of the State, some of which are located on and near Plaintiff's Property.

8

38.     Defendant's discharge to the headwaters of the St. Mary's River without a permit violates 40 C.F.R. § 258.27.

39.     In July 2001, construction of an engineered cap on Cells 1, 2, and 4 was completed and, in 2004, an engineered cap on Cells 3 and 5 was completed.

40.     Unreported by St. Mary's County to Plaintiff, Defendant contracted with GCI Environmental Service ("GCI") for a landfill gas survey of the Landfill which included sampling on the Plaintiff's property.  The survey, performed between November 2003 and January 2004 ("GCI 2004 Gas Survey"), confirmed the presence of landfill gas being generated by, and emanating from the Landfill, including at concentrations "found to exceed regulatory limits."

41.     The GCI 2004 Gas Survey also indicated that "the landfill gas is migrating off of the landfill site in six distinct areas of the landfill."  This off-site migration includes the Plaintiff's Property and bordering areas.

42.     The lower explosive limit for methane gas is 5% by volume.

43.     Sampling conducted by GCI in November 2003 and January 2004 indicated methane gas levels ranging from 8% to 68% by volume -- as much as greater than 13 times above the lower explosive limit -- in subsurface soils on or near Plaintiff's Property.

44.     Data from sampling conducted by Environmental Resources Management, Inc. in June 2007 indicate methane gas levels ranging from 9.9% to 73.7% by volume -- as much as greater than 14.5 times above the lower explosive limit -- in subsurface soils on Plaintiff's Property.

45.     Data from sampling conducted by Environmental Resources Management, Inc. in July 2007 indicate methane gas levels in excess of the lower explosive limit, ranging from 12.2% to 63.1% by volume, in subsurface soils on Plaintiff's Property.

46.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in October 2007 indicate methane gas levels in excess of the lower explosive limit, ranging from 13.6% to 52.4% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

47.     Data from sampling conducted by Environmental Resources Management, Inc. in November 2007 indicate methane gas levels in excess of the lower explosive limit, ranging from 6.3% to 36.7% by volume, in subsurface soils on Plaintiff's Property.

48.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in November 2007 indicate methane gas levels in excess of the lower explosive limit, ranging from 8.9% to 22.2% by volume, in subsurface soils on Plaintiff's Property.

49.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in November 2007 indicate methane gas levels in excess of the lower explosive limit, ranging from 31.6% to 62.8% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

50.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in March 2008 indicate methane gas levels in excess of the lower explosive limit, ranging from 17.3% to 25.9% by volume, in subsurface soils on Plaintiff's Property.

51.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in March 2008 indicate methane gas levels in excess of the lower explosive limit, ranging from 43.7% to 45.4% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

52.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in June 2008 indicate methane gas levels in excess of the lower explosive limit, ranging from 29.5% to 46.9% by volume, in subsurface soils on Plaintiff's Property.

53.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in June 2008 indicate methane gas levels in excess of the lower explosive limit, ranging from 24.6% to 32.6% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

54.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in August 2008 indicate the presence of methane gas in excess of the lower explosive limit, at 21.9% by volume, in subsurface soils on Plaintiff's Property.

55.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County in September 2008 indicate the presence of methane gas in excess of the lower explosive limit, at 14.4% by volume, in subsurface soils on Plaintiff's Property.

56.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 23, 2008, indicate methane gas levels in excess of the lower explosive limit, ranging from 42.4% to 49.4% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

57.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 23, 2008, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 20.6% to 30.2% by volume, in subsurface soils on Plaintiff's Property.

58.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on November 25, 2008, indicate methane gas levels in excess of the lower explosive

limit, ranging from 21.7% to 50.3% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

59.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on November 25, 2008, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 6.7% to 35.6% by volume, in subsurface soils on Plaintiff's Property.

60.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on December 30, 2008, indicate methane gas levels in excess of the lower explosive limit, at 43.8% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

61.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on December 30, 2008, indicate the presence of methane gas in excess of the lower explosive limit, at 32.6% by volume, in subsurface soils on Plaintiff's Property.

62.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on January 30, 2009, indicate methane gas levels in excess of the lower explosive limit, at 36.9% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

63.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on January 30, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 8.6% to 37.2% by volume, in subsurface soils on Plaintiff's Property.

64.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on February 20, 2009, indicate methane gas levels in excess of the lower explosive limit, at 13.5% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

65.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on February 20, 2009, indicate the presence of methane gas in excess of the lower explosive limit, at 21.7% by volume, in subsurface soils on Plaintiff's Property.

66.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on March 27, 2009, indicate the presence of methane gas in excess of the lower explosive limit, at 33.7% by volume, in subsurface soils on Plaintiff's Property.

67.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on April 29, 2009, indicate the presence of methane gas in excess of the lower explosive limit, at 19.6% by volume, in subsurface soils on Plaintiff's Property.

68.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on May 27, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 11.1% to 36.9% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

69.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on May 27, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 12.8% to 34.3% by volume, in subsurface soils on Plaintiff's Property.

70.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on June 24, 2009, indicate the presence of methane gas in excess of the lower explosive limit, at 25.4% by volume, in subsurface soils on Plaintiff's Property.

71.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on July 23, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 14.6% to 35.4% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

72.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on July 23, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 14.4% to 40.1% by volume, in subsurface soils on Plaintiff's Property.

