# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

| | | |
|---|---|---|
| **MARCAS, L.L.C.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. WGC-07-196** |
| | ) | |
| **BOARD OF COUNTY COMMISSIONERS** | ) | |
| **OF ST. MARY'S COUNTY** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## MEMORANDUM OPINION

In the Memorandum Opinion and Order of September 28, 2011 this Court denied the Board of County Commissioners of St. Mary's County's (hereinafter "the County") motion for partial summary judgment and granted in part and denied in part Marcas, L.L.C.'s (hereinafter "Marcas") motion for partial summary judgment. ECF Nos. 107-108. On February 2, 2012 Marcas moved for leave to file a Third Amended Complaint which the County opposed. On April 16, 2012 the Court granted Marcas' motion. The Third Amended Complaint consisted of twelve (12) counts. Marcas later moved for partial summary judgment regarding its takings claims. After a motions hearing, the Court dismissed Counts XI and XII on December 28, 2012. *See* ECF No. 153. Pending before the Court and ready for resolution are the County's motion for partial summary judgment (seeking judgment as to Counts IV, V, VIII, IX and X) [ECF No. 159] and Marcas' cross-motion for partial summary judgment (seeking judgment as to Counts I, VI and VII) [ECF No. 163]. No hearing is deemed necessary and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2011).

## BACKGROUND

The Court outlined the factual background in detail in the Memorandum Opinion of September 28, 2011. ECF No. 107 at 2-52; *see Marcas, L.L.C. v. Board of County Comm'rs*, 817 F. Supp. 2d 692, 696-730 (D. Md. 2011). Other facts pertinent to the resolution of the cross-motions for partial summary judgment shall be discussed below.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

When faced with cross-motions for summary judgment, the Court must consider "each motion separately on its own merits to determine whether either of the parties deserve judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). The Court applies the same standard of review. *Monumental Paving & Excavating, Inc. v. Penn. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citing *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S. 1215 (1985)).

## DISCUSSION

A.     *The County's Motion for Partial Summary Judgment*

1.     *The operation of St. Andrew's Landfill – governmental or proprietary?*

The County moves for summary judgment on Count IV (Interference with Business or Economic Relationship) and Count V (Strict Liability for Abnormally Dangerous or

Ultrahazardous Activity). In the Memorandum Opinion of September 28, 2011 the Court deferred ruling on these two counts because there was insufficient information in the record concerning whether the County's operation of St. Andrew's Landfill was governmental or proprietary. *See* ECF No. 107 at 72-73. "The record in this case must be supplemented with information about the fees collected in relation to the expenses incurred for operating St. Andrew's Landfill." *Id.* at 72.

In support of its motion for partial summary judgment, the County has submitted the affidavit of George A. Erichsen, the County's Director of the Department of Public Works and Transportation ("DPW&T"). Mr. Erichsen has held his position since approximately December 1997 or January 1998. St. Andrew's Landfill (presently closed) was operated by DPW&T.

Mr. Erichsen reviewed the revenues, expenses and debt services for the County's municipal solid waste, rubble and recycling operations from 1986 to the end of fiscal year 2012.[1] The County does not maintain revenue and expense information for its municipal solid waste, rubble and recycling operations before 1986. ECF No. 159-8 at 2 (Erichsen Aff. ¶ 3). The breakout of revenues, expenses and debt service between 1986 and 2012, per Mr. Erichsen's affidavit, is as follows:

| Fiscal Year | Operating Revenues | Operating Expenses | Debt Service | Shortfall (-) or Surplus (+) |
|---|---|---|---|---|
| 1986 | $21,293 | $479,181 | | - $457,888 |
| 1987 | $74,476 | $492,499 | | - $418,023 |
| 1988 | $98,486 | $516,498 | | - $418,012 |
| 1989 | $404,331 | $548,225 | $50,922 | - $194,816 |
| 1990 | $926,581 | $692,381 | $91,920 | **+ $142,280** |
| 1991 | $840,587 | $1,075,713 | $188,884 | - $424,010 |
| 1992 | $1,820,242 | $802,171 | $194,360 | **+ $823,711** |
| 1993 | $1,758,327 | $981,803 | $189,420 | **+ $587,104** |
| 1994 | $1,765,668 | $1,118,047 | $263,425 | **+ $384,196** |
| 1995 | $1,762,253 | $1,129,858 | $308,477 | **+ $323,918** |

---

[1] The affidavit of George A. Erichsen is dated February 7, 2013.

| | | | |
|---|---|---|---|
| 1996 | $1,682,635 | $1,104,906 | $918,394 | - $340,665 |
| 1997 | $1,596,741 | $1,017,641 | $884,881 | - $305,781 |
| 1998 | $1,445,979 | $989,150 | $952,025 | - $495,196 |
| 1999 | $475,729 | $1,266,725 | $964,990 | - $1,755,986 |
| 2000 | $420,501 | $1,712,886 | $961,112 | - $2,253,497 |
| 2001 | $169,509 | $1,745,130 | $1,219,710 | - $2,795,331 |
| 2002 | $197,912 | $1,979,150 | $1,331,776 | - $3,113,014 |
| 2003 | $246,677 | $2,121,953 | $1,374,490 | - $3,249,766 |
| 2004 | $288,939 | $2,320,257 | $1,170,588 | - $3,201,906 |
| 2005 | $447,438 | $2,533,968 | $1,237,824 | - $3,324,354 |
| 2006 | $467,417 | $2,850,997 | $767,075 | - $3,150,655 |
| 2007 | $462,878 | $3,449,013 | $1,081,034 | - $4,067,169 |
| 2008 | $2,713,065 | $4,102,621 | $1,362,168 | - $2,751,724 |
| 2009 | $2,658,922 | $4,036,131 | $1,341,453 | - $2,718,662 |
| 2010 | $2,678,119 | $3,906,742 | $1,074,568 | - $2,303,191 |
| 2011 | $2,704,893 | $3,733,825 | $1,060,568 | - $2,089,500 |
| 2012 | $3,496,321 | $3,548,091 | $1,058,252 | - $1,110,022 |

ECF No. 159-8 at 2-9 (Erichsen Aff. ¶¶ 4-30). For each fiscal year Mr. Erichsen concludes by declaring, "This does not include consideration of the administrative overhead expenses, vehicle maintenance, equipment replacement, utilities, or any related capital project expenditures that did not result in additional debt service."