73.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on August 27, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 5.2% to 33.8% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

74.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on August 27, 2009, indicate the presence of methane gas in excess of the lower explosive limit, at 23.9% by volume, in subsurface soils on Plaintiff's Property.

75.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on September 29, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 11.5% to 54.7% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

76.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on September 29, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 10.4% to 27.8% by volume, in subsurface soils on Plaintiff's Property.

77.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 15, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 10.3% to 55.6% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

14

78.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 15, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 11% to 34.3% by volume, in subsurface soils on Plaintiff's Property.

79.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on November 24, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 8.5% to 67.3% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

80.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on November 24, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 8.6% to 32.8% by volume, in subsurface soils on Plaintiff's Property.

81.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on December 30, 2009, indicate methane gas levels in excess of the lower explosive limit, ranging from 38.9% to 48.6% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

82.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on December 30, 2009, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 16.8% to 29.2% by volume, in subsurface soils on Plaintiff's Property.

83.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on January 29, 2010, indicate methane gas levels in excess of the lower explosive limit, ranging from 19.3% to 50.9% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

84.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on January 29, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 14.4% to 18.8% by volume, in subsurface soils on Plaintiff's Property.

85.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on February 25, 2010, indicate methane gas levels in excess of the lower explosive limit, ranging from 18.9% to 40.1% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

86.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on February 25, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 7.9% to 37.8% by volume, in subsurface soils on Plaintiff's Property.

87.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on March 22, 2010, indicate methane gas levels in excess of the lower explosive limit, ranging from 20.3% to 23.8% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

88.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on March 22, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 9.2% to 28.8% by volume, in subsurface soils on Plaintiff's Property.

89.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on May 27, 2010, indicate methane gas levels in excess of the lower explosive limit, ranging from 6.6% to 11.7% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

90.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on May 27, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 26.9 to 27.3% by volume, in subsurface soils on Plaintiff's Property.

91.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on June 29, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 6.3% to 12.6% by volume, in subsurface soils on Plaintiff's Property.

92.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on July 12, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 24.2% to 25% by volume, in subsurface soils on Plaintiff's Property.

93.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on August 31, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 21.2% to 25.3% by volume, in subsurface soils on Plaintiff's Property.

94.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 5, 2010, indicate methane gas levels in excess of the lower explosive limit, ranging from 8.5% to 11% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

95.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 5, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 8.4% to 14.4% by volume, in subsurface soils on Plaintiff's Property.

96.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 28, 2010, indicate methane gas levels in excess of the lower explosive limit, ranging from 12% to 33.5% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

97.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on October 28, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 11.1% to 15% by volume, in subsurface soils on Plaintiff's Property.

98.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on December 29, 2010, indicate methane gas levels in excess of the lower explosive limit, at 9.7% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

99.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on December 29, 2010, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 8.8% to 9.8% by volume, in subsurface soils on Plaintiff's Property.

100.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on January 24, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 6.2% to 8.9% by volume, in subsurface soils on Plaintiff's Property.

101.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on February 28, 2011, indicate methane gas levels in excess of the lower explosive limit, at 8.5% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

102.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on February 28, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 21.1% to 23.6% by volume, in subsurface soils on Plaintiff's Property.

103.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on April 25, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 16.2% to 18.7% by volume, in subsurface soils on Plaintiff's Property.

104.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on May 23, 2011, indicate methane gas levels in excess of the lower explosive limit, at 13.5% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

105.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on May 23, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 16.8% to 23% by volume, in subsurface soils on Plaintiff's Property.

106.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on June 27, 2011, indicate the presence of methane gas in excess of the lower explosive limit, at 7.5% by volume, in subsurface soils on Plaintiff's Property.

107.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on July 18, 2011, indicate methane gas levels in excess of the lower explosive limit, at 7.6% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

108.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on July 18, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 15.9% to 21.1% by volume, in subsurface soils on Plaintiff's Property.

109.     Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on September 1, 2011, indicate methane gas levels in excess of the lower explosive limit, at 12.9% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

110.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on September 1, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 18% to 19.2% by volume, in subsurface soils on Plaintiff's Property.

111.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on September 27, 2011, indicate methane gas levels in excess of the lower explosive limit, at 47.3% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

112.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on September 27, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 5.3% to 12.3% by volume, in subsurface soils on Plaintiff's Property.

113.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on November 28, 2011, indicate methane gas levels in excess of the lower explosive limit, at 53.6% by volume, in subsurface soils at the property boundary between the Landfill and Plaintiff's Property.

114.    Data from sampling conducted by the Maryland Environmental Service on behalf of St. Mary's County on November 28, 2011, indicate the presence of methane gas in excess of the lower explosive limit, ranging from 15.4% to 17.5% by volume, in subsurface soils on Plaintiff's Property.

115.    The presence of methane gas on Plaintiff's Property and at the property boundary between the Landfill and Plaintiff's Property at levels in excess of the lower explosive limit  violates 40 C.F.R. § 258.23(a)(2), which requires the County to "ensure that . . . the  concentration of methane gas does not exceed the lower explosive limit for methane at the  facility property boundary."