Historically, the collection and disposal of garbage by a municipality is considered a governmental rather than a private function. The assessment of a fee for materials deposited at a landfill does not automatically mean the landfill is a private function. In *Tadjer v. Montgomery County*, the Court of Appeals of Maryland noted, when assessing a government operated landfill which charges a fee,

> If . . . the income was not adequate to maintain the landfill or if this income were barely adequate to cover expenses, we would agree that this landfill operation was a governmental function. On the other hand, if the income derived was in an amount substantially in excess of the County's expenses for rent, operation and the like, so that the landfill was a real moneymaking proposition, it would be a proprietary function.

300 Md. 539, 549-50, 479 A.2d 1321, 1326 (Md. 1984), *superseded by statute on other grounds as recognized in Flaherty v. Weinberg*, 303 Md. 116, 136, 492 A.2d 618, 628 (1985).

Although between 1986 and 2012 there were five years when DPW&T operated the County's municipal solid waste, rubble and recycling operations at a surplus, for the vast majority of those 27 years, these facilities operated in the red. In its opposition Marcas notes the County began shutting down St. Andrew's Landfill in 1997. "According to the County's Declaration of George Erichsen, during the ten years prior to 1997, the County made a 'surplus' from the Landfill five times − or 50% of the time. During the five years prior to 1997, the County made a surplus four times − or 80% of the time." ECF No. 163-1 at 41 (citations omitted). In the Memorandum Opinion of September 28, 2011, the Court noted, "[t]he County discontinued waste disposal in Cells 1, 2 and 4 in November 1997 and discontinued waste disposal in Cell 3 in February 1999. In June 2001 the disposal of rubble was discontinued." ECF No. 107 at 2. In its reply the County states the data presented by Mr. Erichsen is not skewed as Marcas contends. "[L]ong before landfilling operations ceased at St. Andrews Landfill, the County was regularly and substantially subsidizing its operations. Moreover, the County's ongoing costs for the Landfill are very real and must be a part of any consideration as to whether the Landfill was operated as a profit-making enterprise." ECF No. 168 at 20 (citation omitted).

In reviewing Mr. Erichsen's affidavit the Court notes Mr. Erichsen did not identify the cost of operating the St. Andrew's Landfill exclusively. The costs and revenues include *all municipal solid waste, rubble and recycling operations for St. Mary's County* as operated by DPW&T. Second, as the entity responsible for remediation at the St. Andrew's Landfill, the Court finds it is appropriate for DPW&T to include *those real costs* as part of DPW&T's operating expenses. Third, this Court requested evidence about the costs and revenues associated with operating the landfill in accordance with *Tadjer*, 300 Md. at 549, 479 A.2d at 1326. But this Court is mindful of a proclamation by the *Tadjer* court: "[t]he fact that a fee was

charged for material deposited is *not necessarily dispositive* of the issue of whether this was a proprietary or governmental function." *Tadjer*, 300 Md. at 548, 479 A.2d at 1325 (emphasis added). The Court finds the 22 out of 27 years of shortfalls indicate the County's municipal solid waste, rubble and recycling operations was a governmental function.

Additional evidence supporting the operation of St. Andrew's Landfill as a governmental function can be found in legislation. The County has rules and regulations for solid waste. The recitals to those rules and regulations begin as follows:

> WHEREAS, Article 25, Section 14A, Paragraph (a), subparagraph (1) of the Maryland Annotated Code empowers the County Commissioners to prescribe and enforce Rules and Regulations concerning the operation and manner of use Public and Private Solid Waste Acceptance Facilities in St. Mary's County; and

> WHEREAS, the Board of County Commissioners adopted Rules and Regulations governing the use of the County Solid Waste Acceptance Facilities by Resolution No. 71-4, effective March 1, 1971, amended at Resolution No. 91-20, effective August 1, 1991, amended again at Resolution No. 96-24, effective August 12, 1996; and

> WHEREAS, the Solid Waste Ordinance, Ordinance 88-32, (the "Solid Waste Ordinance") was adopted by the Board of St. Mary's County Commissioners on November 29, 1988 and which Ordinance authorizes the County Commissioners to establish by Resolution, a schedule of fees as they deem necessary in connection with the use and operation of the Solid Waste Acceptance Facilities; and

> WHEREAS, the Solid Waste Ordinance authorizes the Department of Public Works and Transportation to set the hours of operation of the County's Solid Waste Acceptance Facilities; and

> WHEREAS, these Rules and Regulations authorize the Board of County Commissioners to establish a fee schedule for the operations of the Solid Waste Program and properly manage the disposal of solid waste in St. Mary's County, Maryland.

ECF No. 159-7 at 3. St. Andrew's Sanitary Landfill was among the County's *public* solid waste acceptance facilities. *Id.* at 6.

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in nature.

*Mayor of Baltimore v. State ex rel. Blueford*, 173 Md. 267, 276, 195 A. 571, 576 (1937). This test has also been defined as "whether the act performed is for the common good of all or for the special benefit or profit of the corporate entity." *Tadjer*, 300 Md. at 547, 479 A.2d at 1325. Unquestionably, the operation of St. Andrew's Landfill was for the common good, to benefit the health and welfare of the residents of St. Mary's County.

Based on all the evidence presented, this Court finds the operation of St. Andrew's Landfill was an exercise of the County's governmental authority. "Where . . . a municipality is engaged in the performance of a governmental function as an agent of the state, the same principle which protects the state from liability also protects the municipality." *Blueford*, 173 Md. at 271-72, 195 A. at 574. A municipality enjoys immunity from certain tort actions based on activities categorized as governmental. *Housing Auth. v. Bennett*, 359 Md. 356, 359, 754 A.2d 367, 368 (2000), *superseded by statute on other grounds as recognized in Prince George's Cnty. v. Longtin*, 419 Md. 450, 484, 19 A.3d 859, 879 (2011). Since St. Andrew's Landfill was a governmental function, the County enjoys immunity and is entitled to judgment as to Count IV (Interference with Business or Economic Relationship), *see Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 658 (D. Md. 2009)[2], and as to Count V (Strict Liability for Abnormally

---

[2] During a motions hearing Plaintiffs acknowledged that they could not pursue their claim of interference with prospective business relations directly against the municipality. The court thus dismissed the count.