116.     Because the St. Andrews Landfill fails to satisfy the methane gas concentration criteria in 40 C.F.R. § 258.23(a)(2), the Landfill constitutes an open dump in violation of 42 U.S.C. § 6944(a). 40 C.F.R. § 258.3(h).

117.     Congress has expressly found that "open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land." 42 U.S.C. § 6901(b).

118.     The presence of methane, as a major component of landfill gas, at certain  concentrations presents a hazard to human health and the environment both because of its  explosive potential and because it presents an asphyxiation hazard through the displacement of  oxygen in confined environments.  The United States Department of Health and Human Services' Agency for Toxic Substances and Disease Registry advises that "methane is highly explosive when mixed with air between its lower explosive limit of 5% by volume and its upper explosive limit of 15% by volume."

119.     In addition to methane, landfill gas contains varying concentrations of VOCs derived from the hazardous substances disposed with the waste.  These VOCs can present hazards to human health depending on the specific constituent and concentration, and relationship to human receptors. VOCs have been identified in gas wells at the Landfill perimeter, and landfill gas is migrating off-site onto the Plaintiff's Property.  Several of these VOCs, including but not limited to vinyl chloride, are known carcinogens to humans.

120.     Maryland regulations provide that the closure cap for a landfill must be designed and built so that concentrations of methane do not exceed 100% of the lower explosive limit (5% by volume) for the gases at the property boundary.  COMAR 26.04.07.21.

121.    Federal regulations applicable to closed landfills require that concentration of methane gas does not exceed 100% of the lower explosive limit for methane at the property boundary. 40 C.F.R. § 258.61(a)(4).

122.    On or about January 23, 2004, and six months prior to Plaintiff's contract with Lincoln, Mr. George A. Erichsen, P.E., Director of the St. Mary's County Department of Public Works and Transportation ("DPW"), drafted a letter to Plaintiff advising that ". . . landfill gas  has migrated approximately 200' beyond the County property boundary" onto Plaintiff's Property ("January 23, 2004 Letter").  The January 23, 2004 Letter further acknowledges that remedial action was necessary "in order to prevent any further landfill gas migration from occurring in the future."

123.    Defendant did not send the January 23, 2004 Letter to Plaintiff.

124.    Plaintiff did not receive the January 23, 2004 Letter via mail.  Plaintiff had no knowledge of the January 23, 2004 Letter until Plaintiff discovered the letter was in DPW's files on September 8, 2004.

125.    In a September 2004 meeting at County offices, with representatives of Plaintiff and Defendant in attendance, a senior official in DPW acknowledged that the January 23, 2004 Letter was never mailed to Plaintiff.

**C.    Failure by Defendants to Address the Migration of Contaminants and Gas to Defendant's Property**

126.    In March 2004, two months after Defendant was aware of the intrusion of high levels of landfill gas from the Landfill to the Property, Defendant's contractor, the Maryland Environmental Service, prepared a "Landfill Gas Remediation Plan for the St. Andrews Landfill" (the "MES Remediation Plan") on behalf of Defendant.  The MES Remediation Plan recommended "that each area of the landfill where off-site gas migration has been detected be treated separately for purposes of mitigating the landfill gas migration."

22

127.     In September 2004, after learning of the contents of Defendant's January 23, 2004 Letter, Plaintiff met with representatives of Defendant, including County Administrator George Forrest and County Attorney John B. Norris, III ("County Attorney Norris"), and expressed concerns about off-site migration of contaminants from the Landfill to Plaintiff's Property.  At that meeting, Plaintiff indicated that contamination on Pod 2 would impede and prevent residential development there.

128.     In September 2004, after learning of the contents of Defendant's January 23, 2004 Letter, Plaintiff commissioned ARCADIS G&M, Inc. to investigate the potential environmental  impacts to the Property resulting from Defendant's Landfill.  ARCADIS prepared a report entitled "Remedial Evaluation Program for St. Andrew's Landfill, St. Mary's County, Maryland." ("ARCADIS Report"), dated October 27, 2004, which was transmitted with a letter prepared by ARCADIS to County Attorney Norris on that same date.  The ARCADIS Report concluded that landfill gas, leachate and contaminated groundwater from the Landfill were impacting at least Pods 2 and 3 of the Property in such a significant and negative manner that residential development of Pods 2 and 3 should not proceed until additional remedial measures were implemented by St. Mary's County.

129.     In October 2004, Plaintiff's representative Paul Summers, consultant Lawrence Hosmer, and Plaintiff's attorney W. Roger Truitt, among others, met with County Attorney Norris, County Administrator George Forrest, County Commissioner Thomas McKay, and County Department of Public Works Director George Erichsen, among others, and discussed Plaintiff's concerns about contamination migrating from the Landfill and impacting Plaintiff's Property.

130.     Plaintiff advised the County in an October 26, 2004 letter from Plaintiff's counsel W. Roger Truitt to County Attorney Norris that "environmental issues associated with the St. Andrews Landfill and the remaining development issues need to be resolved promptly."

131.     In November 2004, Plaintiff commissioned a "Supplemental Site Evaluation," performed by Hosmer & Hosmer ("Hosmer"), which confirmed the presence and extent of landfill gas, leachate and contaminated surface water migrating from the Landfill onto the Property.  Included in the Hosmer Evaluation was documentation of the discharge of a leachate seep, containing chlorinated VOCs, from the Landfill to a perennial stream that forms the headwaters of the St. Mary's River located on Plaintiff's Property.  The leachate seep discharged directly to the ground at the edge of the surface water and then flowed into surface water on the Property.  Hazardous substances were confirmed to be present in the leachate seep and landfill gas present on Plaintiff's Property.  Hosmer determined that the Landfill was the source of the contamination detected on Plaintiff's Property.