Dangerous or Ultrahazardous Activity), *see Board of Educ. of Prince George's County v. Town of Riverdale*, 320 Md. 384, 387-88, 578 A.2d 207, 209 (1990).[3]

2.  *Marcas' Constitutional Challenge to the LGTCA Limitation on Liability*

By way of background, after this Court issued its September 28, 2011 Memorandum Opinion and Order, Marcas moved for leave to file a Third Amended Complaint. *See* ECF No. 112. Among the proposed amendments were three new counts regarding the constitutionality of the statutory cap set forth in Maryland's Local Government Tort Claims Act ("LGTCA"), Md. Code Ann., Cts. & Jud. Proc. § 5-303(a) (Lexis Nexis 1974, 2013 Repl. Vol.). Marcas had raised this issue in its April 2009 motion for partial summary judgment filed with this Court and in its December 2009 brief to the Court of Appeals of Maryland on the certified questions. Neither court addressed this issue. In granting Marcas' motion for leave to file a Third Amended Complaint on April 16, 2012, this Court acknowledged, due to inadvertence, it did not address the issue of the constitutionality of the LGTCA damages cap. In reviewing the Court of Appeals of Maryland opinion regarding the two certified questions, the issue raised by Marcas had not been directly addressed. *See* ECF No. 127.

On May 3, 2012 the County moved to dismiss for failure to state a claim the newly added five counts of Marcas' Third Amended Complaint including the three counts concerning the constitutionality of the LGTCA's statutory liability limitation. *See* ECF No. 131. In the Order of June 11, 2012 this Court denied the County's motion on the grounds that the issues have been previously considered and rejected. *See* ECF No. 133.

For a third time the County challenges Counts VIII, IX and X. The Court considers this issue anew.

---

[3] "Preliminary, we note that, even if the *doctrine of governmental immunity* were to protect Riverdale from the Board's claims based on negligence and *strict liability*, the doctrine of governmental immunity would have no application to the Board's nuisance claim." Emphasis added.

The Court has reviewed Marcas' (Appellee) Brief and the County's (Appellant) Reply Brief to the Court of Appeals of Maryland on the certified questions from this Court. Marcas contends "interpreting the LGTCA to cap Marcas' damages at $500,000 would allow an unconstitutional taking of the property." Brief for Appellee, *Board of Cnty. Comm'rs v. Marcas, L.L.C.* (Md. 2009) (No. 3), 2009 WL 5196422 at *28. In its Reply Brief the County noted that "it does not appear that Marcas has been deprived of all use of the Property such that application of the LGTCA cap would result in an unconstitutional taking in this case. Accordingly, for this further reason, the Court need not address this issue." Reply Brief for Appellant, *Board of Cnty. Comm'rs v. Marcas, L.L.C.* (Md. 2010) (No. 3), 2010 WL 256598 at *14.

The Court of Appeals of Maryland has observed that "[a] property owner who is denied all economically beneficial or productive use of his or her land in the name of the public at large has likely suffered a taking, unless the regulation prohibits a common law nuisance." *Neifert v. Dep't of Env't*, 395 Md. 486, 517, 910 A.2d 1100, 1119 (Md. 2006) (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1022-30 (1992)). As the parties are well aware, this case does not involve a regulatory taking but one comparable to a physical taking. Nonetheless, it is undisputed that Marcas has not been denied all economically beneficial or productive use of its property despite the methane contamination.

The United States Supreme Court recognizes a distinction in the nature of a physical intrusion by the government onto private property. "[T]his Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982).

This case does not involve a permanent physical occupation of Marcas' property by the County. Despite the ongoing emission of methane gas from St. Andrew's Landfill, Marcas has the power to exclude the County from possession and use of its land. This is best illustrated by DPW&T having to obtain Marcas' permission to enter Marcas' land to install monitoring wells and to collect the data from those monitors. *See, e.g.,* ECF No. 79-26 at 2-4 (August 5, 2003 Right-Of-Entry Agreement). "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto*, 458 U.S. at 435. Second, although the methane gas has interfered with Marcas' intended use of certain portions of its property for residential dwellings and commercial use, Marcas has not been denied forever the power to control the use of its property. Finally, despite the migration of methane gas onto its property, Marcas' property is not empty of any value. This is illustrated by the fact that Marcas has sold portions of its land for construction although not as originally planned due to the methane contamination. Remediation efforts to reduce the methane contamination below the lower explosive level ("LEL") and eliminate methane emissions are ongoing although at a much slower rate than either side envisioned. The Court therefore finds Marcas has not asserted a takings claim.

Marcas argues the partial immunity granted by the LGTCA to the County, whereby damages are capped for nuisance and trespass claims, conflicts with the constitutional right to just compensation for a taking. First, as noted above, the methane migration from St. Andrew's Landfill to Marcas' property does not constitute a taking. Second, any compensation Marcas may be entitled to as a result of the methane migration onto portions of its property shall be determined in the State court condemnation action presently pending before the Circuit Court for St. Mary's County. Third, the County is not immune from liability for nuisance and trespass.

The LGTCA was enacted to shield local government employees from excessive litigation. *Ennis v. Crenca*, 322 Md. 285, 294, 587 A.2d 485, 490 (1991). The General Assembly of Maryland "may, in its wisdom, limit tort damages prospectively. . . ." *Longtin*, 419 Md. at 490, 19 A.3d at 883. Local governments (not their officers or employees) enjoyed immunity against most non-constitutional tort claims before the enactment of the LGTCA. "Through the LGTCA, the Legislature altered the common law, giving plaintiffs limited access to the often sizable assets of local government. . . ." *Id.* at 519, 19 A.3d at 119 (Harrell, J., concurring & dissenting).

Although the Court of Appeals of Maryland has not specifically addressed the constitutionality of the monetary cap on liability under § 5-303(a)(1) of the LGTCA, that court has determined "the 180-day notice requirement of Section 5-304(a) of the LGTCA is *constitutional* under the Federal Constitution and the Maryland Declaration of Rights as applied to minors where the underlying local governmental action was governmental as opposed to proprietary in nature." *Rios v. Montgomery Cnty.*, 386 Md. 104, 120, 872 A.2d 1, 10 (2005) (emphasis added)(footnote omitted). This Court has found the operation of St. Andrew's Landfill was governmental as opposed to proprietary in nature. The *Rios* court explained the notice requirement allowed a local government to project its potential costs for future budgeting. *Id.* at 131, 872 A.2d at 17. Similarly, the LGTCA's monetary cap on liability provides a remedy to those injured by the acts of local government officers and employees performed within the scope of employment and without malice, *Faulk v. Ewing*, 371 Md. 284, 298, 808 A.2d 1262, 1272 (2002); limits the financial remedy but not at such a low level "to equate with cutting off all remedy," *Longtin*, 419 Md. at 520, 19 A.3d at 120-21 (Harrell, J., concurring & dissenting); and ensures the financial burden for the injury is borne by the local government ultimately

responsible for the public official's actions, *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995). The legislative history explains the rationale behind the liability limitation.