132.     In a December 30, 2004 letter from Plaintiff's counsel W. Roger Truitt to St. Mary's County Attorney John B. Norris, III ("December 30, 2004 Letter"), Plaintiff transmitted  to Defendant the "Supplemental Site Evaluation" ("Evaluation" or "Hosmer Evaluation") in December 2004.  The Evaluation observed that if actions were undertaken by Defendant in early 2005 to address the Landfill's impacts on the Property, most if not all of the environmental problems caused by the Landfill at Pods 2 and 3 could be remedied within seven months for approximately $950,000.  The remedial work recommended by Hosmer included a system to intercept landfill gas and destroy it by flaring, a system to collect leachate and contaminated groundwater, and a security fence to prevent future residents of First Colony, including children using recreational areas adjacent to the Landfill, from accidentally trespassing or being attracted to the mechanical equipment and open flames used by St. Mary's County to address landfill gas problems.

133.     The December 30, 2004 Letter specifically advised the County that landfill gas  and leachate had migrated onto Plaintiff's Property that the County needed to take prompt steps  to remedy this contamination so that Plaintiff would not suffer damages associated with the Landfill.

134.    Rather than incurring the costs of remedying the migration of hazardous constituents in leachate and gas migrating from the Landfill onto the Property, Defendant represented to MDE that it would use its zoning powers to block use of Plaintiff's Property.  On January 7, 2005, Mr. Erichsen wrote to MDE "[t]he county is currently evaluating its obligations and authority to factor the gas migration into the zoning and planning approval process.  Including the possibility of restricting certain areas from residential development and/or conditional approval, which requires homes to be constructed with certain protective features such as gas monitors."

135.    By January 10, 2005, County Attorney Norris concluded that there was a potential that Plaintiff would sue the County for damages arising from the migration of methane gas from the Landfill onto Plaintiff's Property.

136.    County Attorney Norris conveyed to the County Commissioners Plaintiff's intent to seek damages from the County arising from contamination from the Landfill.

137.    On or before January 10, 2005, in an effort to avoid litigation, County Attorney Norris drafted a Waiver and Estoppel certificate that requested that Plaintiff release all claims related to migration of methane gas from the Landfill onto Plaintiff's Property.

138.    In a January 10, 2005 letter ("January 10, 2005 Letter") written in response to the December 30, 2004 Letter, County Attorney Norris indicated that he had investigated the facts  and law applicable to Plaintiff's potential claims.

139.    Recipients of the January 10, 2005 included the County Commissioners, County Administrator George Forrest, and Director of Public Works and Transportation George Erichsen.

140.    On February 4, 2005, MDE sent a letter to DPW demanding that Defendant take "immediate steps to protect human health from potentially explosive conditions from the migration of methane gas from the Landfill."

141.    GCI subsequently performed a soil gas survey around the Landfill on behalf of Defendant "to collect soil gas samples at locations outside of the existing gas monitoring well network for field testing of combustible landfill gas."  The soil gas survey was undertaken primarily "to assess if combustible landfill gas is migrating beyond the existing gas monitoring wells where the elevated gas readings were obtained and possibly on to private property." In early May 2005, GCI reported that "landfill gas concentrations measured along the property line northeast and east of the waste disposal area [at Plaintiff's Property line] are above regulatory criteria and have migrated onto private property to a limited extent." GCI also indicated that Cells 1 and 4 of the Landfill "are the primary source of the elevated landfill gas along the northeast property boundary."

142.    Monitoring and analysis undertaken by representatives for Defendant and Plaintiff in 2004 identified the presence of volatile organic compounds in the groundwater and surface water at and near the boundary between Plaintiff's Property and the Landfill.  Monitoring and  analysis conducted by Plaintiff's representatives in November 2004 and January 2007 has  confirmed the presence of landfill gas contamination, containing methane and VOCs, on Plaintiff's Property and leachate seep contamination containing vinyl chloride, a known human  carcinogen, as well as cis-1,2-dichloroethene, a probable human carcinogen.  The affected portions of Plaintiff's Property include Pods 2 and 3 and development of these Pods for residential or commercial use would present a health and safety risk to the occupants of these areas unless appropriate remedial measures are undertaken by the Defendant prior to development.  In the absence of such appropriate remedial measures, Pods 2 and 3 remain wholly unsuitable for residential and commercial development.

143.    As a direct result of Defendant's failure to undertake appropriate remedial measures to address the sudden and accidental release and migration of contamination from the Landfill to Plaintiff's

property, the value of Plaintiff's Property has diminished significantly and Plaintiff has suffered damages arising directly from Plaintiff's inability to proceed with development of the property.

144.    Construction activities, such as grading necessary for site preparation at Pods 2 and 3, likely would cause human exposures to leachate, methane gas, volatile organic compounds, and other contaminants migrating to the Property from the Landfill. Such exposures would present a safety and health hazard to construction workers as well as trespassers.