> [The $200,000 limit per individual claim and $500,000 limit per total claims that arise from the same occurrence] are established by regulations issued by the State Treasurer pursuant to amendments to the State Tort Claims Act effective in 1985. Thus, the cap is consistent with existing law. Considering that local governments will be paying judgments in situations where they could have previously avoided liability, the cap is equitable. The cap is necessary so that local governments can predict exposure for both insurance and budgetary purposes. Since local governments provide vital services, unlimited recovery prudents [sic] the prospect of severely impeding the provision of such services.

*Board of Cnty. Comm'rs v. Marcas, L.L.C.*, 415 Md. 676, 686-87, 4 A.3d 946, 952 (2010) (quoting Office of the Governor, Governor's Legislative Office, Briefing Paper H.B. 253/S.B. 237, 9-10).

In construing a notice provision is another act, comparable to the LGTCA notice requirement, the Court of Appeals of Maryland declared,

> It is a fundamental doctrine that the Legislature may grant or deny to individuals a right of action against municipal corporations for injuries resulting from the negligent manner in which streets are maintained. When the Legislature creates a municipal corporation as part of the machinery of government of the State, it is within its province to adjust the relative rights of the corporation and its citizens.

*Hansen v. City of Laurel*, 420 Md. 670, 685, 25 A.3d 122, 131 (2011) (quoting *Neuenschwander v. Washington Suburban Sanitary Comm'n*, 187 Md. 67, 76, 48 A.2d 593, 599 (1946)).

The General Assembly adjusted the relative rights of citizens, like Marcas, and municipal corporations, like St. Mary's County, by allowing the County to be sued and held financially responsible for certain non-constitutional torts committed by its officers or employees but up to a specific dollar amount to limit local governments from excessive civil liability exposure so local governments may continue to provide vital services to their residents. Marcas does not have a constitutional right to unlimited damages from the County. With the enactment of the LGTCA

the General Assembly balanced these competing issues of compensating the injured citizen without bankrupting the local government.

The Court of Appeals of Maryland did not specifically address Marcas' assertion that application of the LGTCA damages cap to Marcas' nuisance and trespass claims constitutes an unconstitutional taking of Marcas' property. This Court can only infer that based on previous decisions concerning the LGTCA as well as the legislative history of this Act, the Court of Appeals of Maryland rejected Marcas' challenge in reaching its decision. In short, that court does not find the LGTCA damages cap constitutes an unconstitutional taking. And this Court shall not second-guess Maryland's application of its own laws. *National R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.*, 422 F.3d 1275, 1282 (11th Cir. 2005).

Moreover, if there was any basis supporting Marcas' constitutional challenge, the Court of Appeals of Maryland would not have issued a decision interpreting and applying the LGTCA's terms of "individual claim" and "same occurrence" in a manner which would violate either the Constitution of the United States or the Maryland Constitution. *See Rios*, 386 Md. at 121, 872 A.2d at 10 ("When determining a statute's constitutionality under the Equal Protection Clause or Due Process Clause, unless a suspect or quasi-suspect class is created or a fundamental important right is implicated, the appropriate standard of review of constitutionality is whether there is a rational basis for the created class or limited process afforded. [The Court of Appeals of Maryland consistently follows the] 'principle that a court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality.'") (citations omitted). For the above reasons the County is entitled to judgment as to Count VIII (42 U.S.C. § 1983 - The LGTCA Damages Cap, as Applied, Violates the Takings Clause of the Federal Constitution), as to Count IX (Common Law - The LGTCA Damages Cap, as Applied, Violates

the Maryland State Constitution) and as to Count X (Declaratory Judgment[4]). Because the Court has granted judgment in favor of the County as to Counts IV, V, VIII, IX and X, the Court will enter a separate order granting the County's motion for partial summary judgment.

B.      *When was Marcas on notice about the contamination to its property?*

In its reply the County refutes Marcas' assertion that it was unaware of the contamination from St. Andrew's Landfill before September 2004. The County claims Cazimir Szlendak, the indirect owner of Marcas, was notified of migration of landfill contamination onto Marcas' property by a letter dated March 7, 2000. ECF No. 168-7 at 2. Mr. Szlendak's attorney wrote an August 13, 2011 letter to the Maryland Department of the Environment ("MDE") seeking the MDE's assessment regarding future contamination. ECF No. 168-7 at 1. The County contends, based on the March 7, 2000 letter, Mr. Szlendak (and therefore Marcas) had actual notice of the contamination or minimally inquiry notice of its injury in 2000. "As such, Plaintiff's trespass, nuisance, and strict liability claims are arguably barred by Maryland's three year statute of limitations and Marcas was not entitled to summary judgment in its favor on the trespass and nuisance claims." ECF No. 168 at 18. The Court disagrees.

The March 7, 2000 letter from DPW&T states in pertinent part,

> The monitoring of the groundwater shows that there is some migration of landfill contamination to a tract of your land (Parcel 455) shown as a Forest Conservation Parcel. This parcel of land is bound by the landfill, St. Mary's River State Park and the Holly Acres Subdivision. This particular contamination was found in a very shallow aquifer that is ***not*** used for drinking water. The Holly Acres Subdivision obtains its drinking water from a separate, deep aquifer located 390 feet below the ground surface. The wells of the homes in this subdivision were tested for possible landfill contamination, and none was found. The landfill is slated to

---

[4] A declaratory judgment "declaring that the LGTCA Damages Cap, as applied to limit Defendant's liability for the entirety of damage Defendant has caused to Plaintiff's Property, is unconstitutional under the United States and/or Maryland Constitutions because such application will result in a taking without just compensation." Third Am. Compl. § 213.