145.    To date, Defendant has not constructed adequate facilities that will prevent methane gas and VOCs in landfill gas from entering Plaintiff's Property or that will remove methane gas and VOCs in landfill gas from Plaintiff's Property.

146.    To date, Plaintiff has incurred substantial CERCLA response costs and will incur additional costs to monitor, evaluate and respond to hazardous substances on the Property migrating from Defendant's landfill.

**D.      Loss of the Lincoln Contract**

147.    Plaintiff notified Defendant of Lincoln's concerns about contamination emanating from the Landfill, including in the October 26, 2004 Letter and the December 30, 2004 Letter from Plaintiff's counsel to County Attorney Norris that advised of the results of the supplemental evaluation commissioned by Plaintiff.

148.    As a result of the December 30, 2004 Letter, County Attorney Norris was concerned that Plaintiff would seek monetary damages from the County for the loss of the Lincoln contract. Consequently, the County Attorney Norris advised the County Commissioners that Plaintiff would sue the County for the loss of the Lincoln contract.

149.    On January 11, 2005, Plaintiff and Lincoln, through a letter from a representative of Lincoln to St. Mary's County DPW, sought assurances that Defendant intended to undertake in a timely

manner the remediation on Pods 2 and 3 as recommended by the Hosmer Evaluation.  DPW failed to sign and return the letter.

150.    As a direct result of DPW's refusal to commit to and execute an appropriate remediation strategy, Lincoln altered its plan to purchase finished residential lots on Pods 2 and 3 and instead committed only to the purchase of finished residential lots on Pod 6.  Plaintiff thus lost the opportunity to develop Pods 2 and 3 with Lincoln.

**E.      Continued Impacts to the Property**

151.    The Landfill's impacts to the Property have still not been remediated.  Recent data generated by the Defendant and inspections of the Property conducted by Plaintiff's  representatives confirm that landfill gas containing high levels of methane above the lower  explosive limit continues to move from the Landfill onto the Property and that leachate seeps and  contaminated groundwater continue to impact the Property.  These impacts present hazards to human health and the environment and leave the Property currently unsuitable for development  by Plaintiff.

**F.      Defendants' Assertion of the LGTCA Damages Cap**

152.    After the initiation of this lawsuit, Defendant, through its authorized agents, asserted that any liability St. Mary's County may have for the damage to Plaintiff's Property was capped at $200,000 per claim and $500,000 per occurrence, pursuant to Section 5-303 of the Courts and Judicial Proceedings Article of the Maryland Code, which is commonly known as the Local Government Tort Claims Act ("LGTCA").

<u>**NATURE OF CLAIMS**</u>

153.    Defendant has caused or allowed the sudden and accidental releases or threatened releases of hazardous substances, contaminants and pollutants, including volatile organic compounds and methane, onto Plaintiff's Property.  Although Defendant has been and continues to be aware that the

Landfill is releasing contamination to the environment and adjacent properties, including Plaintiff's

Property, Defendant has failed to control the source of the releases or remove the hazardous substances,

contaminants and pollutants on Plaintiff's Property.  Defendant has violated federal laws and regulations

concerning the discharge and release of hazardous substances, pollutants  and contaminants and

committed acts sounding in tort that have caused damage and loss of use  to Plaintiff's Property and

damage to the Plaintiff's business relations.

## VIOLATIONS OF LAW

### COUNT ONE

**COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED ("CERCLA"), 42 U.S.C. §§ 9601, *ET SEQ.***

154.    Paragraphs 1-153 are incorporated as if fully alleged herein.

155.    The Landfill is a "facility" as defined by 42 U.S.C. § 9601.

156.    There has been a release or threatened release of a hazardous substance from the Landfill.

157.    Plaintiff has incurred necessary response costs, including monitoring, assessment, and

evaluation costs consistent with the National Contingency Plan, in response to the releases or threatened

releases from the Landfill.  Plaintiff expects to incur further response costs, consistent with the National

Contingency Plan, in response to the releases from the Landfill.

158.    Defendant is a current owner or operator of the Landfill.

159.    Defendant was an owner or operator of the Landfill at the time of disposal of a hazardous

substance.

160.    Pursuant to 42 U.S.C. § 9607(a), Defendant is liable to Plaintiff for all necessary response

costs incurred and to be incurred by Plaintiff at its Property.

## COUNT TWO

### TRESPASS

161.    Paragraphs 1-160 are incorporated as if fully alleged herein.

162.    Plaintiff has an ownership interest in the Property, including Pods 2 and 3.

163.    Defendant has allowed and is continuing to allow the sudden and accidental releases of hazardous substances, pollutants and contaminants from the Landfill to invade Plaintiff's Property and interfere with Plaintiff's interest in the exclusive possession, use and enjoyment of the Property.

164.    Defendant had notice of its actions giving rise to the trespass and failed to cease the actions.

165.    As an actual and proximate result of the trespass by Defendant, Plaintiff has been damaged in an amount greater than $10,300,000, the exact amount to be proven at trial.

## COUNT THREE

### PRIVATE NUISANCE

166.    Paragraphs 1-165 are incorporated as if fully alleged herein.

167.    Defendant's ownership and/or operation of the Landfill has been conducted and is continuing to be conducted in a manner that interferes with Plaintiff's reasonable use and enjoyment of the Property.