> receive a membrane top cover in the Spring of 2000. This "closure" will greatly reduce rainfall infiltration, which should bring about a mitigation of the upper aquifer contamination.
>
> In addition, we expect that the MD Department of the Environment will request that another well or sampling point for surface water be located on Parcel 455. In accordance with State and Federal Regulations 40 CFR, Part 258, we are notifying you with the results of our most recent testing information. In prior conversations with Mr. Donald Cropp, we obtained no objection to our contractor installing Well #11 as shown on the attached Permanent Monitoring Well and Access Easement. We are requesting your additional concurrence in allowing a right-of-entry for our Contractor to test the surface water ponded along the southern central portion of Parcel 455.

ECF No. 168-7 at 2.

The issue of possible contamination of the groundwater from the landfill was alleged in Marcas' Second Amended Complaint and admitted by the County as noted in the Memorandum Opinion of September 28, 2011.

> The County has tested the groundwater around the Landfill for many years. Beginning in 1994, on some occasions, "tetrachlorathene" and vinyl chloride, a known human carcinogen, were detected exceeding maximum allowable contaminant levels in a monitoring well (W-4) located approximately 200 feet from the Marcas property. Second Am. Compl. ¶ 27; Answer ¶ 27. Furthermore, in some groundwater monitoring wells of the Landfill at various points in time, volatile organic compounds ("VOCs") exceeding safe drinking water levels were detected. Second Am. Compl. ¶ 26; Answer ¶ 26.

ECF No. 107 at 3 (footnotes omitted).

The contamination of groundwater is not the crux of this litigation. Rather it is the migration of methane *gas*, vinyl chloride and other volatile organic compounds ("VOCs") from St. Andrew's Landfill onto Marcas' property. This is the contamination Marcas alleges, and this Court found, Marcas had no notice of before September 8, 2004. The March 7, 2000 notification of groundwater contamination is not relevant to the migration of methane gas. In its reply the

County has not presented any *new* evidence of notice to Mr. Szlendak about the <u>migration of methane gas</u> prior to the meeting between Mr. Tarr of DPW&T and a Marcas representative in September of 2004. Therefore the County is *not* entitled to summary judgment in its favor as to Marcas' trespass (Count II) and nuisance (Count III) claims.

C.      *Marcas' Motion for Partial Summary Judgment*

      *1.      Whether Marcas is entitled to summary judgment as to damages on Count I.*

In the Memorandum Opinion of September 28, 2011 this Court entered judgment (liability only) in favor of Marcas on Count I. "It is not clear to the Court whether the amount claimed ($35,751.33) includes *both* pre-and post-September 8, 2004 investigative costs *or* only post-September 8, 2004 investigative costs. Marcas therefore will need to supplement the record with proof of its expenses." ECF No. 107 at 82.

Marcas now moves for judgment as to damages on Count I. The amount Marcas seeks is $35,751.33. Marcas' environmental expert, J. Lawrence Hosmer, P.E., describes the investigative and monitoring costs Marcas incurred.

> From October 8, 2004 to the present, through my work with ARCADIS and Environmental Resources Management, Inc., I have overseen efforts on behalf of Marcas, L.L.C. to investigate and monitor the nature and extent of contamination in the form of hazardous substances, including methane gas, vinyl chloride, and other volatile organic substances, from the St. Andrews Landfill on and beneath property owned by Marcas known as the First Colony Planned Unit Development.
>
> The investigation and monitoring activities which I have performed for Marcas include obtaining preliminary information on the levels of hazardous substances in the subsurface beneath Marcas' property, evaluating the lateral and vertical extent of the contamination, and consideration of remedial options and remedial costs estimates.
>
> The investigation and monitoring costs incurred by Marcas, L.L.C. include $35,751.33 represented on the true and correct

> copies of invoices from ARCADIS and Environmental Resources
> Management, Inc. . . .of work performed from October 8, 2004
> through April 1, 2005.

ECF No. 163-4 at 2-3 (Hosmer Decl. ¶¶ 4-6).

In its opposition the County does not dispute the amount of the investigation and monitoring costs Marcas incurred. The County however reasserts its arguments that Marcas is not entitled to judgment as to liability on Count I because (a) Marcas' alleged response costs were not necessary and were incurred as part of the commercial development of the property, not in response to any threat to public health and (b) Marcas has failed to demonstrate substantial compliance with the National Contingency Plan ("NCP") for its investigative costs. ECF No. 168 at 4.

As noted in the Memorandum Opinion of September 28, 2011, the parties agreed that three of the four elements to satisfy a claim under 42 U.S.C. § 9607(a) were established: (1) a release of hazardous substances, *i.e.,* methane and VOCs, (2) St. Andrew's Landfill is a facility under 42 U.S.C. § 9601(9), and (4) the County is the owner and operator of the facility under 42 U.S.C. § 9601(20)(A). *See* ECF No. 107 at 73-74. The Court now reconsiders the third element, the alleged response costs were necessary and in compliance with the NCP.

Marcas, as a private party, may receive a court award to recover its response costs under CERCLA provided Marcas' response action is consistent with the NCP. The NCP outlines the procedures and organizational structure to prepare for and respond to the release of hazardous substances. 40 C.F.R. § 300.1 (2012). It is readily apparent from the record in this case that the response action was a remedial one, not a removal action. Pursuant to 40 C.F.R. § 300.700(c)(3)(i), a private party response action must be in substantial compliance with the requirements of paragraphs (5) and (6) of section (c) and must result in a CERCLA-quality

cleanup. Under paragraph 5 potentially applicable private party response actions include (vii) Section 300.420 (on remedial site evaluation) and (viii) Section 300.430 (on RI/FS[5] and selection of remedy). Under paragraph 6 the private party must provide the public an opportunity to comment about the proposed response action.

The Court has re-read Marcas' memorandum in support of its first motion for partial summary judgment as to Count I, *see* ECF No. 76-1 at 26-28, and its reply, *see* ECF No. 83 at 10-15. To be in substantial compliance with the NCP, Marcas' response action must satisfy the requirements of § 300.700(c)(5), (6). Marcas has not presented *any* evidence that it complied with the NCP requirement regarding community relations/public comment. 40 C.F.R. §§ 300.430(c), (f)(3), 300.700(c)(6). On this basis alone, the previously entered judgment (liability only) in favor of Marcas as to Count I shall be vacated.