168.    Defendant knew or should have known of the condition and the nuisance or unreasonable risk involved.

169.    Defendant knew or should have known that the condition existed without the consent of Plaintiff.

170.    Defendant has failed, after a reasonable opportunity, to abate the condition.

171.     As an actual and proximate result of the nuisance maintained by Defendant, Plaintiff has been damaged in an amount greater than $10,300,000, the exact amount to be proven at trial.

## COUNT FOUR

### INTERFERENCE WITH BUSINESS OR ECONOMIC RELATIONSHIP

172.     Paragraphs 1-171 are incorporated as if fully alleged herein.

173.     Plaintiff and Lincoln had an ongoing business or economic relationship.

174.     Defendant was aware of the relationship.

175.     Defendant wrongfully interfered with Plaintiff's business or economic relationship through intentional and willful acts that had the foreseeable effect of causing damage to Plaintiff in its lawful business of developing property within the First Colony PUD.

176.     Defendant caused damage to Plaintiff in its lawful business without right or justifiable cause.

177.     As an actual and proximate result of Defendant's actions, Plaintiff was damaged in an amount greater than $2,000,000, the exact amount to be proven at trial.

## COUNT FIVE

### STRICT LIABILITY FOR ABNORMALLY DANGEROUS OR ULTRAHAZARDOUS ACTIVITY

178.     Paragraphs 1-177 are incorporated as if fully alleged herein.

179.     Defendant's operation of the Landfill as an open dump in violation of the Solid Waste Disposal Act and regulations promulgated thereunder is an activity that is unduly dangerous and inappropriate to the place in which it is conducted.

180.     As an actual and proximate result of Defendant's activity, Plaintiff has been damaged in an amount greater than $10,300,000, the exact amount to be proven at trial.

**COUNT SIX**

**SOLID WASTE DISPOSAL ACT ("SWDA"), 42 U.S.C. § 6972(A)(1)(A)**

181.    Paragraphs 1-180 are incorporated as if fully set forth herein.

182.    Plaintiff provided appropriate notice of its intent to file suit under the SWDA more than 60 days prior to asserting this claim.

183.    Defendant has allowed and is allowing known carcinogens and other pollutants to discharge from the Landfill into waters of the United States without a permit in violation of the requirements of § 402 of the Clean Water Act, 33 U.S.C. § 1342.

184.    Defendant has allowed and is allowing methane gas to exceed its lower explosive limit at the facility boundary of the Landfill.

185.    Because the Landfill fails to satisfy the criteria in 40 C.F.R. Part 258, including but not limited to, criteria in 40 C.F.R. §§ 258.27 and 258.23, the Landfill is an open dump prohibited by Section 4005 of the SWDA, 42 U.S.C. § 6945.

186.    Defendant's operation and closure of the Landfill is in violation of the SWDA and regulations, conditions, requirements, and prohibitions that are effective pursuant to the SWDA.

187.    Pursuant to 42 U.S.C. § 6972(a), Defendant should be enjoined from further violations of the SWDA.

**COUNT SEVEN**

**SOLID WASTE DISPOSAL ACT ("SWDA"), 42 U.S.C. § 6972(A)(1)(B)**

188.    Paragraphs 1-187 are incorporated as if fully set forth herein.

189.    Plaintiff provided appropriate notice of its intent to file suit under the SWDA more than 90 days prior to asserting this claim.

190.    Defendant has contributed or is contributing to the past or present storage, treatment, transportation, or disposal of solid and hazardous wastes which present an imminent and substantial endangerment to health or the environment.

191.    Defendant did not and does not now comply with the requirements for the management of hazardous waste at the Landfill under Subchapter III of the SWDA.

192.    Defendant did not and does not now possess a permit for the disposal or management of hazardous waste at the Landfill.

193.    Defendant's Landfill has not been designed, operated, or closed in accordance with the requirements of Subchapter III of the SWDA or its implementing regulations.

194.    Pursuant to 42 U.S.C. § 6972(a), Defendant should be enjoined from further violations of the SWDA.

## COUNT EIGHT

### 42 U.S.C. § 1983 –THE LGTCA DAMAGES CAP, AS APPLIED, VIOLATES THE TAKINGS CLAUSE OF THE FEDERAL CONSTITUTION

195.    Paragraphs 1-194 are incorporated as if fully set forth herein.

196.    The damage to Plaintiff's property caused by the sudden and accidental releases from Defendant's Landfill is an amount greater than $10,300,000, the exact amount to be proven at trial.

197.    After the initiation of this lawsuit, Defendant, acting under color of state law and implementing Defendant's official policies, asserted that its liability for the damage caused by the releases from Defendant's Landfill onto Plaintiff's Property is capped at $200,000 per claim and $500,000 per occurrence under the LGTCA.

198.    Because the amount of damage caused by the sudden and accidental releases from Defendant's Landfill onto Plaintiff's Property is well in excess of the $200,000 and $500,000 limits set forth in the LGTCA, Defendant's application of the LGTCA Damages Cap subjects Plaintiff to a

deprivation of its rights under the Takings Clause of the Fifth Amendment to the United States

Constitution, because it prevents Plaintiff from recovering full and just compensation for the entirety of

the damage to the Property caused by Defendant.