In addition, the County challenges Marcas' contention that its investigative and monitoring costs were necessary. The County asserts these costs were, in fact, duplicative of work already performed by the MDE. The record clearly establishes the MDE inspecting St. Andrew's Landfill as early as 1999 regarding leachate seeps flowing from the landfill to adjacent waters. *See* ECF No. 107 at 4. The MDE is the lead agency[6] regarding St. Andrew's Landfill. As revealed in the extensive *Background* of the Memorandum Opinion of September 28, 2011, the MDE supervised, reviewed and approved the County's, *i.e.,* DPW&T, remediation efforts. Unlike *1325 G Street Associates, LP v. Rockwood Pigments NA, Inc.*, No. Civ.A.DKC 2002-1622, 2004 WL 2191709 at *6 (D. Md. Sept. 7, 2004) where the MDE directed the plaintiff to perform environmental investigations at a facility and further directed the plaintiff to install a security fence, and also unlike *SPS Limited Partnership, LLLP v. Severstal Sparrows Point, LLC*,

---

[5] Remedial investigation/feasibility study.
[6] "*Lead agency* means the agency that provides the [On-scene coordinator]/[Remedial project manager] to plan and implement response actions under the NCP." 40 C.F.R. § 300.5 (2012).

808 F. Supp. 2d 794, 799 (D. Md. 2011) where the MDE asked the plaintiff to test for benzene and subsequently the MDE directed the plaintiff to install a wastewater treatment system designed to remove benzene, in this case, the MDE did not task Marcas with response actions. Marcas cannot deny the gas monitoring wells installed on its property− those same gas monitoring wells which have reported the presence of methane gas at various locations for many years−were installed at the direction of the MDE *without cost* borne by Marcas. Thus the necessity of Marcas' own investigative and monitoring costs has not been demonstrated. "To establish compliance with the NCP, a plaintiff need only show that its remediation was conducted under the aegis of a state environmental agency." *Rococo Assocs., Inc. v. Award Packaging Corp.,* 803 F. Supp. 2d 184, 191 (E.D.N.Y. 2011). Marcas has not met its burden of showing its investigative and monitoring costs were substantially compliant with the NCP. Since Marcas has not established the third element of a claim under 42 U.S.C. § 9607(a), the judgment (liability only) in favor of Marcas as to Count I shall be vacated. Consequently, Marcas' request for summary judgment in its favor on Count I in the amount of $35,751.33 is denied.

2. *Whether Marcas is entitled to summary judgment on Count VI.*

Because it has established the statutory elements of a Resource Conservation and Recovery Act ("RCRA") claim under 42 U.S.C. § 6972(a)(1), Marcas seeks injunctive relief. The County opposes the imposition of any injunctive relief on the grounds that (a) the offending activity, *i.e.,* an actively operating landfill, has ceased and (b) because remediation is underway and has been ongoing, there is nothing for the court to restrain. In its reply Marcas asserts the mere fact that remediation efforts are ongoing does not preclude relief under RCRA. Injunctive relief is appropriate, even if remediation is ongoing, to require a party to install additional remediation systems.

When a cognizable citizen suit has been filed under 42 U.S.C. § 6972(a)(1), a district court has the authority "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste . . . to order such person to take such other action as may be necessary, or both. . . ." 42 U.S.C. § 6972(a)(2). A prohibitory injunction restrains a responsible party from further violating RCRA. A mandatory injunction orders the responsible party to take some action by cleaning up or remediating the hazard. *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 867 F. Supp. 2d 754, 763 (W.D. Pa. 2012); *City of Colton v. American Promotional Events, Inc.*, 824 F. Supp. 2d 1015, 1020-21 (C.D. Cal. 2011); *Spillane v. Commonwealth Edison Co.*, 291 F. Supp. 2d 728, 736 (N.D. Ill. 2003).

Approximately a decade after the County first became aware of methane gas migrating from St. Andrew's Landfill onto Marcas' property, there are still at least two gas monitoring wells detecting methane gas above the LEL on Marcas' property as of January 2013. *See* ECF No. 163-5 at 3 (SALFGW-26 & SALFGW-32). During his deposition on January 9, 2013 George Erichsen, director of DPW&T, conceded the migration of methane gas onto Marcas' property has not been abated.

> Q:     Is it fair to say that currently there are readings in gas wells near the property  - - near or at the property's boundary that equal or exceed 100 percent of LEL for methane gas?
>
> A:     That would be a fair question, and the answer would be, yes, based on my reading of the report.

ECF No. 163-3 at 4 (Erichsen Dep. 18:7-13).

Jason L. Baer, an employee of the Maryland Environmental Service ("MES"), a state agency, is an expert witness for the County. During his April 4, 2013 deposition the following colloquy occurred between counsel for Marcas and Mr. Baer:

Q:     So we know as we sit here today that methane exceeding the LEL has migrated from the landfill onto Marcas's property, right?

A:     Yes.

Q:     Okay.  Can you tell me when methane exceeding the LEL will stop migrating from the landfill on to Marcas's property?

A:     No.  Because I'm currently not able to tell you when the Department will approve the ACM[7] and when the County will approve funds for implementation of the ACM.

ECF No. 171-1 at 7 (Baer Dep. 135:3-13).

40 C.F.R. § 258.23(a)(2) states,

Owners or operators of all MSWLF[8] units must ensure that: The concentration of methane gas does not exceed the lower explosive limit for methane at the facility property boundary.

Landfill gas remediation systems were activated at St. Andrew's Landfill by DPW&T on March 8, 2007 (Area B, Cells 1, 2 & 4) and the week of April 16, 2007 (Cells 3 & 5).  *See* ECF No. 79-57 at 2 (E-mail from Tarr to Wechsler of 7/25/07).  Although these remediation efforts have effectively reduced gas readings below the 100% LEL, methane gas above the LEL continues to migrate onto Marcas' property and/or is present at the boundary of St. Andrew's Landfill.

The Court finds a prohibitory injunction is not an appropriate remedy because the County ceased all operations at the St. Andrew's Landfill as of June 2001.  *See City of Colton*, 824 F. Supp. 2d at 1021.  The Court must now determine whether a mandatory injunction is an appropriate remedy.