199.    Accordingly, Defendant is liable to Plaintiff under 42 U.S.C. § 1983 for deprivation of

Plaintiff's federal constitutional rights, thereby entitling Plaintiff to recover damages at an amount to be

determined at trial.

**COUNT NINE**

**COMMON LAW – THE LGTCA DAMAGES CAP, AS APPLIED,
VIOLATES THE MARYLAND STATE CONSTITUTION**

200.    Paragraphs 1-199 are incorporated as if fully set forth herein.

201.    The damage to Plaintiff's property caused by the sudden and accidental releases from

Defendant's Landfill is an amount greater than $10,300,000, the exact amount to be proven at trial.

202.    After the initiation of this lawsuit, Defendant asserted that its liability for the damage

caused by the releases from Defendant's Landfill onto Plaintiff's Property is capped at $200,000 per

claim and $500,000 per occurrence under the LGTCA.

203.    Article III, Section 40 of the Constitution of Maryland provides that the "General

Assembly shall enact no Law authorizing private property to be taken for public use without just

compensation, as agreed upon between the parties, or awarded by a jury, being first paid or tendered to

the party entitled to such compensation."

204.    Article 19 of the Declaration of Rights of the Constitution of Maryland provides that

"every man, for any injury done to him in his . . . property, ought to have remedy by the course of the

Law of the Land, and ought to have justice and right, freely without sale, fully without any denial."

34

205.    Article 24 of the Declaration of Rights of the Constitution of Maryland provides that "no man ought to be . . . disseized of his freehold . . . or deprived of his . . . property . . . but by . . . the Law of the land."

206.    Because the amount of damage caused by the sudden and accidental releases from Defendant's Landfill onto Plaintiff's Property is well in excess of the $200,000 and $500,000 limits set forth in the LGTCA, Defendant's application of the LGTCA Damages Cap subjects Plaintiff to a deprivation of its rights under Article III, Section 40 of the Maryland Constitution and Articles 19 and 24 of the Declaration of Rights of the Maryland Constitution, because it prevents Plaintiff from recovering full and just compensation for the entirety of the damage to the Property caused by Defendant.

207.    Accordingly, Defendant is liable to Plaintiff under Maryland common law for deprivation of Plaintiff's state constitutional rights, thereby entitling Plaintiff to recover damages at an amount to be determined at trial.

## COUNT TEN

### 28 U.S.C. § 2201(A) -- DECLARATORY JUDGMENT

208.    Paragraphs 1-207 are incorporated as if fully set forth herein.

209.    Although the damage to Plaintiff's Property caused by the sudden and accidental releases of contamination from Defendant's Landfill exceeds $10,300,000, Defendant asserts that its liability for the damage is capped at $200,000 per claim and $500,000 per occurrence under the LGTCA.

210.    Application of the LGTCA Damages Cap to prevent Plaintiff from receiving full and just compensation from Defendant for the entirety of the damage Defendant has caused to Plaintiff's Property violates the Takings Clause of the Fifth Amendment to the United States Constitution, Article

35

III, Section 40 of the Maryland Constitution, and Articles 19 and 24 of the Declaration of Rights of the Maryland Constitution.

211.    Defendant disputes that application of the LGTCA Damages Cap to limit its liability violates either the United States or Maryland constitutions.

212.    Accordingly, there is an actual controversy between Plaintiff and Defendant as to whether application of the LGTCA Damages Cap to limit Defendants' liability in this action violates the United States and/or the Maryland constitutions.

213.    Plaintiff therefore requests that the Court issue a declaratory judgment declaring that the LGTCA Damages Cap, as applied to limit Defendant's liability for the entirety of damage Defendant has caused to Plaintiff's Property, is unconstitutional under the United States and/or Maryland Constitutions because such application will result in a taking without just compensation.

**COUNT ELEVEN**

**42 U.S.C. § 1983 -- INVERSE CONDEMNATION
UNDER THE FEDERAL CONSTITUTION**

214.    Paragraphs 1-213 are incorporated as if fully set forth herein.

215.    Defendant, acting under color of state law and implementing its official policies, has allowed and is continuing to allow the sudden and accidental release of hazardous substances, pollutants, and contaminants from the Landfill onto Plaintiff's Property, thereby causing significant damage to Plaintiff's Property, substantially interfering with Plaintiff's use and enjoyment of the Property, and rendering the Property worthless.

216.    As such, the ongoing contamination, Defendant's failure to stop it, and the fact that the contamination has rendered the Property worthless has resulted in a taking of Plaintiff's Property by Defendant pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution.

36

217.    Because Defendant has taken Plaintiff's Property, Plaintiff is entitled to just compensation from Defendant for the full value of the Property pursuant to the Takings Clause of the Fifth Amendment to the United States Constitution.

218.    Defendant, acting under color of state law and implementing its official policies, has refused to provide just compensation to Plaintiff for the full value of the taken Property.

219.    Accordingly, Defendant has deprived Plaintiff of its rights under the Takings Clause of the Fifth Amendment to the United States Constitution, thereby making Defendant liable to Plaintiff under 42 U.S.C. § 1983 and entitling Plaintiff to recover from Defendant just compensation for the full value of the taken Property.