Both sides agree the County has implemented a remedial action plan that is ongoing.  Some courts have held a mandatory injunction is not necessary when a remedial action plan is in

---

[7] Assessment of Corrective Measures.
[8] Municipal Solid Waste Landfill.

place.  *See, e.g., Trinity Indus.*, 867 F. Supp. 2d at 764.  This however is not the only basis for determining whether a mandatory injunction is warranted.  "Even where an approved remediation plan exists, and remediation activities are taking place pursuant to that plan, a party may still advance a claim under the Act to require a defendant to install additional remediation systems, or to perform remediation activities that the original party has not yet undertaken." *Keller Transp. Inc. v. Wagner Enters., LLC*, 873 F. Supp. 2d 1342, 1351 (D. Mont. 2012).  At his April 4, 2013 deposition the County's own expert witness, Mr. Baer, declares there is more that can be done to abate the methane gas migration.

> Q:     So in simple terms, if the methane level exceeds a lower explosive limit at the County's boundary, the County is not in compliance with the regulations, correct?
>
> A:     That would be correct.
>
> Q:     And currently the County is not in compliance with the regulations, correct?
>
> A:     That is correct.
>
> Q:     And that's been the case now for several years, correct?
>
> A:     It has been, unfortunately.
>
> *                              *                              *
>
> Q:     Now, you mentioned you would like to see the gas extraction system expanded and enhanced.
>
> A:     Yes.
>
> Q:     How would you like to see it expanded and enhanced?
>
> A:     I don't have the plans in front of me, but currently under the ACM, MES proposed the installation of out-of-waste gas extraction wells in an alignment along the northern and eastern property boundaries that abut the Marcas property.

It was our intent to extract gas from those locations. And, again, I apologize, I can't specifically show you where those are because I don't have that document in front of me, but the intent is to extract gas from those locations and send that gas to the same treatment unit currently employed for the in-waste extraction wells in area B.

Q:      And I take it at least one of the reasons why you would like to add those additional wells is to hopefully stop the migration of methane gas onto the Marcas property, correct?

A:      Yes.

Q:      Okay.

A:      However, we've also determined that it is a likely scenario that the removal of the gas will result in the remediation of the low level VOCs present in the groundwater on the County property and the Marcas property.

So the installation of the landfill gas remediation system and subsequent enhancements of it, it's really a twofold goal of not only achieving compliance with the federal and state standards for landfill gas, but for achieving compliance with the federal requirements for groundwater at a landfill site.

Q:      I understand. So at the present time, the County is not in compliance with the federal and state standards for landfill gas or groundwater, but you would like to take additional action to try to get into compliance?

A:      That is the case, yes.

ECF No. 171-1 at 4-6 (Baer Dep. 120:12-22, 122:4-123:22).

Although Mr. Baer, on behalf of MES, makes recommendations to the County about remedial actions, the County decides which remedial actions to implement.

Q:      I guess what I'm trying to get at is, when it comes to taking action on the landfill to try to remediate it, who makes the decisions, the County or MES?

A:      The County does ultimately as the entity that's paying for that service. We provide recommendations. But we don't have the decision to actually initiate action.

> Q:    The County ultimately decides what action to initiate?

> A:    Correct.

*Id.* at 3 (Baer Dep. 18:12-22).

The County's role as the decision maker is verified by a February 4, 2005 letter from Martha Hynson of the MDE to Mr. Erichsen, Director of DPW&T.   "[I]t is the *County's decision*, with notification to the Department, which steps to implement to protect human health from the migration of methane from the landfill.   The County *is responsible to implement additional remediation plans if the initial steps prove insufficient to protect human health*."   ECF No. 76-10 at 3 (emphasis added); ECF No. 79-15 at 3 (emphasis added).

In its opposition the County notes "remediation at the site is ongoing and is being conducted under the direction and supervision of MDE."   ECF No. 168 at 15.   The County further argues an injunction is not appropriate "when the site is already being remediated under the supervision of the state agency."   *Id.* at 16.   What the County fails to acknowledge is *its role as the decision maker*.   Although a state agency, MES, makes recommendations and although another state agency, the MDE, supervises, reviews and approves the County's remediation efforts, the County *ultimately decides* what remedial plan to implement.

The County was aware of the migration of methane gas as early as 2004, implemented a remediation system in 2007 and today, in 2013, methane gas continues to exceed the LEL at the boundary of St. Andrew's Landfill is violation of 40 C.F.R. § 258.23(a)(2).   The County's *own expert witness* has recommended additional remediation measures which the County has not implemented.   The Court therefore finds, due to the continual migration of methane gas from St. Andrew's Landfill more than a decade after operations at the facility were terminated, additional

remediation plans must be considered and a mandatory injunction is warranted and appropriate under these circumstances.

The injunctive relief this Court intends to provide Marcas is not redundant because the County will be required to implement *additional* remediation measures beyond what is presently in place and as recommended by its own expert witness from MES. This case is distinguishable from *Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408 (S.D.N.Y. 2000) because in the *Christie-Spencer* case the plaintiffs did not present "any evidence that further remediation measures are necessary." *Id.* at 420. In this case Mr. Baer explained in detail the benefits of the additional remediation measures he recommends.

Marcas did not submit a proposed order with its cross-motion for partial summary judgment listing in detail the specific injunctive relief it seeks. The Court therefore directs the parties to submit a jointly proposed injunctive order. If the parties cannot agree on the terms of a proposed injunctive order, then each party must submit a proposed injunctive order. The jointly proposed order or separately proposed orders are due within twenty (20) days of the accompanying Order.

The Court shall enter summary judgment in favor of Marcas as to Count VI (RCRA claim) as to the County's violation of 40 C.F.R. § 258.23(a)(2) *only*. Because there is a dispute about a possible violation of 40 C.F.R. § 258.25, judgment is not entered as a matter of law in Marcas' favor as to this section. The Court previously found against Marcas on Count VI as to an alleged violation of 40 C.F.R. § 258.61(a)(4). *See* ECF No. 107 at 90-98.

*3. Whether Marcas is entitled to summary judgment on Count VII.*

Marcas argues, because it has satisfied the four elements of a RCRA claim pursuant to 42 U.S.C. § 6972(a)(1)(B), it is entitled to summary judgment as to Count VII. The County opposes

the entry of summary judgment in favor of Marcas. The County asserts Marcas has failed to establish a necessary element of a RCRA claim under § 6972(a)(1)(B), namely, the hazardous waste is an imminent and substantial endangerment to the health or the environment.