### COUNT TWELVE

### COMMON LAW – INVERSE CONDEMNATION
### UNDER THE MARYLAND CONSTITUTION

220.    Paragraphs 1-219 are incorporated as if fully set forth herein.

221.    Defendant has allowed and is continuing to allow the sudden and accidental release of hazardous substances, pollutants, and contaminants from the Landfill onto Plaintiff's Property, thereby causing significant damage to Plaintiff's Property, substantially interfering with Plaintiff's use and enjoyment of the Property, and rendering the Property worthless.

222.    As such, the ongoing contamination, Defendant's failure to stop it, and the fact that the contamination has rendered the Property worthless has resulted in a taking of Plaintiff's Property by Defendant pursuant to Article III, Section 40, of the Maryland Constitution and Articles 19 and 24 of the Declaration of Rights of the Maryland Constitution.

223.    Because Defendant has taken Plaintiff's Property, Plaintiff is entitled to just compensation from Defendant for the full value of the Property pursuant to Article III, Section 40, of the Maryland Constitution and Articles 19 and 24 of the Declaration of Rights of the Maryland Constitution.

224.    Defendant has refused to provide just compensation to Plaintiff for the full value of the taken Property.

225.    Accordingly, Defendant has deprived Plaintiff of its rights under Maryland constitution, thereby making Defendant liable to Plaintiff under Maryland common law and entitling Plaintiff to recover from Defendant just compensation for the full value of the taken Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court (1) enter judgment against Defendant in favor of Plaintiff for all CERCLA response costs which have been incurred by Plaintiff in connection with the release or threatened release of hazardous substances from the Landfill, plus interest; (2) enter judgment on liability against Defendant in favor of Plaintiff that  will be binding with respect to future CERCLA response costs incurred by Plaintiff in  responding to releases or threatened releases of hazardous substances from the Landfill; (3) enter  judgment against Defendant and in favor of Plaintiff ordering Defendant to cease all conduct  constituting a nuisance and/or trespass to Plaintiff and its Property, reimburse Plaintiffs for past  harms, and pay damages for nuisance, trespass, and strict liability; (4) enter judgment against Defendant and in favor of Plaintiff ordering Defendant to pay damages for its wrongful  interference with business or economic relationship; (5) enter judgment enjoining Defendant  from further violations of the federal Solid Waste Disposal Act; (6) enter judgment against Defendants awarding Plaintiff full compensation for the entirety of damage caused by the sudden and accidental releases from Defendant's Landfill onto Plaintiff's Property and holding that the LGTCA cannot be applied to limit such damages because it would result in an unconstitutional taking of Plaintiff's property without just compensation under both the federal and Maryland constitutions; (7) enter a declaratory judgment ruling that the LGTCA cannot be applied to limit Defendant's liability for the entirety of damage Defendant has caused to Plaintiff's Property because doing so would result in an

unconstitutional taking without just compensation in violation of the federal and Maryland constitutions; (8) enter judgment finding that the sudden and accidental releases of hazardous substances, pollutants, and contaminants from the Landfill onto Plaintiff's Property has resulted in a taking by Defendant of Plaintiff's Property and awarding Plaintiff just compensation for the full value of the taken Property under the federal and Maryland constitutions; (9) enter judgment against Defendant and in favor of Plaintiff allowing Plaintiff's recovery of the costs of litigation under 42 U.S.C. § 6972(e); (10) award reasonable attorney's fees and costs; (11) award Plaintiff prejudgment interest; and (12) grant such other and further relief as the Court deems appropriate.

Dated:  February 2, 2012                              Respectfully submitted,


                                                      /s/ Bikram Bandy
                                                      Thomas M. DiBiagio (Bar ID No. 04369)
                                                         tdibiagio@mckennalong.com
                                                      Bikram Bandy (Bar ID No. 17642)
                                                         bbandy@mckennalong.com
                                                      MCKENNA LONG & ALDRIDGE LLP
                                                      1900 K Street, N.W.
                                                      Washington, DC  20006
                                                      (202) 496-7500
                                                      Fax: (202) 496-7756

                                                      *Attorneys for  Marcas, L.L.C.*

## **JURY DEMAND**

Plaintiff demands a jury for all issues triable by jury.

Dated:  February 2, 2012                                  Respectfully submitted,


/s/ Bikram Bandy
Thomas M. DiBiagio (Bar ID No. 04369)
   tdibiagio@mckennalong.com
Bikram Bandy (Bar ID No. 17642)
   bbandy@mckennalong.com
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 496-7500
Fax: (202) 496-7756

*Attorneys for  Marcas, L.L.C.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 2, 2012, a copy of the foregoing document was electronically filed in this case via the CM/ECF system, which will provide electronic notice to the following counsel of record for Defendant:

>
> Warren N. Weaver
> Thurman W. Zollicoffer, Jr.
> Thomas J. Whiteford
> Emily A. Daneker
> WHITEFORD, TAYLOR & PRESTON L.L.P.
> Seven Saint Paul Street
> Baltimore, MD 21202-1626
>
> *Attorneys for Board of County Commissioners*
> *of St. Mary's County*
>
>                                     /s/ Bikram Bandy
>                                     Bikram Bandy (Bar ID No. 17642)
>                                     MCKENNA LONG & ALDRIDGE LLP
>                                     1900 K Street, N.W.
>                                     Washington, DC  20006
>                                     (202) 496-7500
>                                     Fax: (202) 496-7756