The operative language for commencing a civil suit under § 6972(a)(1)(B) is "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which **may present an imminent and substantial endangerment to the health or the environment**[.]" Emphasis added. The County's own employee and own expert witness admit methane gas exceeding the LEL is present at the boundary of St. Andrew's Landfill. As the MDE, the agency supervising the remediation efforts, advised the County in 2005,

> This Department has been working with the County for some time to remedy the migration of methane gas and volatile organic and inorganic compounds from the landfill. As you are aware, 40 CFR 258.20 governs the operating criteria, including explosive gases control and access requirements, for municipal solid waste landfills and requires that you take immediate steps to protect human health from potentially explosive conditions from the migration of methane gas from the landfill.
>
> *                    *                    *
>
> Your letter states that the County will monitor the methane control systems and based on the Department's review and recommendation, make modifications to the systems. Please be advised, the Solid Waste Program is concerned about possible gas generation and migration from landfills into facility structures and across property boundaries. As you are aware, such migration can cause potential risks to on-site structures, neighboring homes, pedestrians, businesses and properties. The Department believes that continued and intensified gas monitoring of the landfill is needed to minimize the potential for risks caused by gas generation and migration. You must guard against any problems that may result from gas generation and migration into facility structures or across property lines. In accordance with the federal regulations,

> the County must immediately take all necessary steps to protect
> human health from potentially explosive conditions from the
> migration of methane gas from the landfill.

ECF No. 76-10 at 2, 3; ECF No. 79-15 at 2, 3.  Consistent with *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485-86 (1996), Marcas has demonstrated the methane gas migrating from the landfill *may present* an imminent and substantial endangerment to health or the environment as required by § 6972(a)(1)(B).

The facts of this case are distinguishable from the cases the County cites in its opposition. In *Leister v. Black & Decker, Inc.*, No. 96-1751, 1997 U.S. App. LEXIS 16961, at *9 (4th Cir. Jul. 8, 1997), the Fourth Circuit affirmed the dismissal of the Leisters' RCRA claim because, with the installation of the filtration system, there was no longer a threat to health from drinking the well water.  The filtration system abated the level of organic compounds below detectable levels.  Similarly, in *Birch Corp. v. Nevada Investment Holding, Inc.*, No. 97-55282, 1998 U.S. App. LEXIS 14923 (9th Cir. Jun. 29, 1998), the Ninth Circuit found the contamination did not present an imminent and substantial endangerment to the health or the environment in that case. This determination was based on the testing conducted by Birch's own environmental consultant who found no significant health risk existed as well as another expert who likewise found no significant risk level.  Additionally, Birch's own attorney acknowledged in a letter to a regulatory agency that Birch's remediation activities and assessment "'have led to the inescapable conclusion that the contamination poses no risk to any source of drinking water nor does it pose a health risk.'"  *Id.* at *7.  Finally in *Scotchtown Holdings LLC v. Town of Goshen*, No. 08-CV-4720, 2009 U.S. Dist. LEXIS 1656 (S.D.N.Y. Jan. 5, 2009), the plaintiff alleged contamination to land it owned, and intended to develop for residential purposes, due to repeated use of road salt containing sodium chloride to remove snow and ice from the highways.  This

repeated application of road salt caused the groundwater beneath the land to exceed the level for safe consumption by humans. The plaintiff had to abandon its plans for residential development. The Southern District of New York determined the road salt is not an imminent and substantial endangerment to the health or the environment. "The purported endangerment to health of future occupants is not actionable under RCRA because, under Plaintiff's own theory, the harm posed by the sodium chloride will never occur. If indeed the ground water is contaminated, as Plaintiff alleges, it will never be approved for human consumption, as Plaintiff also alleges." *Id.* at *7-8.

Unlike the unsafe level of sodium chloride in the groundwater in *Scotchtown Holdings* which was not *presently* an imminent and substantial endangerment to the health and the environment since the land would not be approved for residential development, in this case, the migrating methane gas at levels above the LEL is a present imminent and substantial endangerment to the health or the environment *irrespective* of the planned construction of residential and/or commercial buildings on Marcas' property. The County is well aware of the serious nature of the migrating methane gas. As Ms. Hynson of the MDE reminded Mr. Erichsen, Director of DPW&T, "the federal regulations require that you take immediate corrective measures to protect human health from potentially explosive conditions from the migration of methane gas from the landfill." ECF No. 79-16 at 2. Moreover, John P. Norris, III, County Attorney, acknowledged the County's responsibility for remediating the methane gas in a January 10, 2005 letter to Marcas' counsel, stating in pertinent part,

> I reiterate that the County will continue to pursue the investigation and remediation of the landfill gas migration occurring from the St. Andrews Landfill in accordance with applicable federal and state law and as directed by MDE. It will continue to rely on the advice of the Department of Public Works and Transportation, its environmental consultants and Maryland Environmental Services, as well as the recommendations of MDE. The remedies selected and implemented will be more than adequate to protect your

> client's current property interests. The County readily accepts its responsibility to safeguard its residents; it has the obligation to stop the migration of methane (and various Volatile Organic Compounds, "VOCs" in the ground water) from beyond County boundaries and to control the methane extraction safely within its property, all in accordance with MDE requirements.

ECF No. 76-31 at 3; ECF No. 79-30 at 3.

Despite the County's efforts to date, that migration continues unabated in certain locations. The imminent and substantial endangerment to the health and the environment remains. The Court therefore finds Marcas has established the elements of a RCRA claim under 42 U.S.C. § 6972(a)(1)(B).

The Court however declines to enter summary judgment in favor of Marcas as to Count VII. In the Memorandum Opinion of September 28, 2011 the Court noted it confronted an issue not raised by either party, namely, whether Maryland's hazardous waste management program supersedes federal law. *See* ECF No. 107 at 63-65. Since the Court lacked sufficient information to determine whether the alleged violations by the County under Subchapter III/Subtitle C of RCRA fell within the purview of Maryland or the purview of the EPA under the "dual State/Federal regulatory program in Maryland," the Court held in abeyance its ruling on Count VII. Neither party has addressed this specific issue in the cross-motions, oppositions or replies. The Court therefore continues to hold in abeyance its ruling on Count VII.

## CONCLUSION

For the above reasons, the County's motion for partial summary judgment will be granted. Marcas' motion for partial summary judgment will be granted in part, denied in part and held in abeyance in part. An Order will be entered separately.

Date: <u>July 25, 2013</u>           _____/s/_____
                                             WILLIAM CONNELLY
                                 UNITED STATES MAGISTRATE JUDGE